**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (SBN 4154324) (*pro hac vice*)
Christine M. Fox (SBN 2704641) (*pro hac vice*)
James M. Fee (SBN 5426168) (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477

*Attorneys for Co-Lead Plaintiffs Boston Retirement System, Central Pennsylvania Teamsters Pension Fund-Defined Benefit Plan, Central Pennsylvania Teamsters Pension Fund-Retirement Income Plan 1987, and Lead Counsel for the Proposed Class*

[additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO VAZQUEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MASIMO CORPORATION, JOSEPH KIANI, MICAH YOUNG, BILAL MUHSIN, and ELI KAMMERMAN<br><br>Defendants. | Case No. 3:23-cv-01546-L-DEB<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

I.      NATURE OF THE ACTION............................................................................. 1

II.     JURISDICTION AND VENUE.................................................................... 10

III.    PARTIES................................................................................................. 11

        A.      Lead Plaintiffs................................................................. 11

        B.      Defendants...................................................................... 11

        C.      Relevant Third Parties – Confidential Witnesses ................................. 13

                a.      Legacy Masimo Healthcare Former Employees............... 13

                b.      Legacy Sound United Former Employees....................... 17

IV.     SUBSTANTIVE ALLEGATIONS OF FRAUD ............................................ 18

        A.      Overview of Masimo's Business........................................... 18

                1.      Masimo's Healthcare Business Segment.................................... 18

                2.      Masimo's Non-Healthcare Business Segment........................... 18

                3.      Masimo's Acquisition of Sound United ................................... 19

        B.      Summary of the Fraud ......................................................... 21

                1.      Masimo Announces the Sound United Acquisition and
                        Quickly Closes the Deal Despite Multiple Internal
                        Objections.................................................................... 21

                2.      Sound United Held Significant Inventory That Grew and
                        Aged While Its Sales Were Slowing Under Masimo's
                        Ownership During the Class Period ........................................... 22

                3.      Masimo Failed to Disclose Ineffective Internal Controls
                        Over Financial Reporting and Disclosure Control
                        Procedures During the Class Period ........................................... 24

                        a.      The Importance of Disclosure Controls and
                                Procedures and Internal Controls Over Financial
                                Reporting, as Governed by SEC Rules.............................. 25

i

4.  Sound United's Fraudulent Inventory and Cost of Goods
    Sold Accounting ........................................................................ 32

    a.  Former High Level Accounting Employees Confirm
        the Culture of Fraudulent Accounting Practices and
        Weak Internal Controls at Sound United Continued
        Under Masimo's Ownership ............................................. 35

    b.  Under Defendant Young's Oversight, Legacy Sound
        United Continues Its Use of "Plugs" to Balance Its
        Books.................................................................................. 46

    c.  Defendant Young Rehires Former Crony With No
        Experience or Training in Consolidation Platform He
        Is Tasked to Rebuild for Legacy Sound United and
        Young Makes Journal Entries in Platform During
        Class Period ..................................................................... 48

    d.  CW-14, Former Vice President Finance & Global
        Controller at Masimo Consumer Refuses to Sign
        SOX Sub-Certification for Masimo Due to Concealed
        Losses and SOX Violations at Legacy Sound United
        and Is Fired As a Result ................................................... 49

5.  Defendants Fail to Integrate Sound United Following
    $1.025 Billion Acquisition .......................................................... 51

6.  Defendants Possess Access To and Regularly Review
    Information Related to Masimo's Healthcare Segment
    During the Class Period .............................................................. 53

7.  Defendants Set Unrealistic Budgets and Sales Targets for
    Masimo Despite Declining and Moribund Device Sales
    Outside of the Company's Core Pulse Oximetry Business ......... 54

    a.  The Individual Defendants Push Unrealistic Sales
        Goals and Unachievable Budgets in Weekly and
        Monthly Meetings in Which They Participated................ 55

    b.  Masimo's Healthcare Business Has Barely Any Sales
        Outside of "Core" SET Pulse Oximetry Business ........... 59

ii

          c.    To Push Excess Inventory on Customers, Masimo
Directs Its Healthcare Sales Force to Offer Sizeable
Discounts ............................................................................ 69

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................. 71

    A.    May 3, 2022 – Earnings Press Release, Form 10-Q for Q1 2022,
Earnings Call ..................................................................... 72

        1.    Q1 2022 Earnings Release ....................................... 72

        2.    Q1 2022 Form 10-Q ................................................ 73

        3.    Q1 2022 Earnings Call ............................................ 74

    B.    August 9, 2022 – Q2 2022 Press Release and Earnings Call ............... 77

        1.    Q2 2022 Earnings Release ....................................... 77

        2.    Q2 2022 Earnings Call ............................................ 79

    C.    August 10, 2022 – Q2 2022 Form 10-Q ............................... 82

    D.    November 8, 2022 – Q3 2022 Press Release and Earnings Call .......... 82

        1.    Q3 2022 Earnings Release ....................................... 82

        2.    Q3 2022 Earnings Call ............................................ 83

    E.    November 9, 2022 – Q3 2022 Form 10-Q ........................... 84

    F.    November 15, 2022 – Stifel Healthcare Conference ...................... 84

    G.    December 13, 2022 – Masimo 2022 Analyst/Investor Day ................. 87

    H.    January 11, 2023 – J.P. Morgan Healthcare Conference ..................... 89

    I.    February 28, 2023 – Press Release Announcing Q4 2022 Results
and Full-Year Guidance for 2023 .......................................... 90

        1.    February 28, 2023 – Q4 2022 Earnings Release ........................ 90

        2.    February 28, 2023 Earnings Call ............................... 90

    J.    March 1, 2023 – Q4 2022 and Full-Year 2022 Form 10-K .................. 91

iii

K.    May 9, 2023 – Press Release Announcing Q1 2023 Results ............... 92

L.    May 9, 2023 – Q1 2023 Earnings Call ................................................ 92

M.    May 10, 2023 – Q1 2023 Form 10-Q .................................................. 93

N.    June 8, 2023 – Jefferies Healthcare Conference ................................ 93

VI.  THE TRUTH EMERGES ................................................................... 94

A.    July 17, 2023 – Preliminary Q2 2023 Announcement ......................... 94

B.    August 8, 2023 – Q2 2023 Earnings Press Release, Form 10-Q,
      and Earnings Call ............................................................................ 97

VII.  ADDITIONAL INDICIA OF SCIENTER ....................................................... 99

A.    The Individual Defendants' Close Personal Monitoring of
      Masimo's New Sales and Accounting Metrics Support That They
      Had Actual Knowledge or Were Reckless in Not Knowing About
      Sputtering Demand for Non-Pulse Oximeter Products and
      Ballooning Inventory .....................................................................100

B.    The Magnitude of the Sound United Acquisition, Defendants'
      Knowledge of the Market's Reaction to the Announcement of the
      Acquisition, and Defendants' Knowledge, Throughout the Class
      Period, of Severe Internal Control Issues at Legacy Sound United......101

C.    Defendants Required Senior Level Employees to Sign
      Certifications Attesting Those Employees Did Not Suspect Any
      Irregularities in Masimo's Financial Reporting and Fired at Least
      One Employee Who Raised Objections .............................................101

D.    The Demand for Masimo's Healthcare and Non-Healthcare
      Products and Their Respective Revenue Generation Were Critical
      to the Company's Core Operations .................................................102

E.    Corporate Scienter .......................................................................103

VIII. LOSS CAUSATION.............................................................................104

IX.  CONTROL PERSON ALLEGATIONS .........................................................106

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-
      THE-MARKET DOCTRINE................................................................106

iv

XI.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR..........108

XII.    CLASS ACTION ALLEGATIONS.................................................109

XIII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .........................111

Lead Plaintiffs Boston Retirement System, Central Pennsylvania Teamsters Pension Fund-Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund-Retirement Income Plan 1987 (together, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Lead Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys. The investigation included, among other things, review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Masimo Corporation ("Masimo" or the "Company"); (ii) Company press releases and conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports and media reports about the Company; (v) public court dockets and filings; (vi) interviews with former employees of Masimo with knowledge of the matters alleged herein[1]; (vii) internal Masimo documents in Lead Plaintiffs' possession; and (viii) consultation with experts in the areas of accounting, loss causation, and damages. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the proposed class (the "Class") they seek to represent, Lead Plaintiffs allege as follows.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of the Class consisting of all persons and entities, other than those excluded by definition, that purchased or otherwise acquired the publicly traded common stock of Masimo during the period from May 4, 2022 through August 8, 2023, inclusive (the "Class Period"), and were damaged thereby.

---

[1] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2). All CWs will be described in the masculine to protect their identities.

2. The Action seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder against: (i) Masimo; (ii) Masimo's founder, Chief Executive Officer ("CEO"), and Chairman of the Masimo Board of Directors ("Chairman") Joseph Kiani; (iii) Masimo's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") Micah Young; (iv) Masimo's Chief Operating Officer ("COO") Bilal Muhsin; and (v) Masimo's Vice President of Business Development and Investor Relations Eli Kammerman (collectively, "Defendants").

3. This Action arises out of Defendants' dissemination of materially false and misleading statements and concealment of adverse facts related to Masimo's two core businesses – its traditional healthcare unit and its new Sound United acquisition (non-healthcare unit). First, Masimo misled the market about the healthcare division's inability to introduce successful new products to the marketplace that would support Defendants' revenue forecasts during the Class Period. Defendants also concealed that the healthcare business was accumulating excessive inventory of single-use sensors – a key driver of the Company's financial success – as customers shifted their preferences to using reusable sensors in many care settings to reduce costs.

4. Second, Masimo misled the market about the Company's non-healthcare business – Sound United. Despite purchasing Sound United for $1.025 billion in cash, and touting synergies and expansion opportunities for the combined companies, Defendants failed miserably in integrating the acquisition and lied about it. Defendants failed to disclose a known and pervasive lack of internal controls and inadequate accounting practices that hindered Masimo's Sound United business and presented significant obstacles to a successful integration. Moreover, Defendants hid Sound United's ballooning inventory costs which prevented it from investing in new products. Even by the end of the Class Period, Masimo was nowhere near successfully integrating the legacy Sound United business into the Company. When the truth about Defendants' declining business in both of its two core segments was revealed to the

2

1    market in a series of disclosures, Masimo stock price declined precipitously,
2    eventually closing at $113.62 per share by the end of the trading week following the
3    second disclosure in early August 2023, down *42.6%* from the Class Period high of
4    $198.00 per share on April 21, 2023.

5         5.    Since Defendant Kiani founded the Company in 1989, Masimo has been
6    focused on providing patient monitoring technologies for use in hospital settings.
7    Masimo's most successful technology is the market-leading Signal Extraction
8    Technology ("SET") pulse oximeter product.  During the Company's 2022 Investor
9    Day, Kiani spoke about the SET pulse oximetry business and said "[W]e just can't
10   screw it up."  In addition to the pulse oximetry suite of products, Masimo has other
11   offerings in the healthcare space, but none has ever achieved widespread adoption like
12   SET, which, prior to the Class Period, accounted for upwards of 90% of Masimo's
13   revenues.

14        6.    During the COVID-19 pandemic, Masimo's profile and stock price soared
15   to new heights as hospitals overflowed with patients and the public became more
16   focused on monitoring health indicators, including monitoring blood oxygen levels.
17   Measuring blood oxygen levels is precisely what Masimo's reliable and market-leading
18   SET pulse oximetry technology does.  Pandemic-driven increased adoption and home
19   use of the pulse oximeter propelled Masimo and its stock price to levels that Defendants
20   had only dreamed of prior to the worldwide public health emergency.

21        7.    At the same time Masimo was experiencing its unprecedented growth, the
22   pandemic proved to be an unexpected, *yet temporary*, boon for companies operating in
23   other market segments uniquely positioned to benefit from a public health emergency
24   and stay-at-home orders.  One such company was Sound United,[2] a manufacturer and
25   distributor of audio equipment with well-known brands such as Bowers & Wilkins,
26   Marantz, Denon, and Polk, among others.  Because many people were working from

---

[2] Sound United was then owned by Viper Holdings Corporation.

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

1  home and spending more time in their residences than before the onset of the pandemic,
2  people began splurging on luxury items and accessories to use at home.  Sound
3  United's portfolio of audio equipment – for home theaters or general music listening—
4  were just such products.

5          8.      As the pandemic waned with the availability of vaccines, hospitals'
6  patient populations declined, and governments lifted stay-at-home orders, businesses
7  like Masimo and Sound United faced a future with revenues below the boom times of
8  the pandemic era.

9          9.      Knowing that Masimo's core pulse oximetry business was incapable of
10  maintaining the new heights his Company had reached, Defendant Kiani, and his loyal
11  lieutenants, Defendants Micah Young, and Bilal Muhsin, began searching for new
12  opportunities to grow the Company.

13          10.     Before the Class Period, on February 15, 2022, Masimo announced that it
14  had entered into an agreement to acquire Sound United for a staggering $1.025 billion
15  – the largest-ever deal in the Company's history.  The all-cash deal for Sound United
16  represented an aggressive pivot for Masimo to focus on in-home consumer audio,
17  rather than in-hospital, patient monitoring though the rationale and prospects for the
18  merger left many investors perplexed, with some outright skeptical about the value
19  such a large acquisition of a company from a completely different industry – consumer
20  audio products – would bring, if any at all.  For example, analysts at Piper Sandler &
21  Co. ("Piper Sandler") published an article on February 16, 2022 titled, "*Downgrade to
22  Neutral – Too Many Questions on Sound United Acquisition*," and wrote "The long-
23  term thesis we've had on shares of MASI – safe, predictable, and with minimal
24  operational risk – seems to be altered for the time being in the eyes of investors."  The
25  Piper Sandler analysts continued, "We don't yet have good answers on why Sound
26  United was the right asset for MASI," and "[w]e also can't help but worry (or at least
27  wonder) about what types of unknowns are looming as MASI ventures outside its core
28  competencies[.]"

4

11.    Even as multiple consultants hired by Masimo advised Defendant Kiani not to proceed with the deal, and undeterred by investors' overwhelming disapproval of the acquisition, Defendant Kiani pushed forward and Masimo closed the transaction to buy Sound United on April 12, 2022.  In a press release announcing the deal's closing, Kiani said, "We are thrilled to add Sound United's premium technology, established consumer channels, and well-known brands to Masimo's broad portfolio of hospital and home medical technology solutions."  Kiani continued, "Masimo will leverage Sound United's expertise across consumer channels to accelerate distribution of the combined company's expanding portfolio of consumer-facing healthcare products."

12.    The Class Period begins on May 4, 2022—the first trading day after Masimo's post-market close earnings announcement for the first quarter of 2022 on May 3, 2022.  The Q1 2022 earnings announcement was the first to include statements about Sound United following Masimo's acquisition of the consumer audio company. On May 3, 2022, Defendants touted the prospects for growth in Masimo's healthcare business and heralded the Sound United acquisition as accretive to the Company's success.  Specifically, Defendant Kiani stated, "*We experienced strong demand for our products during the quarter* while facing some unexpected supply chain challenges."  Kiani also said that Masimo is "*deeply engaged in combined efforts [with Sound United] to generate some exciting new products launches in consumer health & wellness*."

13.    Throughout the Class Period, Defendants continued to make false and misleading statements and omissions about Masimo's healthcare business and the status of the Sound United integration.  For example, concerning the healthcare business segment, Defendant Young claimed that Masimo's new approach with five-year term contracts "*will give a nice tailwind over the next 5 years*," even though Young knew Masimo's sales force were facing reluctance from customers who did not want to lock in to contracts for such a long period of time, especially after the extreme

5

volatility and fluctuation in demand the Company had just experienced during the COVID-19 pandemic.

14.    With respect to Sound United, Defendants made numerous false statements.  For instance, Defendant Kiani claimed that one of the "several reasons" Masimo bought Sound United "*is their management team*," even though he fired Sound United CEO Kevin Duffy ("Duffy") less than three months after the deal closed, and fired several other senior members of Sound United's leadership team.  Similarly, with respect to the decimation of Masimo's market capitalization following the announcement of the Sound United deal in February 2022, Kiani claimed, "*It definitely surprised me.  I couldn't have imagined the way some of the investors reacted*," even though multiple consultants told Kiani not to pursue or close the deal.  Additionally, falsely representing the financial state of Sound United, Defendant Young claimed that Sound United "*just happened to be a company that had pretty good financial metrics and they were immediately accretive to earnings*," even though legacy Sound United accounting personnel told Young directly of serious problems with Sound United's ability to track inventory, its weaknesses in its internal controls, and the extensive use of "plugs" to manipulate Sound United's quarterly revenue figures to meet targets.  Perhaps most brazenly of all, in February 2023, Defendant Kiani claimed that "*We've already completed the integration of Sound United*," despite reports from high-level former employees that, at best, the integration was "embryonic" by the time the Class Period ended in August 2023.

15.    Additionally, throughout the Class Period, accounting personnel at legacy Sound United raised serious concerns directly to Defendant Young regarding the quality of Sound United's accounting practices and the extreme weaknesses in Sound United's internal controls.  Yet, Defendants ignored these warnings and encouraged fraudulent accounting practices.  Indeed, Defendants were so committed to maintaining the facade of success for the Sound United deal that when CW-14, a senior accounting employee, refused to sign a SOX sub certification in March 2023 because Sound

6

United's financial reporting contained hidden costs and manipulated profits due to material weaknesses in Sound United's internal controls, Defendants found another employee to sign in CW-14's stead and fired CW-14 in retaliation.

16.    Defendants' statements during the Class Period touting the healthcare segment's prospects for success and the integration of Sound United into Masimo as a brand-new consumer division were materially false and misleading when made in that Defendants failed to disclose the following adverse facts, among others, which Defendants knew or recklessly disregarded:

(a)    Masimo's healthcare sales team was experiencing severe difficulty selling Masimo devices outside of the core SET pulse oximetry devices because, as confirmed by former employees: (i) the devices did not have approval for all patient populations; (ii) customers preferred competitor's products; and (iii) Masimo's products did not perform well enough to meet the needs of the Company's target customers, including problems such as poor battery-life;

(b)    During the Class Period, the Company had begun offering larger "discounts" to customers (sometimes in the form of extra sensors above the amount in customer contracts or orders), leading to overstuffed sensor inventory at Masimo's customers and cannibalizing future sensor demand;

(c)    Legacy Sound United's accounting practices were riddled with irregularities and fraudulent entries (including the use of "plugs" to balance and close its books which inflated the Company's overall financial results), and internal control problems (including with respect to inventory and expenses that were stifling Sound United's ability to grow and invest in new products);

(d)    The integration of Sound United was not progressing in any meaningful way as the two segments (healthcare and legacy Sound United) remained almost completely segregated throughout the Class Period;

(e)    Masimo's budget forecasts were not tethered to realistic numbers but instead to targets Defendants knew were unattainable because they were based off

7

1    of record years for both business segments during unique circumstances driven by the

2    COVID-19 pandemic in 2021, so Defendants pushed salespeople to offer products with

3    discounts in order to appear to achieve targets; and

4              (f)    As a result, Masimo would ultimately be forced to reveal that the

5    Company's revenues were far below what Defendants forecasted due to declining

6    sales, ballooning inventory, the Company's unreliable accounting processes, and total

7    failure to integrate the legacy Sound United business.

8         17.    Former Masimo employees from its healthcare segment salesforce

9    confirm that various Masimo products were experiencing "very few" and "no" sales as

10   hospitals adjusted to lower patient levels as the pandemic subsided and eventually

11   ended.  For instance, CW-3 recalled that he did not sell any Masimo SafetyNet Alerts

12   during his twelve-month tenure and referred to the device as a "complete bust."

13   According to CW-7, based on his interaction with doctors, there was not any or much

14   interest in Masimo's peri-op products and "not one" product was sold while he was

15   employed at the Company.  According to CW-1, throughout his tenure at Masimo, very

16   few softFlow systems were sold, not just in his territory but anywhere in the U.S.

17   Likewise, CW-10 stated that he did not sell any devices during his tenure.

18        18.    Additionally, Masimo accounting personnel in the legacy Sound United

19   business relay that basic internal controls were "no present" and that the accounting

20   process was "not rational" as it consisted of a number of confusing and aging platforms

21   that rendered the process inefficient and cumbersome.  But even more alarming, CW-

22   14 recalled that inventory value was being artificially inflated with inflated costs,

23   including at least $5 million in miscalculation/inflation as of January or February 2023.

24   CW-14 also indicated that monthly inventory adjustments of $4-6 million were made

25   on a monthly basis to "balance" the books as a result of consolidation system issues

26   that remained unresolved.

27        19.    CW-15 recounted how from the time he joined Masimo, he was

28   consistently trying to get CFO Micah Young's attention in order to raise the internal

8

controls issues he had identified at legacy Sound United, but CFO Young repeatedly ignored his emails and outreach. Additionally, CW-15 relayed that the integration of Sound United was at best "embryonic" at the end of the Class Period in August 2023 and that employees throughout the organization "failed to understand" the Company's strategy in acquiring a consumer audio firm, especially when multiple consultants told Defendant Kiani not do go through with the deal.

20. The truth became known through two disclosures in summer 2023 made in connection with Masimo's financial reporting for the second quarter of 2023.

21. First, on July 17, 2023, after the market closed, Defendants unexpectedly preannounced earnings and revealed that the Company was revising its guidance downward due to a projected earnings and revenue miss for both the healthcare and non-healthcare (*i.e.*, legacy Sound United) segments. Specifically, for the second quarter of 2023, the preannouncement revealed that Masimo was lowering its consolidated revenue target range to $453 million to $457 million, with healthcare revenue expected to range from $280 million to $282 million and non-healthcare revenue to range from $173 million to $175 million. Masimo also announced that it was lowering its full year guidance for the legacy Sound United business to $800 to $850 million from $965 million to $995 million, adjustments of $165 million to the low end and $145 million to high end, respectively.

22. The Company's press release announcing the shortfall singled out declining single-patient use sensor sales, fewer conversions of new customers, and the decline of demand for premium and luxury audio products. Over the next two trading days, Masimo's stock price declined precipitously, from a closing of $147.16 on July 17, 2023 to $112.28 by the market's close on July 19, 2023. In total, Masimo stock's two-day slide amounted to a nearly ***24% percent drop***.

23. Three weeks later, on August 8, 2023 after the market closed, Masimo released its second quarter 2023 earnings report, confirming the revenue and earnings miss previewed in the July preannouncement and revealing that the Company's full

9

year consolidated revenue guidance was being reduced from a range of $2.45 billion to $2.46 billion to a range of $2.1 billion to $2.2 billion, while also reducing the high-end of the Company's healthcare guidance from $1.415 billion to $1.350 billion and maintaining the low end of the healthcare guidance at $1.3 billion.  Additionally, the Company revealed that it would be implementing a $100 million reduction in expenses in response to the shortfall.  This news caused the stock price to decline, from a closing price of $120.00 per share on August 8, 2023, to $117.96 per share on August 9, 2023.  This drop represented an approximately *2% decline* in the value of Masimo's common stock.

24.    As a result of the Defendants' wrongful acts and omissions with respect to (i) Masimo's ability sustain its revenue and earnings growth, (ii) Masimo's ability to integrate Sound United into the Company, and (iii) the precipitous decline in the value of Masimo's stock price, once Defendants' wrongful acts and omissions were revealed, Lead Plaintiffs and other Class members suffered significant losses.

## II.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act, 15 U.S.C. §78aa.

27.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Masimo transacts business in California, including in this District.  Further, during the Class Period, Masimo's securities traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MASI."

28.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

10

## III.    PARTIES

### A.    Lead Plaintiffs

29.    Lead Plaintiff Boston Retirement System ("BRS") purchased shares of Masimo common stock during the Class Period and was damaged thereby.  *See* Ex A. BRS is a government defined benefit plan with approximately $6.4 billion in assets under management overseen for the benefit of more than 34,000 members and their beneficiaries.

30.    Lead Plaintiff Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan (the "CPTPF Defined Benefit Plan") purchased shares of Masimo common stock during the Class Period and was damaged thereby.  *See* Ex. B.  The CPTPF Defined Benefit Plan is a multiemployer defined benefit pension plan with $1.2 billion in investments that it oversees for the benefit of more than 27,000 participants and their beneficiaries.

31.    Lead    Plaintiff    Central    Pennsylvania    Teamsters    Pension Fund – Retirement Income Plan 1987 (the "CPTPF Retirement Plan") purchased shares of Masimo common stock during the Class Period and was damaged thereby. *See* Ex. C.  The CPTPF Retirement Plan is a multiemployer defined contribution pension plan with over $900 million in investments that it oversees for the benefit of more than 9,000 participants and their beneficiaries.

### B.    Defendants

32.    Defendant Masimo is a Delaware corporation with its headquarters located at 52 Discovery, Irvine, California 92618.  Masimo is a technology company that is divided into two discrete segments: (1) healthcare; and (2) non-healthcare.[3] According to Masimo's 2023 Form 10-K, its "healthcare business develops, manufactures and markets a variety of noninvasive patient monitoring technologies,

---

[3] For the first thirty years of its existence since its founding in 1989, Masimo was strictly a medical technology company.  In April 2022, Masimo acquired audio equipment manufacturer Sound United in an attempt to expand the scope of its business.

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

hospital automation and connectivity solutions, remote monitoring devices and consumer health products." Masimo's "non-healthcare consumer audio business develops, manufactures, markets, sells and licenses premium and luxury audio, and related integration technologies." During the Class Period, Masimo's common stock traded on NASDAQ under the ticker symbol "MASI."

33.    Defendant Joseph Kiani ("Kiani") founded Masimo in 1989. Kiani was, at all relevant times, Masimo's founder, CEO, and Chairman.

34.    Defendant Micah Young ("Young") was, at all relevant times, Masimo's CFO.

35.    Defendant Bilal Muhsin ("Muhsin") was, at all relevant times, Masimo's COO. Prior to his role as COO, Muhsin was the EVP of Engineering, Marketing, and Regulatory Affairs, following several Engineering leadership roles in his more than twenty years at the Company.

36.    Defendant Eli Kammerman ("Kammerman") has served as Vice President, Business Development and Investor Relations since 2009.

37.    Defendants Kiani, Young, Muhsin, and Kammerman are sometimes referred to herein as the "Individual Defendants."

38.    The Individual Defendants possessed the power and authority to control the contents of Masimo's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Masimo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions at Masimo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

39.    Defendant Masimo is liable for the acts of the Individual Defendants and each of the Company's employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of each of the Individual Defendants' employment.

40.    The scienter of each of the Individual Defendants and each of the employees and agents of the Company is similarly imputed to Masimo under *respondeat superior* and agency principles.

## C.    Relevant Third Parties – Confidential Witnesses[4]

### a.    Legacy Masimo Healthcare Former Employees

41.    CW-1 was employed by Masimo Corporation from September 2022 to March 2023 first as a Ventilation Sales Specialist and then as a Sales Specialist, Therapies after the FDA told Masimo two or three months after his tenure began that they could not market the softFlow as a ventilation device. According to CW-1, his responsibilities included selling Masimo's softFlow ventilation system to hospitals in Minnesota, Iowa, Wisconsin, Nebraska, North Dakota, and South Dakota.  CW-1 advised that softFlow could be referred to interchangeably as a "Nasal High Flow system" or "High Flow oxygen system." According to CW-1, he and a team of around 12 others across the U.S. were hired around the same time in 2022 to sell Masimo's Nasal High Flow therapy ventilator called softFlow. CW-1 explained that Masimo acquired the softFlow ventilator when the Company acquired a German company called TNI in March 2020. CW-1 reported to Regional Vice President of Sales, Cynthia Villasenor, who in turn reported to Vice President of Sales, Therapy, Gary Cherry, who reported to President, Americas Matt Anacone, who CW-1 believed reported to CEO Joseph Kiani.

---

[4] Plaintiffs believe that the details of the responsibilities of all of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA. However, Plaintiffs can provide additional specificity, including exact titles for CW-2 and CW-11, to the Court through an *in camera* submission as these witnesses feared retribution if their identities were disclosed.

42.    CW-2 was employed by Masimo Corporation from before the Class Period until mid-2023 in Sales Management selling to hospitals for the Company's healthcare segment.

43.    CW-3 was employed with Masimo Corporation as a contractor via Impres Pharma from November 2022 to July 2023 in Ontario, Canada. CW-3 detailed that he exclusively sold the Masimo SafetyNet Alert to pharmacies located in Southwest Ontario. CW-3 described the Masimo SafetyNet Alert as a portable pulse oximeter that monitors oxygen levels.  CW-3 identified Ali ("Al") Moghaddam, current Global Vice President and General Manager of Masimo Consumer and Masimo SafetyNet Alert & Bridge as his contact at Masimo.

44.    CW-4 was employed with Masimo Corporation from December 2020 to June 2022 as a Remote Patient Monitoring Specialist. CW-4 advised that he joined Masimo to help launch its remote patient monitoring platform and sell it to hospitals. CW-4 explained that he sold remote patient monitoring devices to hospitals who used the technology to remotely monitor patients that were discharged early. CW-4 detailed that the remote patient monitoring technology included sensors and other technology that the rest of the healthcare segment sold but with a different chip that interfaced with Bluetooth. CW-4 noted that hospitals often switched to a remote patient monitoring chip before discharging patients so that the patients could be monitored remotely. According to CW-4, he reported to former Vice President of Sales, Remote Patient Monitoring Christopher Puyear, who reported to current President, Americas Matt Anacone. CW-4 added that the remote patient monitoring platform was created to expand Masimo's "footprint" out of the hospital.

45.    CW-5 was employed by Masimo Corporation from June 2022 to February 2023 as Remote Patient Monitoring Specialist. According to CW-5, his responsibilities included selling remote monitoring devices for patients to hospitals across the entire state of Florida, and that the types of sensors included pulse, temperature, and sensors monitoring other vital bodily information for patients transferring from hospital to

14

home. CW-5 advised that in his final reporting structure, he reported to Vice President of Sales, Remote Patient Monitoring Christopher Puyear, who reported to a President of Sales (name not recalled), who in turn reported to CEO Joseph Kiani.

46.    CW-6 worked at Masimo Corporation from June 2011 to April 2023, as Territory Manager for Alternate Care, Great Lakes West. CW-6's territories included Michigan for most of his tenure, Kentucky, southwest Ohio, and most of Indiana while working from home in Ohio.  According to CW-6, his responsibilities included selling medical devices in those territories. CW-6 explained that while the Acute care segment at Masimo sold to hospitals and EMS (Emergency Services), his Alternate Care group was part of Post-Acute Care which sold medical equipment to home care, long term care facilities, WIC (Women Infant Children) facilities. CW-6 advised that in his final reporting structure he reported to Sales Director Mike Hamlin, who reported to Regional Vice President of Sales, U.S. Post-Acute Care, John Mazurowski, who reported to Senior Vice President Alternate Care Andrew Jones, who reported to President, Americas Matt Anacone.

47.    CW-7 was employed by Masimo Corporation from June 2022 to January 2023 as a Clinical Sales Specialist.  According to CW-7, he was based in Tampa, Florida and his territory was the "east coast" of the U.S. stretching from Houston, Texas to Boston, Massachusetts. CW-7 explained that he worked in Masimo's peri-operative division, or "peri-op," and that while he was not directly involved in sales, that he supported the sales team in penetrating markets, mostly hospitals, in his territory. CW-7 advised that he reported to Regional Vice President of Sales, Jon Livak, who reported to Vice President of Sales, Isaac Kisner, who reported to President, Americas, Matt Anacone, who reported to CEO Joseph Kiani.

48.    CW-8 was employed with Masimo Corporation from April 2022 to December 2022 as an Account Manager. CW-8 advised that he was responsible for closing existing business and developing new business with hospitals during his tenure.

15

CW-8 detailed that he sold patient monitoring equipment, including sensors, to hospitals located in New Mexico, West Texas and Eastern Arizona.

49.     CW-9 was employed with Masimo Corporation as a Senior Hospital Automation and Monitoring Specialist from October 2021 to January 2023. During his tenure at Masimo, CW-9 sold non-invasive and continuous patient monitoring services through every channel of the acute care system.

50.     CW-10 was employed with Masimo Corporation as a contractor via IQVIA from July 2022 to February 2023 as a Territory Manager. CW-10 explained that he was paid by IQVIA but sold Masimo products during this period. CW-10 detailed that he exclusively sold the Bridge, an opioid withdrawal device, to providers in Southeast Florida. CW-10 added that he was supposed to eventually sell a pulse oximeter but his time with the Company ended before that occurred. CW-10 recalled that his Masimo contact during his tenure was current National Recovery Clinical Sales Manager Bennett Minchen. CW-10 explained that he mostly provided feedback to Minchen via IQVIA but sometimes provided feedback directly to Minchen.

51.     CW-11 was employed with Masimo as an Account Manager from prior to the Class Period until the third quarter of 2022.  CW-11 advised that he sold Masimo's patient monitoring products to hospitals.

52.     CW-12 was employed at Masimo as a Clinical Account Executive in Canada from April 2022 to October 2022.  CW-12 advised that he sold Masimo's patient monitoring devices to hospitals located in Nova Scotia, New Brunswick, Newfoundland, and Prince Edward Island.  CW-12 stated that he reported to three managers located in Toronto, Quebec, and Vancouver.

53.     CW-13 worked at Masimo Corporation from February 2022 to March 2023 as Vice President of Information Systems. According to CW-13, throughout his tenure he worked at Masimo's corporate headquarters in Irvine, California, and in his final reporting structure he reported to CFO Micah Young. CW-13 advised that his responsibilities included developing a roadmap and budget for the implementation of

16

1   a global ERP system, Oracle EBS, to replace Masimo's legacy ERP system
2   Expandable.

3   **b.   Legacy Sound United Former Employees**

4   54.   CW-14 worked at Masimo until August 2023. According to CW-14, he
5   was Vice President Finance & Global Controller at Sound United from September 2021
6   until his departure from Masimo.[5] CW-14 advised that, upon Masimo's acquisition of
7   Sound United, he originally reported to CFO Micah Young, and then at some point he
8   began reporting to Chief Accounting Officer Paul Hataishi**,** who reported to Young.

9   55.   CW-15 was employed as the Vice President of Finance Transformation
10  and Risk in Masimo's legacy Sound United segment from July 2022 to August 2023.
11  CW-15 was responsible for helping implement internal controls for the non-healthcare
12  segment at Masimo (formerly Sound United).  CW-15 also was in charge of managing
13  Sarbanes-Oxley Act (SOX) compliance for the Americas for the non-healthcare
14  segment at Masimo. CW-15 explained that as part of his SOX responsibilities, he
15  consolidated controls and ensured that the heads of the different regions were
16  communicating with each other. CW-15 stated that, with his colleagues, he also
17  attempted to remediate known material internal control weaknesses for the non-
18  healthcare segment at Masimo.

19  56.   CW-16 joined Sound United as a Staff Accountant in December 2018 and
20  was later promoted to Senior Accountant in June 2022. CW-16 subsequently departed
21  Sound United, after it had become part of Masimo, in July 2023. CW-16 advised that
22  he was responsible for typical accounting duties.

23

24

25

26

27  _____
[5] Sound United originally contracted CW-14 as a consultant from CFGI as Director of
28  Finance Transformation in February 2021 and directly hired him as VP Finance &
    Global Controller around September 2021.

17

1

**IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD**

2

    **A.    Overview of Masimo's Business**

3

        **1.    Masimo's Healthcare Business Segment**

4

    57.    Masimo is a global medical technology company that develops,

5

manufactures, and markets a variety of non-invasive monitoring technologies.  The

6

Company was founded by Defendant Kiani in 1989 and remained private, under

7

Kiani's leadership, for eighteen years.  Currently, Masimo employs over 6,000

8

employees across twenty-seven offices.  According to Kiani, the Company's mission

9

is to develop noninvasive health monitoring solutions that improve patient outcomes

10

and reduce the cost of patient care.

11

    58.    On August 8, 2007, Masimo engaged in an initial public offering to take

12

the Company public.

13

    59.    Prior to 2022, Masimo's business solely focused on its products related to

14

healthcare.  Masimo developed and sold patient-monitoring technologies, hospital

15

automation and connectivity solutions, remote monitoring devices, and consumer

16

health products.  Masimo's most successful and well-known product is its pulse

17

oximeter, which employs its signature SET, and is most often seen as a version that

18

attaches to a patient's fingertip to retrieve data.  Masimo describes the SET pulse

19

oximetry product line, that measures through motion and low perfusion arterial blood

20

oxygen saturation and pulse rate monitoring, as its "core business."

21

    60.    Masimo sells its healthcare products to hospitals, emergency medical

22

providers, home care providers, physician offices, veterinarians, long-term care

23

facilities, and consumers through the Company's direct sales force, distributors, and

24

original equipment manufacturer partners.

25

        **2.    Masimo's Non-Healthcare Business Segment**

26

    61.    Founded in 2012 in Carlsbad, California, Sound United's mission was "to

27

bring joy to the world through sound" using a unique approach to home entertainment.

28

62.    Under brands such as Bowers & Wilkins, Denon, Polk Audio, Marantz, Definitive Technology, Classé, and Boston Acoustics, Masimo's non-healthcare segment develops, manufactures, distributes, and sells an array of premium audio products, including loudspeakers, sound bars, AV receivers, wireless speakers, amplifiers, turntables, and headphones.  Sound United distributes its products primarily through direct-to-consumer channels focused on consumer technologies.

63.    At no point in its history did Sound United operate in the medical technology and/or medical device market.

64.    Following Masimo's acquisition of Sound United, Masimo rebranded the consumer audio portion of its Company as "Masimo Consumer."

### 3.    Masimo's Acquisition of Sound United

65.    In February 2022, Masimo entered into an agreement to acquire Sound United, which was then owned by Viper Holdings Corporation with a majority share held by Charlesbank, a private equity firm in Boston, Massachusetts.  Masimo agreed to buy Sound United in an all-cash deal for $1.025 billion, the largest deal in Masimo's history.

66.    The acquisition was completed just two months later on April 12, 2022.

67.    According to Masimo and the Individual Defendants, several reasons justified the acquisition.  In a Company press release dated February 15, 2022, Defendant Kiani stated that "Masimo shares Sound United's commitment to providing innovative, best-in-class products and experiences, with a relentless focus on improving the consumer experience."  In the same press release, Kiani touted the purported benefits of the acquisition to Masimo's business including Sound United's direct-to-consumer relationships and product distribution expertise.

68.    Internally, Masimo and legacy Sound United employees expressed concerns about the acquisition.  According to CW-14, nobody at Masimo seemed to understand the purpose of the Sound United acquisition, since it was a "strange marriage." CW-14 heard Joseph Kiani wanted to get into consumer markets through

19

Sound United's distribution channels including Amazon and Best Buy.  Similarly, CW-15 recalled that after Masimo acquired Sound United in April 2022, the consensus was that it was a "very strange marriage." Lastly, CW-6 recalled that he and colleagues around the Company were shocked the Company spent $1 billion on an acquisition that was so different from Masimo's brand.

69.    As noted above, investors were far less enthusiastic about Masimo's acquisition of Sound United; indeed, they were downright confused, and this confusion caused Masimo's stock price and market capitalization to suffer greatly.  In reaction to the announcement of the Sound United acquisition for slightly more than $1 billion dollars, Masimo's stock price plunged and wiped out $5.1 billion of the Company's market capitalization.  While the destruction of shareholder value spooked many investors, one investor, Politan Capital Management ("Politan"), saw the Sound United acquisition as the final straw in a long list of fiduciary duty violations and, in October 2022, sued Defendants Kiani, Young, Masimo, and the board of directors in the Chancery Court of Delaware (the "Politan Lawsuit").

70.    The Third Verified Complaint filed in the Politan Lawsuit alleged:

> Long-simmering stockholder discontent with the Board's inaction in the face of serious corporate governance failures finally boiled over when Masimo announced that it was acquiring Sound United—a consumer audio company that sells speakers and headphones under brands such as Bowers & Wilkins, Denon, and Polk Audio—for approximately $1.025 billion.  The Sound United acquisition, which represented a departure by Masimo from its core pulse oximetry business into unrelated consumer audio products, was the final straw for many of Masimo's stockholders.[6]

71.    According to the Politan Lawsuit, "based on extensive research, never before in the history of United States publicly traded companies has an acquiring company's market cap declined by more than *two* times, let alone *five* times the purchase price of the acquisition where the acquisition was material (*i.e.*, 5% or more of the acquiring company's market cap."[7]

---

[6] Third Verified Complaint, *Politan Cap. Mgmt. LP v. Kiani et al.*, Case No. 2022-0948-NAC (Del. Ch. Aug. 7, 2023), ¶ 89.
[7] *Id.* at ¶ 91.

**B.    Summary of the Fraud**

72.    The Class Period begins after the acquisition of Sound United.  Former Masimo and Sound United employees confirm that throughout the Class Period, Masimo struggled to integrate Sound United into Masimo.  On top of that, Sound United's accounting practices fell below the standards required for a public company and utilized "plugs" to ensure that reported financial figures met expectations.  Additionally, outside of its core pulse oximetry business, Masimo's healthcare segment struggled to sell new products as the marketplace refused to adopt their technologies and new long-term contracts, as the Company's inventory of single-use sensors ballooned.

**1.    Masimo Announces the Sound United Acquisition and Quickly Closes the Deal Despite Multiple Internal Objections**

73.    As outlined above, Masimo announced its plan to acquire Sound United in February 2022.  Less than two months later, on April 12, 2022, the deal closed.[8]  In addition to the disapproval and concern expressed by the market following the announcement of this deal, employees within Sound United and Masimo at that time were confused and concerned as well.  For some, this confusion was exacerbated by internal reports that consultants and Masimo employees told Defendant Kiani not to go forward with the deal during the diligence process.

74.    At Sound United, this confusion extended to the highest ranks of the organization.  CW-14 stated that Scott St. Clair was the CFO at Sound United prior to the acquisition by Masimo and St. Clair said that selling Sound United to Masimo was a "fire sale" because the Sound United brand was on the decline.  CW-15 further recalled that he had lunch with St. Clair in January 2023, who told him that he "failed to understand" Masimo's strategy in acquiring Sound United.

---

[8] CW-14 recalled that the due diligence process started in early 2022 and lasted 2 – 3 months.

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

Case 3:23-cv-01546-L-DEB    Document 28    Filed 02/12/24    PageID.789    Page 28 of 121


75.    CW-15 recalled that Mike Palumbo mentioned to him that CEO Joseph Kiani was told internally "multiple times" during due diligence on the acquisition not to proceed with the Sound United acquisition.

76.    CW-14 recalled that Senior Director, Accounting, Dennis Batin – whom CW-14 described as his counterpart in Masimo's healthcare segment – told him that an outside consultant, who CW-14 thinks may have been McKinsey & Company, warned CEO Joseph Kiani during due diligence, "Don't do this" – meaning do not buy Sound United, but Batin told CW-14, "Kiani wanted to do it."

2.    **Sound United Held Significant Inventory That Grew and Aged While Its Sales Were Slowing Under Masimo's Ownership During the Class Period**

77.    When Masimo acquired Sound United in April 2022, Sound United's most significant tangible asset at the time of the acquisition was inventory with a reported value of $230.7 million, according to Masimo's Form 10-Q for the second quarter of 2022, dated August 10, 2022. In the same 10-Q, Masimo reported that Sound United's inventory exceeded 50% of Masimo's consolidated inventory of $449.2 million.

78.    During the five quarters preceding the Sound United acquisition, Masimo's inventory had remained consistent—in the range of $201 million to $216 million. Post-acquisition, however, Masimo's inventory ballooned 30% from $449 million to $585 million as of September 30, 2023. During the same period of time, as alleged herein, Masimo's sales experienced significant declines.

79.    As a result, Masimo's cashflow became tied up in its inventory investment causing significant concerns related to working capital. For example, whereas Masimo pre-acquisition typically had in excess of $550 million in cash, at the end of the second quarter of 2022—immediately following the acquisition, Masimo's cash position fell to $218 million. Throughout the Class Period, Masimo's cash has continued to decline, most recently to $124 million at the end of the third quarter of 2023.

22

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

80. These cashflow constraints limited Masimo's ability to invest in research and development to modernize its non-healthcare products. Moreover, the legacy Sound United segment's slower sales resulted in inventory levels that, as most recently reported, exceed quarterly revenue—a harbinger of the need for effective controls surrounding the inventory process:



81. At least initially, Masimo claimed that it was accumulating inventory to address COVID-19-related supply chain challenges. Masimo 2022 Form 10-K, p.50. In 2023, though, Masimo's non-healthcare segment (*i.e.*, Sound United) also began to experience a significant decline in sales. Specifically, non-healthcare quarterly sales fell 35% from $265 million in the fourth quarter of 2022 to just $171 million in the third quarter of 2023. Consequently, Masimo now confronts falling sales at the same time inventory is rising, which invariably results in inventory aging and the need for appropriate inventory reserves.

82.    According to former employees, just after inventory reached peak levels, Masimo's executives ordered a 10% increase to the 2023 sales forecast.  This increase was made without any justification.  But such an increase ran counter to any reliable expectation.  Sales were bound to fall as the tailwind of COVID-19-related consumer purchasing patterns subsided.  Instead, the clear implication of the management-imposed unsupported increase to the sales forecast was that the need for inventory reserves would be reduced.  That is, increased inventory reserves could be avoided if the outlook for sales was robust.

### 3.    Masimo Failed to Disclose Ineffective Internal Controls Over Financial Reporting and Disclosure Control Procedures During the Class Period

83.    Several former employees, including two senior level accountants, confirm a culture of fraudulent practices and ineffective internal controls at Sound United that led to rampant accounting issues and material weaknesses plaguing the company.  Internal documents show that these problems persisted throughout the Class Period, including a February 2023 PowerPoint slide deck titled "Global Accounting Concerns," which listed out internal controls weaknesses concerning legacy Sound United's governance, consolidation process, local affiliate ERP systems, and general processes such as disjointed inventory reserve policies.  Sound United's material

24

1    weaknesses resulted in a particular vulnerability to its accounting for inventory and
2    related cost of goods sold in the income statement.  At least four problems confronted
3    Sound United's inventory and cost of goods sold accounting.

4        84.    Effective internal control over financial reporting ("ICFR") is critical to
5    support a public company's operations.  When a company expects to grow rapidly, that
6    growth often puts a strain on internal controls and has the potential to materially impair
7    the business.

8        85.    Prior to the acquisition, Sound United had numerous material weaknesses
9    that persisted even after the acquisition. These material weaknesses included: (1) lack
10   of segregation of duties ("SODs");[9] (2) an inability to use the company's accounting
11   systems for the financial close process; necessitating the use of spreadsheets to report
12   financial statements, which are known to be prone to manual errors; (3) a broad failure
13   to perform account reconciliations, causing significant uncertainty regarding the
14   reliability of reported account balances; (4) a procurement process without a control,
15   such as the use of purchase orders; and (5) a lack of controls over access to information
16   technology systems (*e.g.*, anyone was permitted to record journal entries in the
17   accounting system).  Critically, Masimo refused to provide authority to Sound United's
18   personnel responsible for ICFR to make the improvements needed to resolve these
19   serious material weaknesses.

20
21          **a.    The Importance of Disclosure Controls and Procedures
                  and Internal Controls Over Financial Reporting, as
                  Governed by SEC Rules**

22       86.    Defendants' decision to allow the fraudulent accounting practices at
23   legacy Sound United runs afoul of the law.  Indeed, federal law requires that the CEO
24   and CFO of public companies certify their company's quarterly, and annual reports
25
26
27   ─────────────────
     [9] Segregation of duties is a key internal control intended to minimize the occurrence of
28   errors or fraud by ensuring that no employee has the ability to both perpetrate and
     conceal errors or fraud in the normal course of their duties.

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

filed with the SEC and the procedures established by those companies to prepare the financial statements and disclosures.

87.    Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX")—designed to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosures and to instill investors with confidence concerning the accuracy, quality, and reliability of a company's periodic SEC reports—require that a CEO and CFO of a public company address the following topics in annual SEC filings (a Form 10-K for Masimo): (1) the material accuracy and fair presentation of the report's disclosures; (2) establishment and maintenance of "disclosure controls and procedures" ("DCP"); and (3) any material changes to the company's ICFR.  The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls.  These certifications communicate to investors that all material information required to be disclosed is contained in the report.

88.    Section 404 of SOX, 15 U.S.C. § 7262, requires management of public companies such as Masimo to establish and maintain a system of internal controls relating to, among other things, financial reporting.  Section 404 further requires management to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis. Ultimately, Section 404 requires that management of a public company annually

26

1  evaluate the effectiveness of the company's ICFR and disclose the conclusion,
2  including any material weaknesses, to investors.

3      89.    Section 404 of SOX was "intended to bring information about material
4  weaknesses in ICFR into public view."  SEC Release 33-8810.  Under Item 308 of
5  Regulation S-K, 17 CFR § 229.308(a)(3), "[m]anagement is not permitted to conclude
6  that the registrant's internal control over financial reporting is effective if there are one
7  or more material weaknesses in the registrant's internal control over financial
8  reporting."   A statement that ICFR are effective is, therefore, an assertion by
9  management that there are no material weaknesses in such internal controls.

10     90.    Section 404 of SOX requires management of public companies to select
11 an internal control framework, then assess and report on the design and operating
12 effectiveness of those internal controls on an annual basis.   According to the
13 Company's filings, Masimo adopted the "2013 Internal Control-Integrated Framework
14 issued by the Committee of Sponsoring Organizations of the Treadway Commission."
15 2022 Form 10-K, p.76.

16     91.    The COSO Framework states: "[i]nternal control is a process, effected by
17 an entity's board of directors, management, and other personnel, designed to provide
18 reasonable assurance regarding the achievement of objectives" relating to (i)
19 effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii)
20 compliance with applicable laws and regulations.

21     92.    COSO identifies five interrelated components of internal control: (1)
22 control environment, (2) risk assessment, (3) control activities, (4) information and
23 communication, and (5) monitoring activities.  COSO requires that "[e]ach of the five
24 components of internal control and relevant principles is present and functioning [and
25 that] [t]he five components are operating together in an integrated manner."  COSO
26 also identifies that these components are relevant to an entire entity and to the entity
27 level, its subsidiaries, divisions, or any of its individual operating units or functions.

28

93.    COSO states that the "Control Environment" is "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization" and recognizes that "[t]he board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct."  With respect to the "control environment," COSO requires that "[t]he board of directors demonstrate[] independence from management and exercises oversight of the development and performance of internal control[,]" and that "[m]anagement establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives."  The "control environment" also requires that the "organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives."

94.    The "Risk Assessment" component requires that the Company "identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed."  It also requires that "[t]he organization identifies and assesses changes that could significantly impact the system of internal control."

95.    The "Control Activities" component requires that an "organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels"; "selects and develops general control activities over technology to support the achievement of objectives"; and "deploys control activities through policies that establish what is expected and in procedures that put policies into action."

96.    The "Information and Communication" component requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control"; "internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control"; and "communicates with external parties about matters affecting the functioning of internal control."

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

97.    The "Monitoring Activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning[,]" and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

98.    Public companies like Masimo are required to design and implement two kinds of control systems to ensure the accuracy of their financial and non-financial representations to investors: (1) DCP and (2) ICFR.

99.    DCP ensure that information a company must disclose under the federal securities laws is communicated to company management and its board sufficiently in advance of the company's filing dates, to allow ample time for those groups to consider the information before disclosing it to investors.  *See* 17 C.F.R. § 240.13a-15(e).  The Exchange Act defines DCP to mean "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported, within the time periods specified" by the SEC.  *See id*.

100.    The SEC defines ICFR as "a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]."  *See* 17 C.F.R. § 240.13a-15(f).

101.    The Exchange Act states that ICFR specifically includes "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;" [and] (2) [p]rovide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP], and that receipts and expenditures of the issuer are being made only in accordance with

29

authorizations of management and directors of the issuer[.]"  *Id.*  Company management is required to review and evaluate these controls quarterly to determine their effectiveness.

102.  A company's DCP and ICFR cannot be considered effective if a "material weakness" exists.  A "material weakness" in ICFR is "a deficiency, or a combination of deficiencies, in ICFR such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." SEC Release No. 33-8810 § II.A, p. 9, n.18. Likewise, a material weakness in DCP arises when there is a reasonable possibility that the company's controls will fail to timely prevent or detect a material misstatement in a public disclosure.  A reasonable possibility arises when the chance of a future event occurring (*e.g.*, a material misstatement) is more than slight.  SEC Release No. 33-8810 § II.B, pp. 34-35, n.47.

103.  A deficiency in ICFR may pertain to either a deficiency in the design or operation of a control.  SEC Release No. 33-8810 § I, pp. 4-5.  A design deficiency "exists when (a) necessary controls are missing or (b) existing controls are not properly designed so that, even if the control operates as designed, the financial reporting risks would not be addressed."  SEC Release No. 33-8810 § II.A.1.b., p. 15, n.29.  An operating deficiency exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively.  *See* SEC Release No. 33-8810 § II.A.2., p.21.  In other words, a material weakness exists, regardless of any error in the financial statements, if any design or operating deficiency gives rise to a reasonable possibility that a material misstatement will not be prevented or detected.

104.  An evaluation of ICFR begins with the identification and assessment of the risks to reliable financial reporting.  SEC Release No. 33-8810, § II.A., pp. 9-10. While undertaking this evaluation, Masimo should have considered the sources and potential likelihood of misstatements occurring within its financial statements.  SEC

Release No. 33-8810, § II.A.1.a, p. 13.   Specifically, and as the SEC emphasizes, management should have "perform[ed] more extensive testing in high-risk areas." SEC Release No. 33-8810, § I, p. 5.   In particular, the SEC observes that the likelihood that a control would fail to operate was an important consideration in focusing management on those areas most critical to evaluate.   SEC Release No. 33-8810, § II.A.1.b, pp. 25-26.

105.   Next, management evaluates whether its ICFR is in place to address those risks (*i.e.*, the design of ICFR).   SEC Release No. 33-8810, § II.A.1, p. 12.

106.   Finally, management should ensure that testing procedures are performed regarding the operating effectiveness of those ICFR.   SEC Release No. 33-8810, § II.A.2, p. 21.   The COSO Framework characterizes such testing as part of an entity's monitoring of ICFR because "[m]onitoring ensures that internal control continues to operate effectively."   COSO Framework, Ch. 9, Monitoring, p. 124.

107.   If management is aware, or determines, that a control is not designed or operating effectively, a deficiency exists that must be evaluated.   SEC Release No. 33-8810, § II.A.1.b, p. 15.   Management's evaluation of the severity of a control deficiency does not guarantee that a material misstatement has already occurred.   SEC Release No. 33-8810, § II.B.1, p. 35.   Rather, the evaluation focuses on whether a reasonable possibility of a material misstatement existed.   This evaluation focuses on the likelihood of the risk occurring and the impact if the misstatement were to occur. Likelihood is assessed as higher in consideration of factors such as whether the defect is known to be present as opposed to vulnerability to the defect, whether a history of similar defects have occurred, and the presence of any mitigating controls.   Impact is assessed higher in consideration of factors such as financial materiality, the business area affected, the business processes affected, effect on the entity's reputation, expected response of external stakeholders, as well as mitigating controls.

108.   Ultimately, prior to making the SOX 302 and SOX 404 certifications, management was required to conduct an appropriate evaluation.   In doing so, the SEC

31

expected management's evaluation to focus on "areas of weakness or continuing concern." SEC Release No. 33-8238 § II.E.  This is because the "required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace."  SEC Release No. 33-8124 § VII.

### 4.   Sound United's Fraudulent Inventory and Cost of Goods Sold Accounting

109.   Sound United's material weaknesses resulted in a particular vulnerability to its accounting for inventory and related cost of goods sold in the income statement. At least four problems confronted Sound United's inventory and cost of goods sold accounting.

110.   *First*, Sound United did not have internal controls to govern its process to set inventory standard costs.  Without such controls, Sound United was unable to effectively identify which costs should be captured in the value of inventory versus recorded as an expense in the period incurred.  The result was that Sound United used inflated inventory standard costs, which in turn overstated the value of products in inventory and understated expenses during 2022.  When this issue was detected, the effect reversed as Sound United was forced to recognize the higher-costed inventory as a cost of revenue in 2023.



111.    *Second*, Sound United did not have effective internal controls to enable the identification of inventory that had been sold to customers.  Consequently, when a sale was recorded, Sound United did not have controls to ensure that the proper cost of that sale had been recorded.  Critically, absent the effective operation of this control, Sound United lacked reliable information regarding the amount of inventory that it actually held at any date.  Worse, Sound United did not conduct a physical inventory to test whether the inventory it reported was actually reliable.  These conditions prevailed at a time when inventory was reported to be growing rapidly, which created a significant risk of misstatement.

112.    *Third,* Sound United did not have an inventory obsolescence policy.  CW-15 proposed a policy but the project was "killed."  Without such a policy, Sound United's inventory reserving process was, at best, arbitrary, and at worst, deliberately understated.  For example, Sound United held a significant amount of unsaleable Turkish Airlines headphones that warranted recognition of an impairment charge but no policy to measure the expected loss on this inventory against.

113.    *Fourth*, Sound United's dysfunctional accounting system necessitated "plug" entries to balance the books.  Each month, Sound United recorded such "plug"

1 entries, changing cost of goods sold simply because otherwise the accounting records
2 could not be balanced.  These monthly "plug" entries occurred in amounts up to $9
3 million—well in excess of the Sound United financial statement materiality threshold
4 of $2 million.  "Plug" entries are non-standard or topside journal entries, which are a
5 hallmark of improper management override of internal controls.  *See, e.g.,* PCAOB
6 Standard 2401, Consideration of Fraud in a Financial Statement Audit, ¶58.  Here, the
7 "plug" entries had the benefit of improving Sound United's reported gross profits by
8 reducing cost of goods sold.

9      114.  These material weaknesses created a reasonable possibility that Sound
10 United's financial statements, and in turn, Masimo's financial statements, could be
11 materially misstated.  To remediate the material weaknesses, Masimo needed
12 competent personnel with sufficient accounting and internal control skills.  As
13 described above, however, such personnel did not exist.  Nor did Masimo assign its
14 personnel to assist Sound United.  Instead, Masimo ran Sound United like an unmanned
15 silo.  And when Defendant Kiani terminated Duffy shortly after the acquisition,
16 Masimo shot down any chance of resolving the ticking time bomb caused by its
17 deficient ICFR.

18      115.  An effective control environment, which is "the set of standards,
19 processes, and structures that provide the basis for carrying out internal controls across
20 the organization[,]" is premised on several principles, perhaps none more important
21 than what is referred to as the "tone at the top."  It was incumbent on Masimo's
22 directors and officers to set an effective tone at the top, which the COSO Framework
23 describes as to "demonstrate through their directives, actions, and behavior the
24 importance of integrity and ethical values to support the functioning of the system of
25 internal control."  Considering that the need for enhanced ICFR at Sound United was
26 identified as far back as April 2022, yet remained uncured as of December 2023, it is
27 evident that Masimo management failed to set an appropriate tone at the top and
28 maintain an effective control environment for the enterprise.

116.   Masimo was required to provide disclosure regarding its assessment of ICFR and DCP, inclusive of Sound United beginning one year after the acquisition (*i.e.*, for periods after April 2023).  In both of Masimo's subsequent financial statement filings with the SEC (August and November 2023), however, Masimo omitted any mention of the material weaknesses known to pervade ICFR stemming from Sound United when providing management's SOX 302 certifications.  Finally, in either late February or early March 2024, however, Masimo will be forced to provide its first SOX 404 assessment of ICFR, inclusive of its assessment of Masimo.

117.   Ultimately, the SOX 302 certifications by Masimo's CEO and CFO included in the Company's Form 10-Qs for the second and third quarter of 2023 provided misleading assurance to investors that ICFR and DCP functioned effectively to either prevent, or detect and correct, instances of materially inaccurate financial reporting.  In fact, Masimo's ICFR and DCP were exposed to material weaknesses, including those at legacy Sound United, which required disclosure.

<blockquote>

a.   **Former High Level Accounting Employees Confirm the Culture of Fraudulent Accounting Practices and Weak Internal Controls at Sound United Continued Under Masimo's Ownership**

</blockquote>

118.   According to CW-14, he was originally hired by Sound United because of his finance and controls experience with publicly traded companies, which he described Sound United as having been either very lacking or completely deficient in up until that point. CW-14 further described the situation as Sound United having "no accountants with public experience." CW-14 noted that key accounting personnel from Sound United that joined Masimo after the acquisition had quit by the end of 2022 and added that the unqualified staff were allowed to stay even though Masimo was aware of their accounting deficiencies.

119.   CW-14 recalled that when he joined Sound United, the company was undergoing an audit conducted by BDO to prepare Sound United for the accounting processes and standards it would need to implement and follow as a "public company."

CW-14 recalled that the BDO audit found at least five material weaknesses at Sound United including: (i) lack of segregation of duties, (ii) insufficient design of formalized processes and procedures, (iii) lack of review of journal entries affecting manual close processes coming out of the OneStream system, and (iv) insufficient review of material contracts, (v) lack of information technology general controls.  CW-14 described Sound United's accounting department as "broken across the board."

120.   CW-14 confirmed that Sound United's non-existent controls led to margin and inventory issues on the non-healthcare side of Masimo.

121.   CW-14 recalled that while Sound United had implemented consolidation software OneStream several years prior to him joining, they still used Excel spreadsheets for its accounting records, not specialty accounting or financial software. CW-14 relayed that Sound United's CFO of the Americas, Naseem ("Nas") Ansari, was the only person with the ability to alter or edit Sound United's financial statements. According to CW-14, Ansari reported to Scott St. Clair, Sound United's CFO, and, following Masimo's acquisition of Sound United in April 2022, Ansari reported to Defendant Young.

122.   CW-14 recalled that reporting at Sound United was done manually by one person who made unreliable, entity-level entries. Further, according to CW-14, during his tenure, none of the international regions were ever educated on U.S. GAAP accounting.  CW-14 stated that the regions were only interested in statutory accounting rules governing accounting in their local jurisdictions.

123.   According to CW-14, Sound United's Excel spreadsheet process for accounting was "crazy." CW-14 explained that his goal from the outset of his tenure at Sound United was to improve accounting practices and procedures.  Despite his best efforts to improve Sound United's accounting practices and procedures, which included working with consultants at MorganFranklin and CFGI, CW-14 stated that he was unable to fix Sound United's accounting practices and procedures – that

1    contributed in large part to the five material weaknesses identified in the 2021 BDO
2    audit – before his departure in August 2023.

3        124.    CW-15 detailed that Masimo's non-healthcare segment was in the
4    "embryonic" stages of installing internal controls when he joined in July 2022.  CW-
5    15 noted that the non-healthcare segment used *BlackLine* to reconcile its balance
6    sheets.  CW-15 stated that Masimo had multiple entities worldwide and that one of his
7    projects was to reduce redundant entities, but that it was challenging to get key affiliates
8    to cooperate.

9        125.    CW-15 stated that one of the big problems he encountered at Masimo was
10    that he lacked authority and "teeth" to implement any sort of changes to strengthen
11    controls in the non-healthcare segment. CW-15 recounted how from the time he joined
12    Masimo, he was consistently trying to get CFO Micah Young's attention in order to
13    raise the internal controls issues he had identified, but CFO Young repeatedly ignored
14    his emails and outreach. CW-15 recalled that he emailed current Vice President of
15    Internal Audit, Mike Palumbo in January 2023 about lack of Segregation of Duties
16    (SoD), which are critical for fraud prevention, and copied CFO Young. CW-15
17    explained that despite this attempt to bring attention to the issue, there was no progress
18    on SoD.

19        126.    According to internal emails sent between Masimo's accounting team,
20    Deloitte consultants identified numerous design gaps in the non-healthcare, legacy
21    Sound United accounting systems.  As of June 29, 2023 nearly twenty design gaps were
22    identified, many of which were related to insufficient Segregation of Duties.
23    According to certain emails, these design gaps impacted legacy Sound United's ability
24    to open and close accounting periods.

25        127.    CW-15 also explained that he had "limited visibility" during his tenure at
26    Masimo. CW-15 believed he was entitled to additional visibility given his job title and
27    responsibilities. Specifically, CW-15 expressed that he wanted to visit different
28    Masimo facilities around the world to gain greater insight into Masimo's non-

healthcare facilities (including its manufacturing facilities in Japan) but was told there was a corporate travel ban. CW-15 specifically wanted to visit Masimo's foreign affiliates to test the effectiveness of their controls and to compare notes with North America as well as to speak directly with their employees. CW-15 added that supply chain visibility "was not provided." Even when CW-15 travelled to Europe for personal reasons and suggested to visit the Netherlands and United Kingdom-based affiliates, he was told his visit was redundant.

128. CW-15 described Masimo's non-healthcare segment internal controls as extraordinarily weak. For example, CW-15 stated that "everyone" with access to the accounting module in the non-healthcare segment had the ability to create journal entries in Masimo's accounting system, which he described as an internal controls deficiency. CW-15 specified that everyone in the Finance Department had access to the accounting system, from the CFO to accounts payable entry clerks. In CW-15's experience, access to the system to create journal entries should be limited based on an employee's role and function and complete access should not be available to the entire group.

129. CW-15 stated that Masimo's non-healthcare segment was comprised of an inexperienced and unqualified accounting department, which was short-staffed and had a high turnover rate. CW-15 further recalled that current Senior Director of Finance/U.S. Controller Greg McSwain was asked to oversee the non-healthcare segment's accounting department during his tenure and that he worked with McSwain on balance sheet reconciliations. CW-15 noted that he told a colleague named Becky that the sheets did not balance and that her response was "so what?"

130. CW-15 attributed the lack of internal controls at Masimo to a lack of governance and oversight. CW-15 stated that basic controls at Masimo were not present.

1

2
                    (1)    Sound United's Inventory Accounting Suffered from
3                           a Lack of Internal Controls

4        131.   Regarding inventory, CW-14 described how Masimo's non-healthcare

5  segment's inventory was "years off," explaining that this had to do with the Company's

6  lack of controls. According to CW-14, inventory on the non-healthcare side has been

7  growing for years and given the lack of controls, an impairment test should have been

8  performed and the appropriate amounts should have been written off. CW-14 explained

9  that part of Masimo's problem was that technology gets old, obsolete and people move

10 on to new technology, and that quite a bit of the inventory from Sound United was not

11 selling due to obsolescence. CW-14 and CW-15 stated that Masimo's non-healthcare

12 business did not conduct a physical inventory evaluation, which it was required to do.

13       132.   According to CW-14, in his whole career, he never saw inventory

14 accounted for the way Sound United did it, adding that this continued after the

15 acquisition. CW-14 recalled that inventory value was being artificially inflated with

16 inflated costs, including at least $5 million in miscalculation/inflation as of January or

17 February 2023. CW-14 also indicated that monthly inventory adjustments of $4-6

18 million were made on a monthly basis to "balance" the books as a result of

19 consolidation system issues that remained unresolved.

20       133.   CW-14 reiterated that Sound United could not track inventory in and out.

21 CW-14 described Sound United's inability to track inventory as a "very noisy" problem

22 for certifying financials because CW-14 "could not prove" Sound United's level of

23 inventory on hand. CW-14 emphasized that he knew about this problem because he

24 was one of the accountants at Sound United responsible for certifying the company's

25 financials. According to CW-14, this increase in inventory on hand posed a significant

26 risk as revenues were declining over this period causing inventory on hand to

27 increasingly consist of obsolete products. CW-14 explained that unsaleable inventory

28 caused working capital pressure which in turn limited the Company's ability to

modernize its product suite.

1   134.   During his tenure, CW-14 received daily cash reports and could see that

2   Sound United was getting cash from Masimo. CW-14 could also see in these reports

3   that the Company's low cash availability was tied to its increasing inventory.

4   135.   According to CW-14, Sound United began capitalizing additional costs

5   into inventory based on volatile shipping costs that were not predictable.  Since they

6   could not verify what sales had actually sold against the capitalization from the

7   previous month, CW-14 explained the amounts just kept growing and rolling forward.

8   CW-14 said Masimo used transit times for inventory from Japan that was on cargo

9   ships at sea as additional justification for this undocumented methodology.  CW-14

10  described it as a rolling capitalization.  However, according to CW-14, they had to

11  identify what sold through and there was no way to track the inventory sold. CW-14

12  relayed that Sound United "made stuff and sold stuff" but "they couldn't track" the

13  inventory because there was "never a documented process" to do so.

14  136.   According to CW-14, the inflated standard costs which included volatile

15  costs such as freight were negatively affecting margins. In CW-14's view, these

16  standard costs which were using overstated values, were "killing" Sound United's

17  margins. CW-14 stated that inflated standard costs and declining sales resulted in a

18  gross margin drag, with sales decreasing and inventory increasing.

19  137.   In October or November 2022, CW-14 raised concerns to Paul Hataishi

20  that Sound United's inventory standard costs were wrong.  In December 2022, CW-14

21  had a detailed face-to-face conversation with Young and Paul Hataishi about the

22  problems with the non-healthcare segment's inventory standard costs.   Later, in

23  January 2023, CW-14 recalled emailing Young, Hataishi, and others about his

24  concerns.  CW-14 had the model master with the costs but no information on how they

25  came up with the standard costs. CW-14 recalled that Sound United did not have

26  standard pricing and had different pricing for the same items at the same location but

27  in different colors.

28

40

138.   CW-14 stated that when he and the VP of Finance Transformation and Risk asked to be included in the calculation and review of the standard costs for 2023, CW-14 was told by Tracy Willaims (Director of Cost Accounting) that they did not have time for "idle curiosity" and both CW-14 and the VP of Finance Transformation and Risk were barred from attending meetings or reviewing the numbers.  When CW-14 raised this to Paul Hataishi, he responded that he had advised Tracy Williams and Naka that "if the numbers are wrong, don't come crying to me."  CW-14 considered this a most unsettling response given the magnitude of the issue.  CW-14 explained these costs set the standards and controlled margins for the coming year.

139.   According to CW-14, Micah Young led CFO calls every quarter to discuss cash flow, among other topics. CW-14 recalled Young stating during a CFO call, "I don't understand why we don't have cash." CW-14 reported that the lack of cash was due to an increased "glut" of inventory. CW-14 relayed that by some point in 2022, after banner years for both Masimo and Sound United in 2021 during the Covid pandemic when "they were both swimming in cash," orders for legacy Sound United products were down, inventory was up, and cash was down. CW-14 recalled that towards the end of his tenure in 2023, Young stopped attending the CFO calls.

140.   CW-14 recalled that Sound United often did not have purchase orders in their records prior to spending (these were created after the fact when the invoice came in), which CW-14 explained was among the material weaknesses before the acquisition which was not remediated after the acquisition.

141.   CW-15 explained that he worked on a matrix of inventory obsolescence for Masimo's affiliates worldwide. CW-15 stated that there were "inconsistencies" in calculating inventory at Masimo and he explained that some regions, including Japan, calculated capitalization 90 days out while other areas, including the United States, calculated capitalization 116 days out. CW-15 stated that the standard is 120 days out. CW-15 noted that he exposed this problem to Paul Hataishi and offered solutions.  CW-

41

15 advised that he alerted CFO Micah Young and Paul Hataishi via email in January
2023 about the non-healthcare segment's lack of internal controls.

142.    CW-15 recalled that he suggested an inventory obsolescence policy for
the non-healthcare segment to Masimo which he modeled during a presentation, but
that Masimo "killed" this project and came up with an "arbitrary" policy instead.

143.    CW-14 and CW-15 both recalled that Sound United did not have an
impairment process in place during their tenures.  For example, CW-14 stated that at
some point during his tenure there was an "outrageous" working capital shortfall of
$200 million. CW-14 recalled that even though Deloitte attributed the $200 million
shortfall to inventory and intangible assets, Masimo did not take an impairment on
inventory.

(2)    Sound United Lacked Basic Segregation of Duties
Internal Controls

144.    CW-14 stated that Sound United lacked basic SODs (Segregation of
Duties) which was a concern he expressed regularly. Segregation of duties is a key
internal control intended to minimize the occurrence of errors or fraud by ensuring that
no employee has the ability to both perpetrate and conceal errors or fraud in the normal
course of their duties.    Yet, according to emails between legacy Sound United
accounting personnel and Grant Thornton, over 40 people made journal entries for
Sound United in 2022 who were not listed as employees with access to do so.

145.    According to CW-14, Naseem Ansari could make all sorts of journal
entries and could open and close accounting periods when he wanted to.  CW-14
reported that some of these entries were in excess of $100 million dollars with no
review or approval.

146.    For example, in August 2022, Naseem Ansari submitted journal entries
into OneStream with purported back up information that his colleague told him could
not be approved without further explanation.  Despite multiple requests for clarification
and a lack of explanation by Ansari, Ansari received permission from Paul Hataishi to

42

1 approve the journal entries himself and then Ansari directed the staff to "force
2 consolidate" the legacy Sound United entries so that he could "review the remaining
3 [intra company] margin."

    (3)    <u>Sound United Used Four, Incompatible Enterprise Resource Planning Systems That Exacerbated Tracking of Sales and Costs</u>

6     147.  CW-14 explained that the enterprise resource planning ("ERP") systems
7 at legacy Sound United were not interconnected across its many business segments.
8 Additionally, legacy Sound United used four different ERP systems that did not "talk"
9 to each other further exacerbating the tracking of sales and costs.  This was a significant
10 issue in Japan since their version of SAP (R3) was not used as the basis for accounting.
11 Japan instead calculated numbers in Excel and loaded them directly to the
12 consolidation tool.  CW-14 raised this concern many times and even gave a
13 presentation to CFO Micah Young, calling out the issues and proposed a solution of
14 transitioning Japan to a standard SAP instance so that financials could be obtained
15 based on actual transactions and not Excel estimates.

16     148.  Accounting for inventory was made more difficult by the fact that legacy
17 Sound United's ERP systems did not have easy capability to age inventory, as
18 confirmed by internal emails from December 2022.  At the same time, members of
19 Masimo's accounting group, like Joe Tristani, were flagging problems with inventory
20 reevaluation.  Specifically, Joe Tristani confirmed that the inventory reevaluations
21 were "botched" in an internal email in December 2022.

    (4)    <u>Sound United's Fraudulent Accounting Practices and Ineffective Internal Controls Lead to $177 Million Worth of Unrecognized Inventory Costs</u>

24     149.  CW-14 advised that at the end of 2022, Sound United closed the books
25 with $177 million of unknown assets, which CW-14 explained was going to affect their
26 international tax payments. CW-14 explained that this was one of the many reasons he
27 refused to sign the SOX sub cert representation letter for the close of the 2022 financials
28 (*see* Section IV.B.4.d.).

43

150.    CW-14 explained that "capitalization methodology" is "not existent or not followed" at Masimo and that as one example, he detailed that legacy Sound United held $1 million worth of headphones that they did not think they could sell but did not write off in a timely fashion.    CW-14 further described Masimo's capitalization methodology as a "black hole" and that inventory values were "manipulated."    CW-14 recalled that Senior Director, Finance Stephen Bubar received a model from CFO Micah Young and later stated that his model of capitalization had issues.    According to CW-14, Bubar came up with his own model that resulted in a significantly smaller total value than the one the CFO provided.    CW-14 stated that Young's model was put together for the sole purpose of increasing profit for the quarter and resulted in an additional capitalization of $4M for the quarter. CW-14 advised that he emailed with CFO Micah Young in 1Q 2023 discussing $177 million of unallocated intercompany profits. CW-14 also stated that with sales down significantly, inventory balances continued to climb.    Since most inventory was manufactured by the company, it did not make sense that the balances were going up significantly.

151.    CW-14 recalled that Sound United was "liberal" with their capitalization on inventory. CW-14 added that Sound United used capitalization and FX (foreign exchange) accounts to manage the numbers to make them "what they wanted them to be."

152.    According to CW-14, there was also 5-7% sitting in a random account which would "magically" go to zero at year end.    CW-14 specified that this amount was $177 million in unallocated intercompany profits that should have been booked to regional entities.    Instead, CW-14 said the company kept it recorded in CTA (Cumulative Translation Adjustment – an accounting entry that reflects the impact of fluctuations in currency exchange rates on a company's financial statements. CTA appears in a company's financial statements when it has foreign operations or subsidiaries in countries with different currencies).    On December 31st, CW-14

recounted, the CTA was slid into Retained Earnings, and on January 1st, the CTA amount was zeroed out.

(5)    Sound United Japan Created Sustained Internal Controls Problems That Masimo Refused to Fix

153.    CW-14 described Sound United in Japan as "a problem from Day 1." According to CW-15, Sound United's Japan affiliate controlled the Sound United's entire supply chain and dictated what products would be manufactured.

154.    According to CW-14, Sound United General Counsel Kathy Cover told him to go to Japan because there is "something wrong going on" over there. CW-15 recalled that he and CW-14 were instructed in September 2022 by CFO Micah Young to visit the Japan affiliate before the end of 2022 because employees in Japan were opening and closing accounts without permission. However, after Defendant Young instructed them to take the trip to Japan, CW-14 and CW-15 were then informed the next day by Chief Accounting Officer Paul Hataishi that there was a corporate travel ban and that they were therefore not allowed to travel to Japan. CW-14 suggested that Young sent Hataishi to tell him after Young changed his mind because he did not want to expose anything wrong with the non-healthcare segment accounting at Masimo.

155.    CW-14 identified Japan as an example of a controls issue with inventory standard cost. CW-14 raised this issue in 2022 post acquisition, in person with Paul Hataishi and also emailed him and copied others. CW-14 included CFO Micah Young as a recipient of a January 2023 email CW-14 authored and sent about lack of controls in Japan but Young never responded. CW-14 advised that he and CW-15 attempted to get involved in the process to fix Japan's accounting issues, and Young and Hataishi rebuffed their efforts.

156.    CW-14 remembered that Sound United also needed to secure a $16 million loan from outside the Company in Japan to pay Japanese taxes that they had not properly planned for.    CW-14 added that Young had to approve internal and external loans.

157.  CW-14 added that there was no cash strategy at Sound United whatsoever, the Treasurer had very little power and decisions were being made first by Yoshifumi ("Naka") Nakagawa (CFO Japan) and Naseem Ansari (CFO Americas), and then after Ansari's departure, Naka, Joe Tristani, and CFO Micah Young. CW-14 added that there was no cash forecast based on accounts receivable or commitments, and that there was "willy nilly" spending and no visibility due to the lack of a requirement to have a purchase order prior to many purchases.  CW-14 reported that "spot buys" were also an issue as Naka often made multi-million dollar purchases with no prior approval.

158.  CW-14 also recalled that Masimo was supposed to make a $26 million tax payment to Japan in September 2023 that legacy Sound United was not going to be able to meet, so Masimo made a "$9 million deal" instead. CW-14 recalled that if Masimo had to make the $26 million payment that legacy Sound United would have been unable to make payroll.

**b.    Under Defendant Young's Oversight, Legacy Sound United Continues Its Use of "Plugs" to Balance Its Books**

159.  Beginning before the Masimo acquisition, Sound United manipulated its accounting through the use of "plugs" in its consolidation tool to balance its books, a flagrant violation of accounting rules and a hallmark of a weakness in internal controls. Defendants were aware of this practice and, following Masimo's acquisition of Sound United, Defendant Young participated in manufacturing these "plugs" for Sound United.

160.  CW-14 explained that Sound United's numbers were being plugged into the books each month because the financials of each of its brands were siloed and did not match the consolidated numbers that the divisions were reporting. CW-14 explained that the consolidation tool, *OneStream*, was "broken" because the financials consolidated in the system "did not jive." CW-14 advised that these problems were still ongoing when he left Masimo in August 2023.

161.   According to CW-14, CFO Micah Young would send him topsides to book as journal entries. CW-14 advised that Young created those models. CW-14 described the "plug" as a COGS credit that juiced the margins with the offset going to inventory, the motive of which was to make forecasted numbers for legacy Sound United.

162.   CW-14 recalled that Sound United was plugging as much as $9 million a month into the books as part of the closing process. CW-14 explained these plug entries were generally recorded as a credit to Cost of Goods Sold (COGS) and a debit to Inventory.  In 2021 and part of 2022, according to CW-14, Ansari was responsible for "closing the books" which was "done in isolation with no prior review." CW-14 noted that the manipulation of Sound United's financial close numbers continued after the Sound United acquisition. CW-14 noted that "we weren't going to make the numbers," so Masimo CFO Micah Young redid capitalization based on a model he developed. Young sent CW-14 a $4.2 million journal entry to add to topside. CW-14 added that Sound United could not close its books without "plugs" to get the numbers to balance.

163.   CW-14 recalled that after Young made a $4.2 million entry in Q1 2023 and Q2 2023, Senior Director, Finance Steve Bubar reviewed it and said, "I don't know what he's doing." After a while, CW-14 recounted Bubar said they can use $1.2 million (instead of $4.2 million), and upon further investigation Bubar said it should have been $800,000. CW-14 described the topside adjustments as "11th hour topside entries" and always occurring a day or two before everything had to be final during his tenure.

164.   Internal documents show that legacy employees at Masimo were aware of the problems with Masimo's consolidation process.  In early 2023, Masimo employees identified global accounting concerns in a presentation related to "Masimo Consumer." The presentation confirmed that, as a result of the consolidation process, books could not be closed on Masimo's schedule.  In fact, the consolidation process was deemed not "stable" or "consistent."

1

2

3

          **c.**      **Defendant Young Rehires Former Crony With No Experience With or Training in Consolidation Platform and He Is Tasked With Rebuilding the Platform for Legacy Sound United; Young Makes Journal Entries in Platform During Class Period**

4

5

6

7

8

9

165.    According to CW-14, Sound United's consolidation tool throughout his tenure was *OneStream*. Both CW-14 and CW-15 recalled that Vice President of Financial Systems Damon Gangi rejoined Masimo in April 2022 and took over full responsibility of *OneStream*, Masimo's non-healthcare consolidation tool, from CW-14 after he refused to sign the SOX segment representation letter in approximately March 2023.

10

11

12

13

14

15

16

17

18

166.    CW-14 recalled that Young ignored recommendations from both MorganFranklin consultants and *OneStream* consultants to rebuild Sound United's consolidation tool. Instead, Young rehired Damon Gangi, a former Masimo employee, to serve as Vice President, Financial Systems. CW-14 relayed that Young's decision to hire Gangi for this position was strange because Gangi had no experience with, nor training on, the *OneStream* platform. CW-14 recounted that Gangi's directive was to fix *OneStream* because the plugs in the systems below were not working to balance the company's financial statements. CW-14 noted that Gangi – whom CW-14 described as "Micah's guy" – was not an accountant, and that he reported directly to Young.

19

20

21

22

23

24

25

167.    Both CW-14 and CW-15 explained that *OneStream* was the "foundation" of legacy Sound United's external reporting and that any edits made to the system changed its logic. CW-15 detailed that Gangi, who reported to Young, was supposed to suggest changes to *OneStream* and that those changes were supposed to be vetted. According to CW-14 and CW-15, Gangi made changes to *OneStream* before May 2023 on the request of different legacy Sound United affiliates, none of which were vetted by a corporate controller.

26

27

28

168.    On one occasion, CW-14 asked his colleague why his margin numbers changed. CW-14 recalled that the colleague responded that Damon Gangi made changes to his margin numbers.

48

169.   Indeed, internal emails confirm that the accounting team on the legacy Sound United side of Masimo lacked sufficient internal controls for SOX purposes.  A June 28, 2023 internal Masimo email from Damon Gangi to other accounting personnel confirmed that management was not regularly reviewing admin changes and that the changes being made were not adequately being tracked in Masimo's systems.

170.   Internal emails confirm that Young directly engaged in making accounting entries at Sound United.  For example, in an April 2023 email concerning intercompany profit and inventory reconciliation, Young stated that he input his own calculations to adjust journal entries and requested that Damon Gangi automate his calculations going forward.

**d.   CW-14, Former Vice President Finance & Global Controller at Masimo Consumer Refuses to Sign SOX Sub-Certification for Masimo Due to Concealed Losses and SOX Violations at Legacy Sound United and Is Fired As a Result**

171.   Following over two years of efforts to reform Sound United's accounting practices, including more than 12 months while at Masimo, to eliminate the myriad weaknesses in its internal controls and the resulting fraudulent practices to cover up irregularities those weaknesses created, CW-14 reached his limit when Masimo requested that he sign a sub-certification SOX representation letter in March 2023, to give Defendants Kiani and Young assurances that the legacy Sound United financials were sound when Kiani and Young signed their SOX 302 certifications in connection with Masimo's fourth quarter 2022 earnings report.  As explained in more detail below, after CW-14 expressed his concerns, rather than address the concerns, Masimo appointed another person to sign instead of CW-14 and began a process of marginalizing CW-14 from his duties until he was eventually fired.

172.   CW-14 explained that he was fired in "retaliation" for refusing to sign off on the SOX sub cert representation letter, adding that he "told them" he was refusing to sign off because he had issues with the letter, specifically the results and guidance that he was being asked to sign off on the non-healthcare segment where costs were

49

being hidden (resulting in an eventual revenue miss for legacy Sound United business in the second quarter of 2023) and SOX continued to be violated. CW-14 explained that certain specific members of the senior level personnel are required to sign off on the representation letter and he recalled that when he refused the letter, that Paul Hataishi was then promoted to Chief Accounting Officer so he could sign off on it instead. CW-14 explained that his refusal to sign off on the representation letter led to his termination, adding that a Vice President – Finance Transformation & Risk also was fired the same day he was.

173.   CW-14 recalled that "the night before earnings release," in early 2023, Masimo's Executive Vice President, General Counsel Tom McClenahan called and asked if anything could be done to get him to sign the SOX sub cert representation letter. CW-14 responded to McClenahan, "Yes, fix the problems." CW-14 said he would not sign the sub cert letter because of his reservations regarding its accuracy.

174.   According to CW-14, Grant Thornton – Masimo's external auditor – reached out to him soon after his refusal to sign the SOX sub cert representation letter and asked him about why he refused. CW-14 explained on an hour-and-a-half long phone call with Grant Thornton where CW-14 "walked through the elements" of his concerns including (i) problems with reporting structure, (ii) CW-14's lack of visibility so he could not certify the numbers, (iii) numbers that CW-14 did not agree with, and (iv) there were random $10 million swings in revenues which were concerning because CW-14 could not explain them. CW-14 recalled Grant Thornton shared some similar concerns. CW-14 noted that six months later, Masimo missed its revenue projections by $100 million, part of which CW-14 believes is tied directly to the weaknesses and reasons he cited for not signing the SOX sub cert representation letter for Sound United.

175.   CW-14 stated that after his refusal to sign the SOX sub cert representation letter, Vice President of Internal Audit Mike Palumbo uninvited CW-14 from SOX meetings that CW-14 had previously been attending.

176.    CW-14 recalled that Sound United's material weaknesses identified by the BDO audit in 2021 had not been resolved by the time he refused to sign the SOX sub cert representation letter, adding that Grant Thornton has a fiduciary duty to disclose any material issues. CW-14 described it as surprising that Grant Thornton signed off on Q4 2022's earnings, even after their conversation with CW-14 regarding the control issues and lack of signature on the sub cert letter. CW-14 further added that CW-14 flagged these issues for Micah Young and Paul Hataishi, but they did not respond to him.

177.    CW-14 also placed the blame for the persistence of the material weaknesses at Sound United identified in 2021 by BDO on Vice President of Internal Audit Mike Palumbo and Senior Director of Finance / U.S. Controller Greg McSwain. CW-14 stated that Palumbo and McSwain were familiar with all of Sound United's material weaknesses, but still did not require purchase orders for approval and likely allowed accounts payable to be understated.

### 5.    Defendants Fail to Integrate Sound United Following $1.025 Billion Acquisition

178.    As the fraudulent accounting and internal controls weaknesses at legacy Sound United persisted during the Class Period, Defendants also persisted in failing to integrate Sound United into Masimo.  As confirmed by former employees, Defendants barely integrated any of the key functions at Masimo and legacy Sound United and failed to achieve any meaningful synergies, as the two segments continued to operate independently of one another through the end of the Class Period.

179.    According to CW-14, following Masimo's acquisition of Sound United, there was no intercompany consolidation.  CW-14 opined that management did not make any long-term plan for the acquisitions known to him. CW-14 added that there was the same lack of governance at the operational level as there was at the accounting level.  CW-14 heard Kiani wanted to get into consumer markets through Sound United's distribution channels including Amazon and Best Buy. However, CW-14

never observed any synergies between the two companies during his time at Masimo nor were there any efforts to integrate the two accounting groups. CW-14 recalled that there was "only" a $40,000 intracompany booking between legacy Sound United and healthcare by the time CW-14 left Masimo in August 2023, with $80,000 or $90,000 pending.

180.   Similarly, CW-15 recalled that there was "very little" or no integration between Masimo and Sound United from a finance standpoint and "less so" from an IT and operations perspective. CW-15 added that during his tenure, there were never any common projects or synergies between the two segments.

181.   CW-15 stated that differences in technologies and cultures prevented the two companies from creating synergies. CW-15 further recalled that in January 2023 he had lunch with former Sound United CFO Scott St. Clair and St. Clair told him that any potential synergy would be difficult.

182.   As an illustration of the difficulty, CW-15 pointed out that Masimo's non-healthcare segment sales "peaked" in early 2022 and the Company began to see declining sales in Q4 2022. CW-15 explained that Masimo's speakers were becoming "obsolete" but that its brand value would "suffer" if the Company sold them at a discount. Yet, CW-15 added that Masimo did not have the "appetite" to invest in new technology for Sound United. At the same time, CW-15 recalled that Masimo's Healthcare business also "had struggles themselves," which negatively impacted Sound United because Masimo was not generating the cash flow it needed to integrate the two companies.

183.   Additionally, CW-15 detailed that Masimo's non-healthcare business had "little" interaction with its healthcare business. CW-15 recalled that Paul Hataishi, Damon Gangi and Mike Palumbo shared very little information about Masimo's Healthcare business. CW-15 noted that there were "clear divisions" between Masimo's non-healthcare and healthcare segments.

184.    CW-14 recalled meeting with former Sound United CFO, Scott St. Clair, in March 2023. During that meeting, St. Clair discussed how there had been no synergies between the two companies. CW-14 also recalled hearing that Chief Operating Officer, Consumer Division Blair Tripodi "was a little lost" after the acquisition and former Sound United CEO Kevin Duffy's ouster.  According to CW-14, "nobody was driving the bus on corporate governance" when it came to the new acquisition, and it seemed like nobody in Masimo leadership cared about Sound United after the deal closed.

185.    CW-16 stated that prior the middle of 2023, there were no revenue synergies between the two companies and that they operated as two separate entities. CW-16 detailed that Masimo utilized Sound United's technologies to create a baby monitoring device in Q2 2023 that connected to customers' phones. CW-16 noted that Masimo began using Sound United's sales channels at this time as well.

186.    CW-14 and CW-15 both noted that they were unaware of an integration committee overseeing the integration of Sound United post-acquisition and did not recall any "roadmap" for the integration.

187.    By the time he left Masimo in August 2023, CW-14 stated that legacy Sound United and Masimo's healthcare segment were still being run as separate entities.

**6.    Defendants Possess Access To and Regularly Review Information Related to Masimo's Healthcare Segment During the Class Period**

188.    During the Class Period, former employees confirm that Defendants had ready access to and regularly reviewed the accounting and sales information related to Masimo's healthcare business.

189.    CW-13 relayed that he developed a roadmap for implementing Masimo's new global ERP system, Oracle EBS, to replace the Company's legacy ERP system Expandable, which he advised was around 25 years old when he started his tenure at Masimo.

190.   According to CW-13, Oracle EBS and its predecessor, Expandable, contained all of Masimo's healthcare sales, financials and "SOX related data," and inventory data, and that this data could be accessed by senior executives at any time through the Company's Microsoft Power BI dashboards. CW-13 recalled that CEO Joseph Kiani and CFO Micah Young, as well as their staff, had the capability of accessing the data from the dashboards at any time and noted that the information could be retrieved directly from Oracle EBS but that senior executives often chose to pull it from the dashboard, explaining that Microsoft Power BI dashboard presented the information in the form of a cleaner report.

191.   CW-13 recalled that the data was housed in the ERPs and that could be retrieved through the dashboards that included sales metrics, sales projections, and financials and SOX related data for each of its healthcare lines of business, as well as inventory levels at each of Masimo's healthcare finished goods and distribution centers in North America and Amsterdam, Netherlands. CW-13 recalled that COO Bilal Muhsin, sales leadership, and senior financial people often retrieved sales, financials and SOX related data, and inventory information from the dashboards to review them with Young, who CW-13 suggested in turn reviewed it with Kiani. CW-13 described Muhsin as a "consumer of information from Power BI" and "very hands on" with the dashboard, as were much of Young's staff.

**7.    Defendants Set Unrealistic Budgets and Sales Targets for Masimo Despite Declining and Moribund Device Sales Outside of the Company's Core Pulse Oximetry Business**

192.   Despite having access to a plethora of data related to sales and other information for the healthcare and legacy Sound United business segments, the Defendants insisted on pushing Masimo's revenue growth contrary to the declining sales and ballooning inventory problems in both segments, as confirmed by former employees.

a.    **The Individual Defendants Push Unrealistic Sales Goals and Unachievable Budgets in Weekly and Monthly Meetings in Which They Participated**

193.  CW-15 recalled that in December 2022, during the preparation of a budget for non-healthcare/consumer for 2023, the level of growth projected by Masimo was not attainable. By Q4 2022, Sound United's revenue was decreasing while its inventory was increasing, which CW-14 reported caused an "inventory glut." Notwithstanding the already unattainable budget, CW-14 said CEO Joseph Kiani increased the budget by an additional 10%. CW-14 specifically recalled Kiani stating with "every forecast" to "add 10% and make it happen," adding that "they knew it couldn't happen."

194.  CW-15 recalled that Masimo's Finance Director for the EU, Marco van Hoeck, told him during that visit that van Hoeck also was "stuck" with an unattainable 10% budget increase in 2023 and that in reality sales were projected to decrease between 10 and 15% in 2023.

195.  According to CW-14, a major reason why Masimo missed their 2023 fiscal guidance was because they "came up with their budgets after Covid," explaining that Masimo continued to project guidance based on its pandemic-related growth in 2021 and 2022, but which he further explained was unsustainable and unrealistic to expect continuing after the pandemic subsided and customers' business decisions and practices returned to pre-pandemic levels. CW-14 recalled that it was because of these unrealistic budgets based on a Covid-surge that Masimo was consistently 10% away from making their numbers. CW-14 further recalled that for the non-healthcare or Sound United segment, Masimo was using "highs" from the "tail end of Covid" as the basis for the standard costs and cost accounting for inventory. CW-14 added that based on inconsistent inventory capitalization of costs, Masimo "could not tell you the actual value of inventory on the balance sheet." CW-15 detailed that that cash and sales were "horrible" for Masimo's healthcare and non-healthcare businesses in late 2022 and 2023.

196. According to CW-14, the forecasting got to the point of being so poor that CFO Micah Young stopped attending the monthly CFO Reviews for months before the 2Q 2023 earnings call, adding that he had previously attended these monthly CFO Reviews. CW-14 added that it was in these CFO Reviews where forecasting for both segments were discussed and how he had some exposure to the healthcare side being in trouble as well. CW-14 described the guidance presented to shareholders as: "The external guidance was very different from the internal reality."

197. CW-14 explained that throughout his tenure, Sound United's sales and budgeting processes were just as problematic as its accounting processes. CW-14 recalled that the cash figures in the CFO call presentation decks were "horrible on both sides" of Masimo's business in 2023. CW-14 recalled that the last CFO call he was on was in June or July 2023, and cash and sales on both sides were down significantly, adding that the miss was not all on the non-healthcare side.

198. According to CW-14, there was a flawed thinking that the company could wait to make an assessment until end of Q4, after the holiday shopping season, because they thought Sound United would make more money during that busy period; however, CW-14 explained that by Q3, legacy Sound United could see whether that will happen or not, so that they could have let the market know then instead of waiting.

199. CW-15 attended Quarterly CFO Calls held by Micah Young, which he stated lacked detail and organization. According to CW-15, it was discussed on these calls throughout his tenure that sales were declining and that the non-healthcare segment had no cash and was not making its budget. CW-15 further recalled that Young responded to these concerns by saying "we're on top of it" but that there was little follow up from Young after these calls.

200. CW-15 noted that Young also asked the participants on the Quarterly CFO Calls "what is going on with inventory?" CW-15 added that he showed Young a trend of increasing inventory and that Young seemed receptive to the trend but never appeared to take any action. According to CW-15, CW-14 invited him to these CFO

56

calls shortly after he joined Masimo because he wanted to participate in them. CW-15 stated that he tried to meet with and escalate concerns to CFO Micah Young several times but was denied every time. CW-15 noted that he eventually stopped trying to meet with Young because it was clear that he was not interested in meeting with CW-15.

201.   According to CW-14, Masimo had Sales & Operations meetings ("SNOPs") for "every segment" which he explained were monthly operational meetings and financial reviews, led by Vice President Finance Consumer, Joe Tristani and Blair Tripodi.  CW-14 stated that during the SNOP calls, brand leaders presented their financial results and, as necessary, explained and justified those results.  CW-14 advised that he attended each SNOP for his segment where sales, projections, inventory, planning and supply chain updates were discussed, adding that he was aware that the same topics were discussed in each segment's SNOP. As a result, according to CW-14, the SNOP calls detailed the truth about the brands' financial performances, but the brand level financial results were then manipulated when those figures were rolled up to the top and consolidated. CW-14 described the presentation and bullet points as shameful, including tables without explanations, meaning that there was no reasoning behind the graphs and tables.

202.   CW-14 recalled there were additional monthly meetings to discuss financials at the regional levels (Americas, UK, Europe and Japan), which were led by CW-14 with the regional controllers and Joe Tristani attending.

203.   According to CW-14, during his tenure, financial goals for the upcoming fiscal year were usually presented at the end of the current year. CW-14 said that Sound United's CFO of the Americas, Naseem Ansari, worked with Masimo's Irvine-based finance team, including Young, to put together the unattainable budgets. CW-14 recalled that on the CFO call held at the end of 2022 to present 2023 goals, all of the Sound United participants were "scared" of the target numbers presented because they were seen as unattainable coming out of Covid. According to CW-14, Several Sound

1    United participants expressed their disbelief and skepticism for the targets on the call.

2    CW-14 recalled hearing Kiani dismissing these concerns by saying, "I don't care, add

3    10%" more on top of the 2022 numbers.

4        204.    CW-14 emphasized that there was no basis for the 2023 goals that were

5    presented at the end of 2022 for several reasons. First, consumers were cutting back on

6    expenses for luxury items (like Sound United's high-end speaker systems). Second,

7    Masimo had ever-increasing old inventory stockpiles that counseled against increasing

8    financial targets. Finally, CW-14 explained that orders had been trending downward or

9    at least softening as 2022 progressed. According to CW-14, the "market is fickle" for

10   Sound United's products and it was clear that the budgets set by the executives "sitting

11   in Irvine" were "unattainable" based on what they were hearing from their colleagues

12   in manufacturing, distribution, and sales.

13       205.    According to CW-14, during the SNOP calls at the end of 2022, brand

14   leaders asked Tristani and Tripodi why forecasts were being increased when it was

15   common knowledge in the industry that the Covid-spike in luxury entertainment sales

16   was not going to continue. CW-14 recalled brand leaders asking how they could

17   achieve their targets if market demand and conditions were not there. CW-14 recalled

18   that at brand meetings Tristani and Tripodi would ignore this unrealistic target setting

19   and responded by saying we are going to miss by $10 million this month but "we'll

20   make it up by the end of the year." CW-14 recalled presentations at these meetings

21   showing projections moving up without explanations to justify the growth targets.

22       206.    CW-14 explained that they had to know that Sound United's sales were

23   not achieving the projected guidance numbers because they looked back at the previous

24   two months of sales, on every monthly entity level review call.

25       207.    CW-14 described Kiani as "so delusional" that he directed those on the

26   call to "push volume at discounts." CW-14 added that the problem was that Sound

27   United inventory was older and "couldn't be given away" except for pennies on the

28   dollar.

b.      **Masimo's Healthcare Business Has Barely Any Sales Outside of "Core" SET Pulse Oximetry Business**

208.   Despite the historically reliable pulse oximeter business, during the Class Period, Masimo's healthcare sales force encountered tremendous obstacles to selling new products to customers.  As confirmed by former employees, customer preferences were shifting away from single-use sensors, hospitals were unwilling to purchase devices that were not approved for all patient populations, and customers were dissatisfied with the performance of many of Masimo's non-SET product offerings. Thus, Masimo's healthcare sales people had very few sales outside of the core SET pulse oximetry business during the Class Period.

209.   CW-3 recalled that he did not sell any Masimo SafetyNet Alerts during his tenure and referred to the device as a "complete bust." CW-3 detailed that there were approximately 300 pharmacies located in his territory and 95% of them could not order the Masimo SafetyNet Alert due to a lack of distribution. CW-3 explained that the Masimo SafetyNet Alert did not sell because it was overpriced, it did not work "all that well."  CW-3 added that Masimo did not have a distribution deal with Ontario's two main distributors.

210.   CW-3 stated that his colleague, a fellow Masimo SafetyNet Alert salesperson located in Toronto, Ontario who started in May 2022, did not sell any product either. According to CW-3, only 12 Masimo SafetyNet Alerts were sold in Canada during his tenure, all of which were in British Columbia.  CW-3 detailed that Ali "Al" Moghaddam, Masimo's Global Vice President and General Manager of Masimo Consumer and of Masimo SafetyNet Alert & Bridge, served as the liaison between the Canadian Masimo SafetyNet Alert salespeople and Masimo. CW-3 noted that Moghaddam was aware of the lack of Masimo SafetyNet Alert sales in Canada. CW-3 added that Moghaddam took a month to answer simple questions and that Masimo was "poorly run."

211.  According to CW-3, Masimo initially rolled out the Masimo SafetyNet Alert in Europe, then Canada and then in the U.S. CW-3 stated that the Masimo SafetyNet Alert was introduced in the U.S. between April and June 2023 and that it "struggled" to sell in the U.S. for the first couple of months. CW-3 noted that Masimo subsequently lowered the price of the product by CA$150.

212.  CW-3 detailed that the Masimo SafetyNet Alert required a sensor to work. However, CW-3 noted that the sensors lasted about two weeks and never longer than a month and therefore customers needed to replace the sensors every two weeks for the Masimo SafetyNet Alert to work. CW-3 also noted that he often had trouble getting the Masimo SafetyNet Alert to properly work during sales demonstrations. CW-3 recalled that it was a "very frustrating experience" attempting to sell the Masimo SafetyNet Alert.

213.  CW-3 recalled that there was no way to replace sensors in his territory after they died. CW-3 detailed that a patient called Moghaddam because the Masimo SafetyNet Alert stopped working after the sensor died and Moghaddam could not figure out how to replace the sensor and asked CW-3 for help. CW-3 added that Masimo removed a sensor from a new Masimo SafetyNet Alert device and placed it in the patient's device in this instance.

214.  CW-7 recalled that sales staff that serviced Masimo's east coast were given "lofty" sales goals but that they were never met during his tenure because "not one" product was sold in his territory while he was employed at the Company. CW-7 was also under the impression that the rest of the territories in the peri-op division were unable to sell any products throughout his tenure at Masimo.  CW-7 added, "We really struggled."  CW-7 advised that the products he had been tasked with helping sell were the (i) LiDCO Hemodynamic Monitoring System, (ii) oxygen delivery cables, (iii) hemoglobin sensors, and (iv) SedLine brain functioning monitor.

215.  According to CW-7, based on his interaction with doctors, there was not any or much interest in Masimo's peri-op products.  CW-7 relayed that the product that

60

had been pushed the most was LiDCO, adding that he was unable to sell any of these products and recalled doctors telling him that it "didn't work" and was "too much work" to use. CW-7 explained that LiDCO is an acronym for (Li)thium (D)ilution of (C)arbon (O)utput and is used for the measurement of cardiac output and does so by measuring how long it takes for lithium to dilute in arterial blood. According to CW-7, the LiDCO product was supposed to be calibrated using lithium, but that instead – after Masimo acquired LiDCO – it "ran off of a nomogram," which he described as like an algorithm created by Masimo, to perform the calibration instead. CW-7 recalled that the nomogram was created by entering different criteria such as the age, weight and other factors of the patient but that it did not include gender, which he advised would have been extremely important given key physiological differences between biological males and females. CW-7 recalled doctors referring dismissively to Masimo's LiDCO product as "just a numbers generator" and that they did not want to buy the product because they did not trust it.

216. CW-7 explained that prior to being acquired by Masimo, the company LiDCO calibrated their hemoglobin sensor a certain way using lithium, or a lithium-based product. CW-7 recalled speaking with Senior Vice President Marketing, Matt Sassone, whom he advised had come over from LiDCO when it was acquired and had an internal reputation for being excellent at selling LiDCO. CW-7 recounted how he told Sassone that he was hearing concerns from doctors over the switch to using a nomogram instead of lithium calibrating, which LiDCO had done before Masimo acquired it. CW-7 said that Sassone did not have an answer to pass on to those concerned doctors. CW-7 added that there was a change in how the LiDCO device operated post-acquisition in order to make it technically non-invasive. CW-7 also spoke with Vice President of Sales Isaac Kisner and Perioperative Sales - Southeast, Francis Wilke about the feedback from doctors on LiDCO and neither of them had an answer to the feedback.

217.    CW-7 recalled that another issue as to why doctors did not want LiDCO was because they required a battery life of eight hours, but LiDCO's battery only lasted 2 – 3 hours, meaning that it could stop working in the middle of a surgery. CW-7 also recalled telling a hospital employee about this 2 – 3 hour charged lifespan and his response was similar to "Oh, that's not what I had been told," indicating to CW-7 that he had been told something different by the Masimo sales representative whom CW-7 collaborated with.

218.    CW-5 described Masimo as the worst work experience he ever had and that his entire team of 13 in his division turned over twice between when it began around mid-2021 and through the end of his tenure. According to CW-5, he and the 12 other members of his division sold to different areas of the U.S., and were recruited to build up this new division, along with Christopher Puyear who he advised had been hired around a year before CW-5's tenure began. CW-5 added that the division's products of remote sensors had been viewed internally by Masimo as an expected area for large growth.

219.    Yet, CW-5 recalled that he and his entire team (12 other colleagues around the U.S.) never came close to meeting their goals. CW-5 described the forecasts that he and his colleagues reported to Vice President Christopher Puyear as "180-degree different" from what Puyear in turn forecasted to his supervisor, a President at Masimo, which he described as being "inflated."  CW-5 knew the numbers used by corporate were inflated because he and his colleagues on his team participated in weekly meetings where they reviewed the actual results submitted to Puyear and saw the inflated forecasts that Puyear intended to submit to the Masimo President.

220.    CW-8 recalled that sales, including sensor sales, declined during his tenure. CW-8 explained that sales declined partially because admissions at hospitals were down due to COVID lessening, which subsequently led to less patient monitoring. CW-8 added that sensor sales at Masimo were also down because hospitals contracted with companies, including Stryker and Medline Industries, to reprocess single-use

62

1    sensors instead of continuing to repurchase single-use sensors from Masimo. CW-8
2    detailed that since hospitals were strapped for cash and reprocessing.

3        221. According to CW-2, weekly regional calls for his business unit were held
4    where sales projections were discussed, and then there were quarterly calls with
5    "leadership" held near the end of each quarter.

6        222. According to CW-2, calls were held near the end of each quarter
7    throughout his tenure to discuss revenue and meeting that quarter's revenue targets.
8    CW-2 recalled that there were quarterly calls for the sales personnel in the western part
9    of the United States, and a corresponding call for the eastern part of the United States.
10   CW-2 advised that attending these respective calls were Vice Presidents including
11   Andrea Walters, respective Regional Vice Presidents such as Vice President East, Tom
12   Layne, and President Matthew Anacone, the highest-ranking attendee. CW-2 advised
13   that Layne's counterpart, Vice President Sales West, John Tincher, attended the
14   quarterly calls involving the sales personnel in the western part of the U.S.

15       223. CW-2 advised it was on these quarterly leadership calls that sales
16   projections for the end of the present quarter were reviewed for the entire country,
17   regardless of business unit or segment. CW-2 added that it was here when units would
18   be directed to "pull from our upside" even if that unit had met its sales projections in
19   order to make up for the shortfall of other units. CW-2 explained that "pull from our
20   upside" meant offering new contracts to customers in order to take orders early, and
21   that the incentive in the contract was to offer a month's worth (as an example) of
22   product for free. According to CW-2, the result was making it more difficult to meet
23   the following month or quarter's numbers, especially with the additional free month of
24   products included.

25       224. CW-2 said that in 2023 Masimo's certain care units hospital clients
26   switched back to reusable sensors. CW-2 described the sensors as clips that are used
27   on patients' fingertips when running different types of tests.

28

225.   CW-2 explained that prior to the Covid pandemic hospitals bought and used reusable sensors, and that after the pandemic began, and the healthcare community was unsure how Covid was spreading, those hospitals changed to buying and using disposable ones. According to CW-2, after the healthcare community had a better understanding of Covid, hospitals looked at how much they were spending on disposable sensors and decided that it was safe and economical to go back to buying reusable ones.

226.   CW-2 stated that the hospitals' switch to reusable sensors caused a noticeable impact on his revenue streams. CW-2 specifically recalled that Masimo was going to take a six-figure loss in 3 years on the disposable sensors with hospitals in his region and CW-2 suggested that if you extrapolate that six-figure loss across all of his regional customers, and all of Masimo's hospital customers around the U.S. and possibly the world, that it could be a substantial revenue loss for the Company.

227.   CW-2 explained that another problem related to hospitals' decision to switch back to reusable sensors presented to Masimo was that the Company had "an excess of supply" of disposable sensors as well as other products. According to CW-2, Masimo had been negatively impacted by the Covid-related delays in supply chains and that in the beginning of those delays, Masimo had a difficult time meeting their customers' needs. CW-2 added that the Company vowed to not be in that position again and decided to have an excess many of their products at higher levels than had been done before Covid.

228.   According to CW-1, throughout his tenure at Masimo, very few softFlow systems were sold, not just in his territory but anywhere in the U.S. CW-1 knew this because he attended regular calls that were led by Vice President of Sales, Therapy, Gary Cherry, and the lack of sales throughout the country were discussed on those calls. CW-1 explained the problem was that Masimo had been continuously unable to get FDA approval for softFlow's use with pediatric, infant, and tracheostomy patients. According to CW-1, hospitals wanted High Flow systems that were approved for use

64

for all patients and did not want to buy multiple systems. CW-1 emphasized that hospitals did not want to use multiple High Flow systems from different manufacturers for different patients but rather wanted such systems that could treat all patients from infants to the elderly. CW-1 explained that due to the Covid pandemic, the High Flow market became saturated with many competitors in the field who offered systems that could be used on all patients, which stifled Masimo's ability to penetrate that market. CW-1 recalled that after the first COVID wave subsided, hospitals had a surplus of the High Flow systems and Masimo struggled to break through.

229.   According to CW-1, approximately two or three months after his tenure began, there was a directive given by Vice President of Sales, Therapy, Gary Cherry to also start selling a Masimo capnography product line, while still selling softFlow. Around this same time, the FDA required Masimo to stop marketing softFlow as a ventilation system.

230.   CW-1 added that when he and his colleagues were directed by Cherry, around a month or two before his tenure ended, to transition their focus away from selling softFlow to selling the capnography product line, he took it as his signal that it was time for him to leave Masimo. CW-1 explained that he and his colleagues had backgrounds in ventilation systems, which was why they were hired, and that was what he wanted to stay with.  According to CW-1, he and all of his colleagues had backgrounds in ventilation systems and/or were clinically experienced licensed respiratory therapists who had been hired by Masimo specifically to sell the Company's softFlow system.  CW-1 advised that capnography, on the other hand, had nothing to do with their respiratory backgrounds, they all had no experience in that area, and they did not have contacts at hospitals to sell the capnography product line to unlike for the Nasal High Flow systems.

231.   CW-1 added that while he and his team received directives on selling the capnography product line and moving away from selling softFlow directly from Gary

Cherry, he suggested that Cherry himself would have gotten such directives from his supervisor, President, Americas Matt Anacone.

232.    CW-4 recalled that no one "came close" to hitting their remote patient monitoring sales targets during his tenure. According to CW-4, Masimo set "ambitious sales goals" for the remote patient monitoring platform. CW-4 detailed that although no one hit their remote patient monitoring sales targets, Masimo raised them by approximately 400% annually. CW-4 further recalled that Masimo was aware that no one hit their remote patient monitoring sales targets but raised the sales projections by 400% because they claimed that they saw "large opportunities" for the platform. CW-4 noted that there was "a lot of pressure" to make sales during his tenure.

233.    According to CW-4, there was an increase in sensor sales companywide at Masimo during COVID. However, CW-4 recalled that sensor sales began to decline companywide in the middle of 2022 because hospitals bought an excess number of sensors during COVID to keep up with the high demand. CW-4 noted that demand for sensors also declined after COVID lessened and that hospitals were subsequently stuck with a surplus of sensors sitting idly in their basements. CW-4 stated that Masimo "gave away" capital monitors to hospitals if they purchased a certain number of sensors during his tenure, which he noted was how Masimo set up its contracts.

234.    According to CW-9, there was a "significant" decline in sales, including sensor sales, in Q4 2022 and that as a result, "changes and adjustments were made." CW-9 explained that Masimo's "biggest challenge" was that its competitors also had the ability to sell Masimo's sensors and connect them to their own equipment. Therefore, CW-9 noted that there were "limitations" to selling the sensors.

235.    CW-6 explained that in Fall of 2020 Sales Director Mike Hamlin directed CW-6 and his team that at the start of 2021, they were to switch from a focus on selling sensors, to selling longer term commitments to the devices that the sensors operated with. Along with this change in focus, CW-6 and his colleagues' compensation changed from being tied to sensor sales to instead being tied to long term device

66

contracts. According to CW-6, traditionally his group's focus was to get 2- or 3-year commitment on the devices from facilities and then the sensors sold themselves on an as-needed basis throughout the relatively short life of the commitment. The 2021 directive required CW-6 and his colleagues in his group to sell 5-year commitments on the devices, with a focus on pushing these commitments on the Rad-97 Pulse CO-Oximeter, which he described as a "flagship" device for Masimo, adding that it replaced the previously popular but older generation Rad-8.

236. According to CW-6, respiratory therapists, nurse managers, and purchasing managers were reluctant to commit to 5-year deals because medical technology consistently improves, and they did not want to lock into that long term of a commitment. As a result, throughout his final two years, facilities were pulling back, and hence fewer sensors were sold in his Alternate Care group. CW-6 added that facilities were financially stretched thing after the Covid pandemic and wanted to get back to the reusable sensors.

237. CW-6 recalled that prior to shifting focus to selling long term contracts on devices that he used to sell $1 million a year in sensors. CW-6 could not recall the extent of the drop in that number after the shift in focus but recalled that it was "significant," and that it coincided with the shift in focus and most facilities unwilling to sign on to 5-year contracts for devices. CW-6 recalled the rest of the members in his group fared as poorly as he did but could not recall exact numbers. CW-6 stated that his group lost those contracts with the long-term care services of "two big companies" – Kindred and Select – because they did not want to sign 5-year contracts.

238. CW-10 stated that he did not sell any Bridge devices during his tenure. CW-10 noted that other Bridge salespeople were based in California, Nevada, Georgia and Tennessee and that only the salesperson in Georgia, Mike Diamond, was able to successfully sell Bridge devices during CW-10's tenure, though Diamond "did not sell many" Bridge devices.

67

239.   According to CW-10, the sales process was "disorganized" and Masimo did not provide any guidance on who to sell the device to. CW-10 detailed how he attempted to sell the Bridge to psychiatrists, rehabilitation centers and anyone else who treated opioid disorders. CW-10 recalled that the feedback he received from potential clients was that the Bridge was too expensive and did not sell because it was not covered by insurance given that it was FDA cleared but not FDA approved. CW-10 recalled that he spoke with a doctor in Tampa, Florida in September 2022 who expressed interest in the Bridge and requested an in-person meeting. However, CW-10 stated that Masimo wanted to only speak with this doctor over the phone and refused to allow an in-person meeting, which subsequently terminated this potential sale. CW-10 noted that this was the closest he got to making a sale for Masimo.

240.   CW-10 noted that Bennett Minchen, his supervisor, was aware of the lack of sales for the Bridge but still supported the device.

241.   According to CW-11, Masimo was "very sales driven."  CW-11 stated that he was given "high" sales targets, some of which were "unachievable."

242.   CW-11 recalled that sales "peaked" during COVID. CW-11 explained that during this time, hospitals spent a lot of money on Masimo's products, including sensors. However, CW-11 noted that sales in his region began to "plateau" once COVID lessened in 2022 because hospitals did not have money to spend and had an excess number of products from over purchasing during the pandemic.

243.   According to CW-11, Masimo pushed him to sell more sensors, especially single use sensors because they generated more revenue than reusable sensors.

244.   CW-11 noted that after sales declined, his supervisors suggested the sales team attempt to sell wearable technology, especially for opioid withdrawal, and pushed them to sell home monitoring technology since hospitals were overstocked with equipment.

245.   CW-12 detailed that there was a lot of pressure to make sales at Masimo and the Company expected its salespeople to work "24/7."

246.   According to CW-12, single-use sensor sales declined "substantially" in his territories during his tenure. CW-12 noted that sales, including single-use sensor sales, also declined in Canada overall during this time. CW-12 explained that sales in Canada declined because customers in Canada were not very familiar with Masimo and therefore they purchased monitoring equipment from *Nellcor*, because they were more familiar with that company. CW-12 noted that he discussed the decline in single-use sensor sales with his managers "all the time."

### c.    To Push Excess Inventory on Customers, Masimo Directs Its Healthcare Sales Force to Offer Sizeable Discounts

247.   CW-2 relayed that Masimo was "100% discounting" and recalled that Masimo had directed its sales force to offer discounts to hospital customers at the end of each quarter in order to meet sales goals even though it was known by senior executives that this would affect the Company's ability to meet projections in the subsequent quarter. CW-2 further recalled that these directives to offer discounts began sometime in 2022, and then became consistent "quarter after quarter" starting in late 2022 and continuing through the end of his tenure.

248.   CW-2 recalled, starting at some point in 2022 and continuing through the end of his tenure, President Matthew Anacone directed CW-2 and his sales management colleagues to offer discounts to their respective hospital customers. CW-2 recalled that he or his colleagues stated on the call that these new contracts would impact their ability to meet goals for future quarters, and these concerns were acknowledged by leadership. According to CW-2, President Matthew Anacone directed the sales personnel on the quarterly calls he attended to offer additional free sensors, as an example, if the customers took their next order three months early. CW-2 explained that the sensors themselves could not be discounted but that additional free sensors would be offered instead.  According to CW-2, sensors and other Masimo equipment were sold to hospitals on contractual basis, and the contracts normally called for steady deliveries at set time periods.

69

249. According to CW-2, he and his colleagues did not have access to sales goals but rather were asked by their supervisors what sales numbers they expected to meet. CW-2 explained that if they met those sales numbers but other business units did not, then they would be directed to contact targeted customers and ask if they would take orders early, from their future quarter(s), and then provided a new contract that would include a certain percentage of free additional items that were ordered as an incentive. CW-2 noted that this was done to make up for the shortfall by other business units for that quarter. CW-2 emphasized, however, that if the customer accepted the new contract offer, it would take from the projected revenue from future quarters.

250. According to CW-2, it was on quarterly calls attended by the C-suite where these directives were given on what customers to go to and what orders to ask them to take early. Regarding C-suite attendance, CW-2 recalled that attending at different times were CEO Joseph Kiani, CFO Micah Young, and/or COO Bilal Muhsin. According to CW-2, the C-suite was tracking what quarterly numbers needed to be made and what customers to approach and ask to take orders early. CW-2 recalled that there were lists and emails of "bulk buys" and what customers to target, adding that "they were tracking this."

251. To give an example of how the discounting worked, CW-2 recalled that he was directed to offer a new contract on sensors where the customer took the next quarter's shipment early with a month's worth of free sensors on top of that. CW-2 explained that if the customer took their next shipment of say 60 sensors early, they would receive an additional month's worth of sensors for free. According to CW-2, the Masimo salesforce could not discount the price of a sensor, but they could offer additional sensors as an incentive. CW-2 explained that in this example the invoice would show 60 sensors sold at the agreed upon price, along with the additional free month of additional sensors at a zeroed-out price. CW-2 added that the invoice would not or could not show discounted pricing. CW-2 stated that he was directed to first go

70

1  to "Hospital A" (as an example) offering the discount, and that if Hospital A was not
2  receptive to it, to then go to Hospitals B, C, and D.

3      252.   CW-2 specifically recalled that, on the final quarterly call he attended in
4  June 2023, Anacone stated, in response to concerns about discounts taking away from
5  future quarters' revenues, something similar to: "We are aware of this but for now you
6  need to concentrate on the current."  CW-2 added that he quit his position at Masimo
7  because he had never worked at a Company before that was so adamant about meeting
8  revenue goals to the point of pushing customers to take inventory early, which he found
9  embarrassing.

10     253.   CW-11 recalled that Masimo provided discounts on equipment to
11 hospitals if they purchased a certain amount of single use sensors.  CW-11 added that
12 Masimo also provided discounts to hospitals if they converted all their equipment to
13 Masimo equipment.

14 **V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

15     254.   Lead Plaintiffs allege that Defendants' statements highlighted in bold and
16 italics within this section were knowingly and materially false and misleading and/or
17 omitted to disclose material information of which Defendants were aware or were
18 reckless in not knowing.  As alleged herein, such statements artificially inflated or
19 maintained the price of Masimo's publicly traded common stock and operated as a
20 fraud or deceit on all persons and entities that purchased Masimo common stock during
21 the Class Period.

22     255.   Throughout the Class Period, Defendants made a series of false and/or
23 misleading statements or omissions concerning the performance of Masimo's
24 healthcare business and the success of the Company's legacy Sound United business,
25 as detailed below.

26
27
28

71

**A.    May 3, 2022 – Earnings Press Release, Form 10-Q for Q1 2022, Earnings Call**

256.    The Class Period begins on May 4, 2022, the day after Masimo issued its first earnings release for Q1 2022 after the market closed on May 3, 2022, filed its Form 10-Q, and held its first earnings call following the acquisition of Sound United in April 2022.

**1.    Q1 2022 Earnings Release**

257.    In the May 3, 2022 earnings release, filed on Form 8-K with the SEC, Defendant Kiani stated, "***We experienced strong demand for our products during the quarter*** while facing some unexpected supply chain challenges."  Kiani also said that Masimo is "***deeply engaged in combined efforts [with Sound United] to generate some exciting new products launches in consumer health & wellness***."

258.    Defendant Kiani's statement in ¶257 regarding the Company's growth prospects was materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  The true facts, which Defendants knew or were deliberately reckless in not knowing, were:

(a)    During the Class Period, the Company had begun offering larger "discounts" to customers (sometimes in the form of extra sensors above the amount in customer contracts or orders), leading to overstuffed sensor inventory at Masimo's customers and cannibalizing future sensor demand;

(b)    Masimo's healthcare sales team was encountering serious pushback from customers to the Company's new five-year contracting terms because customers did not want to be locked into a contract for that long given: (i) the pace of change in healthcare technology, and (ii) customer experience with supply chain delays and demand fluctuations during and after the COVID-19 pandemic; and

(c)    Masimo's healthcare sales team was experiencing severe difficulty selling Masimo devices outside of the core SET pulse oximetry devices because, as

72

1   confirmed by former employees: (i) the devices did not have approval for all patient
2   populations; (ii) customers preferred competitor's products; and (iii) Masimo's
3   products did not perform well enough to meet the needs of the Company's target
4   customers including problems such as poor battery-life (*see* Section IV.B.7.).

5       259.   Further, Defendant Kiani's statement ¶257 regarding the integration of
6   Sound United was materially false and misleading when made because, among other
7   reasons, it omitted to disclose material information of which Defendants were aware
8   or were reckless in not knowing. The true facts, which Defendants knew or were
9   deliberately reckless in not knowing, were:

10       (a)   Defendants had no roadmap or integration plan following the Sound
11   United acquisition and no integration plans were ever put in place throughout the Class
12   Period; and

13       (b)   As a result of the lack of roadmap and integration plan, the two
14   segments (Masimo healthcare and legacy Sound United) remained almost completely
15   segregated throughout the Class Period.

16       **2.   Q1 2022 Form 10-Q**

17       260.   Also on May 3, 2022, Masimo filed its quarterly report on Form 10-Q for
18   Q1 2022 (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendants Kiani
19   and Young. The Q1 2022 10-Q declared:

20       ***We maintain disclosure controls and procedures that are designed to***
21       ***ensure that information required to be disclosed in our reports filed***
    ***under the Securities Exchange Act of 1934, as amended (the Exchange***
22       ***Act), is recorded, processed, summarized and reported within the time***
    ***periods specified in the Securities and Exchange Commission's (SEC)***
23       ***regulations, rules and forms and that such information is accumulated***
    ***and communicated to our management, including our CEO and Chief***
24       ***Financial Officer (CFO), as appropriate, to allow for timely decisions***
    ***regarding required disclosure***.

25       261.   Defendants' internal controls statements in ¶260 were materially false and
26   misleading when made because, among other reasons, they omitted to disclose material
27   information of which Defendants were aware or were reckless in not knowing. Former
28   Masimo and Sound United employees have confirmed that legacy Sound United had

73

1   non-existent internal controls including, among other things, little or no control over

2   user-access to make journal entries at Sound United and journal entries that lacked any

3   support. Prior to the acquisition by Masimo, an audit by BDO identified at least five

4   material weaknesses in Sound United's internal controls that former employees

5   confirm were never fixed post-acquisition. Indeed, Defendants knew or were

6   deliberately reckless in not knowing that Sound United was never ready to meet the

7   accounting standards for a publicly traded entity. *See* Section IV.B.

8   ### 3.   Q1 2022 Earnings Call

9   262.   On the earnings call on May 3, 2022, Defendant Kiani claimed that supply

10   chain problems rendered the quarter an "anomaly" and touted the prospects for Sound

11   United at Masimo following completion of the acquisition. Specifically, Kiani said,

12   "***This quarter was an anomaly from the perspective of reported revenue and earnings***

13   ***due to supply chain problems***."

14   263.   Defendant Kiani continued to speak about the purported benefits of the

15   Sound United acquisition during the scripted portion of the earnings call on May 3,

16   2022. Specifically, he said, "[In] 2022, ***Sound United should continue to benefit from***

17   ***the growth of high-resolution audio streams that should drive adoption of premium***

18   ***home entertainment systems, which can process it***."

19   264.   Also during the May 3, 2022 earnings call, Defendant Young falsely

20   pointed to the supply chain as causing a revenue shortfall for Masimo, stating, "***Our***

21   ***results were adversely affected by certain supply chain issues, which we have***

22   ***addressed. Had this not occurred, we would have exceeded our revenue and earnings***

23   ***expectations for the quarter due to continued strong customer demand***."

24   265.   An analyst from Raymond James & Associates, Inc. ("Raymond James")

25   asked what the growth rate for Sound United was in the revenue guide of $660 million

26   to $700 million. Young responded, "***[W]e're assuming high-single digit growth for***

27   ***the full year***."

28

74

266.   Adding to the analysts' continued focus on the Sound United acquisition, an analyst from Piper Sandler asked what Masimo's plan was for Sound United "beyond the recent W1 announcement" and "how you plan to move forward with establishing a consumer brand[?]"  In response, Defendant Kiani said:

> Bottom line is we have bought Sound United for several reasons. I think I articulated that during our prepared remarks. ***One of them is their management team and their ability to think through consumer sales, advertisement, logistics***…
>
> So, a big reason for this acquisition is our conclusion that we have some really incredible products coming out without an incredible distribution channel and team. And as we tried over the last few years as we were preparing for the launch of W1 and other products, we try to build that up organically. We had not succeeded to the level that we thought would fulfill our plans. ***So, they are our plan. And we have additional things we're brainstorming with them, but that's really the plan***.

267.   Finally, an analyst from Wolfe Research, LLC ("Wolfe Research") asked Defendants whether the investment community's negative reaction to the Sound United transaction surprised them, since the $1 billion investment led "the market [to vote] by reducing your enterprise value by $6 billion or $7 billion, [] an alarmingly high spread." Defendant Kiani responded:

> ***Yes. It definitely surprised me. I couldn't have imagined the way some of the investors reacted*** because, look, I don't know why people want to invest in Masimo or why they don't. But if people got out because of the Sound United, that was really a bad decision because Sound United helps our plans for the future. And we didn't mortgage much to gain that assurance for our future.
>
> ***So yes -- no, the investors' reaction is a big surprise***, but it doesn't at all, not at all, change our thinking about the reason we did it and our conclusion that this was a great acquisition. As of this point, we told you before, if things don't work out, you make decisions, you go forward, but sometimes, you can be wrong. If it doesn't work out, we'll let you know. But this is really at this point what we think is the best thing we could have done.

268.   Defendants' statements in ¶¶262-65 regarding the Company's growth prospects were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  The true facts, which Defendants knew or were deliberately reckless in not knowing, were:

75

(a)    During the Class Period, the Company had begun offering larger "discounts" to customers (sometimes in the form of extra sensors above the amount in customer contracts or orders), leading to overstuffed sensor inventory at Masimo's customers and cannibalizing future sensor demand;

(b)    Masimo's healthcare sales team was encountering serious pushback from customers to the Company's new five-year contracting terms because customers did not want be locked into a contract for that long given: (i) the pace of change in healthcare technology, and (ii) customer experience with supply chain delays and demand fluctuations during and after the COVID-19 pandemic;

(c)    Masimo's healthcare sales team was experiencing severe difficulty selling Masimo devices outside of the core SET pulse oximetry devices because, as confirmed by former employees: (i) the devices did not have approval for all patient populations; (ii) customers preferred competitor's products; and (iii) Masimo's products did not perform well enough to meet the needs of the Company's target customers including problems such as poor battery-life (*see* Section IV.B.7.);

(d)    The legacy Sound United business segment had rampant material weaknesses in internal controls over financial reporting which led to a ballooning and ageing stockpile of inventory, which meant Masimo could not effectively identify which costs should be captured in the value of inventory versus recorded as an expense in the period incurred;

(e)    The increase in inventory on hand at Sound United posed a significant risk during the Class Period as demand was declining while inventory on hand increasingly consisted of obsolete products which had to be discounted (risking damaging certain of Sound United's high end audio brands). Further Sound United's aging and obsolete inventory was not adequately reserved against.

(f)    According to former employees, Sound United's unsaleable inventory caused working capital pressure which in turn limited the Company's ability to modernize its product suite.

269.    Further, Defendants' integration statements in ¶¶266-67 were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing, as discussed in ¶¶258(a)-(b).

270.    Defendants' comments during the Q1 2022 earnings call and Masimo's SEC filings soothed analysts' concerns, as analysts responded positively to Defendants' statements by maintaining their outlook for the stock.  For example, Morningstar, Inc. published a report on May 3, 2022 titled, "*While Masimo's Q1 Didn't Sound Great, Sound United Wasn't as Dilutive as Feared; Maintain $163 FVE*," and concluded that "the market has overreacted" regarding the Sound United deal.  Going one step further, Wolfe Research published a report on May 3, 2022 titled, "*Value Case Starting to Kick, Scream, Shout 'Just Buy It'*."

271.    The market reacted positively to Defendants' after-hours statements on May 3, 2022.  The next day, on May 4, 2022, Masimo's common stock price rose to a close of $128.10 per share, up 11.6% from the prior day's close of $117.97 per share.

## B.    August 9, 2022 – Q2 2022 Press Release and Earnings Call

272.    On August 9, 2022, after the market closed, Masimo released its Q2 2022 financial results for the period ended July 2, 2022, in addition to holding a conference call to discuss the results.

### 1.    Q2 2022 Earnings Release

273.    In its Q2 2022 earnings press release, Masimo touted its financial results as beating their guidance, with a purported "***85.3% reported growth compared to [Q2 2021]***."  Indeed, Defendant Kiani was quoted in the release, as saying:

> We delivered strong performance in the second quarter with revenue and ***earnings exceeding the high end of our guidance range***. Our healthcare business fulfilled most of the delayed shipments from the first quarter by increasing manufacturing output, which boosted our growth in the second quarter. ***As a result, our healthcare business delivered 11% constant currency revenue growth for the first half of the year***. We are raising our financial guidance on a constant currency basis for fiscal year 2022. I'm excited about the expanded potential to address new markets with our

77

recently acquired consumer business, which will advance solutions for our customers at hospitals and at home.

274. The earnings release also included guidance for the third quarter of 2022 and the full year of 2022, ***including guidance for legacy Sound United of $195 million to $215 million for the third quarter of 2022 and $655 million to $700 million for the full year 2022***.

275. Masimo and Defendant Kiani's statements in ¶¶273-74 regarding the Company's growth prospects were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing, as discussed in ¶¶268(a)-(f).

276. Additionally, Defendants' statements in ¶¶273-74 regarding the Company's financial guidance were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. Indeed, Defendants knew or deliberately disregarded that the use of "plugs" at legacy Sound United to balance and close its books manipulated and artificially inflated the Company's overall financial results. Indeed, each month, Sound United recorded "plug" entries altering, among other things, Sound United's cost of goods sold and inventory because otherwise Sound United's accounting records could not be balanced. These monthly "plug" entries occurred in amounts up to $14 million[10]—well in excess of the Sound United financial statement materiality threshold of $2 million. As confirmed by former Sound United and Masimo employees, the "plug" was a COGS credit that artificially inflated Sound United's margins with the offset going to inventory, the motive of which was to meet forecasted numbers for non-healthcare/legacy Sound United.

---

[10] Mike Palumbo sent an internal email to Defendant Young on March 10, 2023, regarding the $14 million "plug." The email explained that the $14 million plug had no support and was the same plug that had been entered monthly.

78

### 2. Q2 2022 Earnings Call

277. On the Q2 2022 earnings call, Defendant Kiani noted that this was the first quarter that Sound United was included in the reporting results and declared, "***The new business performed very well in the quarter, with sales exceeding expectations.***" Providing more specificity, Defendant Young reported:

> ***For our consumer non-healthcare segment, second quarter revenues were $208 million from April 11, 2022, through fiscal quarter end***. On a pro forma basis, for the full quarter, our consumer non-healthcare revenues would have been $215 million, representing 4% reported growth and 10% constant currency growth. This business had solid growth across all regions and categories led by the premium brands of [Denon], Marantz and Bowers & Wilkins. ***The combination of strong demand with effective management of supply chain challenges produced better-than-expected sales performance during the quarter***.

278. Defendants Kiani and Young's statements in ¶277 regarding Sound United's growth prospects materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. The true facts, which Defendants knew or were deliberately reckless in not knowing, were:

        (a)    The legacy Sound United business segment had rampant material weaknesses in internal controls over financial reporting which led to a ballooning and ageing stockpile of inventory, which meant Masimo could not effectively identify which costs should be captured in the value of inventory versus recorded as an expense in the period incurred;

        (b)    The increase in inventory on hand at Sound United posed a significant risk during the Class Period as demand was declining while inventory on hand increasingly consisted of obsolete products which had to be discounted (risking damaging certain of Sound United's high end audio brands). Further Sound United's aging and obsolete inventory was not adequately reserved against.

        (c)    According to former employees, Sound United's unsaleable inventory caused working capital pressure which in turn limited the Company's ability to modernize its product suite.

79

279.  Additionally, Defendant Young's statements in ¶277 regarding Sound United's effective management of supply chain issues in were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  The true facts, which Defendants knew or were deliberately reckless in not knowing, were that due to material weaknesses in its internal controls, including an inability to track inventory and no inventory obsolescence policy, during the Class Period, Sound United's aging inventory stockpiles ballooned.

280.  Later in the Q&A, an analyst from Piper Sandler questioned Defendant Kiani directly about his July 11, 2022 termination[11] of former Sound United CEO Kevin Duffy after "you indicated when you announced the transaction 6 months ago that retaining Sound leadership and talent was the top priority and is what you saw as the biggest risk to a successful integration or outcome from the acquisition."  Kiani replied that "*sometimes it feels like it's a good fit and sometimes it doesn't feel like it's a good fit.  And it wasn't a good fit for either Kevin or us*."  Kiani continued, "*The good news is we have a very strong team below Kevin that have really been running the business*."

281.  Defendant Kiani's statements about former Sound United CEO Kevin Duffy's departure from Masimo and the Sound United integration ¶280 were false, misleading, and omitted material facts.  In addition to the reasons discussed at ¶¶258(a)-(b), Kiani fired Mr. Duffy because he disagreed with Mr. Kiani's knee-jerk firing of the head of Bowers & Wilkins in the United Kingdom for personal reasons, alleged to be a perceived eye roll in a meeting.  As confirmed by former employees, by the end of 2022, Defendant Kiani fired many of the top management personnel at

---

[11] Masimo's July 13, 2022 SEC filing on Form 8-K only stated that Duffy's termination was "without cause," with no accompanying reasons or justifications why, just ninety (90) days following the close of the Sound United acquisition, Masimo was parting ways with the leader of that organization, after Defendant Kiani emphasized the importance of retaining leadership for the success of the integration.

Sound United, including Sound United CEO Kevin Duffy, despite citing, in early 2022, that the Sound United management team was one of the primary reasons for buying the Sound United.

282.   During the Q&A session of the August 9, 2022 earnings call, an analyst from Needham & Company, LLC ("Needham & Co.") asked Defendants Kiani and Young if the new non-healthcare segment drove the "bigger delta" announced for third quarter and full year guidance for Masimo.  Defendant Kiani responded that the third quarter "*has historically been the lightest quarter*" for healthcare because patients have fewer "*elective procedures in the summertime*[.]"  Kiani added, "And I think on the consumer side, *a lot of business gets done in the holiday season in Q4*. And so, I think *they're kind of in the same boat*. So, we don't – *there is nothing that we're alarmed about*."  Defendant Young added, "*[T]o Joe's point, the strongest quarter for the consumer, our now non-healthcare segment, is of course the fourth quarter*." Young continued, "*And there's a lot of investment that goes into the business throughout the year preparing for that fourth quarter*."

283.  Defendants Kiani's statements in ¶282 that Sound United's business would achieve growth were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing, including the "plugs" being used at Sound United to balance its books, as discussed in ¶276.  Furthermore, as discussed in ¶279, due to material weaknesses in its internal controls, including an inability to track inventory and no inventory obsolescence policy, during the Class Period, Sound United's aging inventory stockpiles ballooned.  Finally, Defendant Kiani's statements regarding Masimo healthcare's sales were materially false and misleading for the reasons discussed in ¶258(a)-(c).

284.  Defendants' statements in ¶¶277, 280, and 282 assuaged analysts' concerns and they responded by issuing positive reports following the earnings call. For example, on August 9, 2022, Wolfe Research published a note titled, "*Core Caught*

81

1  *Up and Sound United Didn't Whiff – So… Decent Report*," in which they wrote,

2  "Concerns mounted following consumer leader departure and more med tech supply

3  chain snafus" but that "short-run fears likely assuaged."  Similarly, analysts at BTIG,

4  LLC ("BTIG") published a report on August 9, 2022 titled, "*Q2 Sales Beat Booster by*

5  *Consumer Business and HC Shipping Catch Up; Forex Hits Guide; New Product*

6  *Details Expected in December*," in which they noted that "[m]anagement gave upbeat

7  commentary on both sides of the business, noting sustained strong demand for the

8  healthcare products and anticipated continued consumer appetite for discretionary

9  spending on the non-healthcare products."

10      285.  The market reacted positively to Defendants' after-hours statements on

11  August 9, 2022.  The next day, on August 10, 2022, Masimo's common stock price

12  rose to a closing price of $157.78 per share, up 15.4% from the prior day's closing

13  price of $148.17 per share.

14      **C.    August 10, 2022 – Q2 2022 Form 10-Q**

15      286.  On August 10, 2022, Masimo filed its Form 10-Q for the period ending

16  July 2, 2022 (the "Q2 2022 10-Q").  The Q2 2022 10-Q was signed by Defendants

17  Kiani and Young.

18      287.  The Q2 2022 10-Q contained the same false statement regarding

19  Masimo's internal controls as in the Q1 2022 10-Q discussed at ¶260.  The Q2 2022

20  10-Q statement regarding Masimo's internal controls was false for the reasons stated

21  in ¶261.

22      **D.    November 8, 2022 – Q3 2022 Press Release and Earnings Call**

23      288.  On November 8, 2022, after the market closed, Masimo released its Q3

24  2022 earnings for the period ending October 1, 2022 and held a conference call.

25          **1.    Q3 2022 Earnings Release**

26      289.  In its November 8, 2022 press release announcing financial results for the

27  third quarter of 2022, filed with the SEC on Form 8-K, Masimo included a statement

28  from Defendant Kiani, who said, "Our healthcare segment achieved double digit

82

constant currency growth and ***our consumer non-healthcare segment reported another quarter of better-than-expected results***. ***Our performance in the third quarter was achieved in a challenging environment and made possible by commendable contributions from our entire team***."

290. Defendant Kiani's statement regarding Sound United's results in ¶289 was materially false and misleading when made because, among other reasons, he omitted to disclose material information of which Defendants were aware or were reckless in not knowing, including Sound United's use of "plugs" discussed at ¶276.

### 2.    Q3 2022 Earnings Call

291. During the 3Q 2022 earnings call, Defendant Young stated:

> ***We delivered strong results in the third quarter with revenues, operating margins and earnings per share exceeding the high end of our guidance range***. ***Our consolidated revenue was $549 million***, representing 3% reported growth and 8% constant currency growth on a pro forma basis.

292. Defendant Young continued, and specifically stated with respect to Sound United:

> For our consumer nonhealthcare segment, third quarter revenues were $222 million, decreasing 2% on a pro forma reported basis but increasing 5% on a pro forma constant currency basis.
>
> As I mentioned on our last earnings call, this business faced its toughest year-over-year comparison due to an exceptionally strong third quarter of 2021, which was above trend line due to the fulfillment of back[-ordered] products. ***Despite the difficult year-over-year comparison, this business delivered solid growth due to strong performance by our premium Bowers & Wilkins and Marantz brands***.

293. Defendant Young's statements ¶291 regarding Q3 2022 revenues and guidance for Masimo's nonhealthcare segment were false and misleading for the reasons stated in ¶276.

294. Additionally, Defendant Young's statements in ¶292 regarding the performance of Sound United and its prospects for growth were false and misleading when made for the reasons discussed at ¶278(a)-(c). Furthermore, Defendant Young's statements in ¶292 regarding the "strong performance" of Sound United was false and

1    misleading when made because it omitted to disclose the ballooning inventory
2    stockpile at Sound United as discussed in paragraph ¶279.

3    295.   Defendants' statements in connection with the Q3 2022 earnings report
4    soothed the market.   For example, analysts at Piper Sandler published a report on
5    November 8, 2022 titled, "*Solid 3Q, but Fx and Supply Chain EPS Headwinds*
6    *Extending to '23 as We Expected,*" and noted that "core growth for each of Healthcare
7    and Non-Healthcare were good and better than forecasted. . . . [T]he solid underlying
8    business trends . . . leave[] us with a sense of optimism for the broader business."
9    Likewise, on November 8, 2022, analysts at Wolfe Research published a report titled,
10   "*This Report Sounds Good Enough for Now – Likely Get a Better Pulse on 2023 in a*
11   *~Month,*" and wrote that it "felt like another ho-hum Masimo update."

12   296.   The market reacted positively to Defendants' after-hours comments on
13   November 8, 2022.   The next day, on November 9, 2022, Masimo's common stock
14   price rose to a closing of $121.58 per share, up 9.7% from the prior day's closing price
15   of $110.88 per share.

16   **E.    November 9, 2022 – Q3 2022 Form 10-Q**

17   297.   On November 9, 2022, Masimo filed its Form 10-Q for the period ending
18   October 1, 2022 (the "Q3 2022 10-Q").   The Q3 2022 10-Q was signed by Defendants
19   Kiani and Young.

20   298.   The Q3 2022 10-Q contained the same false statement regarding
21   Masimo's internal controls as in the Q1 2022 10-Q discussed at ¶260 and the Q2 2022
22   10-Q discussed at ¶¶286-87.   The Q3 2022 10-Q statement regarding Masimo's internal
23   controls was false for the reasons stated in ¶261.

24   **F.    November 15, 2022 – Stifel Healthcare Conference**

25   299.   On November 15, 2022, Defendants Young and Kammerman appeared on
26   behalf of Masimo at the Stifel Healthcare Conference.   At the Stifel Healthcare
27   Conference, the host pressed Defendant Young to explain "the confusing part for
28   [him]" after "both . . . business[es] perform[ed] extremely well" because Masimo

84

1    cautioned on its November 9, 2022 earnings call that there were foreign exchange
2    headwinds and supply chain issues tempering its guidance for the fourth quarter of
3    2022 and beyond into 2023.  Young responded, "*We are being cautious right now just*
4    *because there are a lot of challenges right now in the macro environment*."

5        300.  Defendant Young's statements in ¶299 regarding the "challenges" in the
6    "macro environment" were false and misleading when made because, among other
7    reasons, they omitted material facts regarding the real challenges to the Company's
8    growth, as discussed at ¶¶268(a)-(f).

9        301.  Furthermore, Defendant Young's statements in ¶299 were false and
10   misleading when made because they concealed the true state of the Company's
11   ballooning inventory in both the healthcare and legacy Sound United segments.  The
12   true facts, which Defendants knew or were deliberately reckless in not knowing, were:

13       (a)    Due to material weaknesses in its internal controls, including an
14   inability to track inventory and no inventory obsolescence policy, during the Class
15   Period, Sound United's aging inventory stockpiles ballooned;

16       (b)    Following the COVID-19 pandemic, Defendants decided to
17   stockpile single-use sensors which they were subsequently unable to sell as Masimo's
18   healthcare customers were increasingly favoring reusable sensors leading to a
19   ballooning inventory of single-use sensors on the healthcare side of Masimo's business;
20   and

21       (c)    Additionally, during the Class Period, the Company had begun
22   offering larger "discounts" to customers (sometimes in the form of extra sensors above
23   the amount in customer contracts or orders), leading to overstuffed sensor inventory at
24   Masimo's customers and cannibalizing future sensor demand.

25       302.  Later during the Stifel Healthcare Conference, the host asked Defendant
26   Young to clarify the contract backlog in Masimo's healthcare business and "the
27   implications for [20]23[.]"  In response, Young claimed:

28

LEAD PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS [Case No. 3:23-cv-01546-L-DEB]

*Well, it's a good tailwind going into '23 and our outlook for next year as well as beyond* because a lot of our contracts, as you know, those are, call it, 4-, 5-year terms as far as length . . . that backlog represents undelivered equipment under contract as well as undelivered sensors. So *that will give a nice tailwind over the next 5 years [as we] start to install under those contracts and roll out the equipment*.

\*\*\*

*We're seeing that in our contract -- the new contracts, winning new customers to Masimo. We're also seeing strong renewals as well.* So all those things are lining up very well for -- as we move into next year.

303.    Defendant Young's statements in ¶302 regarding the Company's legacy healthcare segment's growth prospects were materially false and misleading when made because, among other things, they omitted to disclose material information of which Defendants were aware of were reckless in not knowing, as discussed in ¶¶258(a)-(c).

304.    Also at the Stifel Healthcare Conference, the host asked Defendant Young about the status of the integration of Sound United into Masimo.  Young stated:

Right now, we've got -- it's -- right now, we're going through collaboration among our R&D and development teams. So those projects are underway. They're working together. A lot of those projects are 2-year-plus type contracts or projects. *The back office, we've been integrating more to the back office. That's been driving some efficiencies there for us. We're through the majority of the integration. So we still have some systems integrations that we need to work through, but it's going very well so far.*

305.    Defendant Young's statements about the integration of Sound United into Masimo in ¶304 were materially false and misleading when made because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing as discussed at ¶281.

306.    The market reacted positively to Defendants' comments during the Stifel Conference on November 15, 2022.  During trading that day, Masimo's common stock price rose to a closing price of $126.58 per share, up 3.6% from the prior day's close of $122.13 per share.

**G.    December 13, 2022 – Masimo 2022 Analyst/Investor Day**

307.    On December 13, 2022, Masimo hosted its 2022 Analyst/Investor Day. During the 2022 Analyst/Investor Day, the Defendants addressed many topics, including Masimo's revenue guidance and the Sound United acquisition.

308.    During his opening remarks, Defendant Kiani said the following about why Masimo bought Sound United, Defendant Kiani said:

> What we have in our hands right now is rice krispies and cornflakes. ***People keep buying them. And we just can't screw it up*** and we don't intend to. We intend to actually take it to a new level. But we couldn't have gotten that with some of the new companies that have emerged that could be gone tomorrow.
>
> ***And by buying Sound United, we now have another $1 billion business that on its own will do well despite, God forbid, what could ever happen to Masimo health care***.

309.    Defendant Kiani's statements in ¶308 about Masimo's acquisition of Sound United were false and misleading for the reasons discussed in ¶281. Furthermore, Defendant Kiani's statements ¶308 regarding the growth prospects for Masimo's legacy healthcare segment and Sound United were materially false and misleading when made for the reasons discussed in ¶268(a)-(f).

310.    Next, Defendant Mushin spoke at the 2022 Analyst/Investor Day about the healthcare segment.    During his speech, Muhsin made the following claim regarding the addressable market for Masimo:

> What gives Masimo SET the right to win and continue to win not only by expanding with our installed base, ***but continuing to win customers from our competitors***.

311.    Defendant Muhsin's statements in ¶310 regarding the prospects for growth at Masimo's legacy healthcare segment were materially false and misleading when made for the reasons discussed in ¶258(a)-(c).

312.    Later at the 2022 Analyst/Investor Day, Defendant Young presented about Masimo's financials.    Regarding the consolidated revenue guidance for 2023, Young stated, "***[W]e're looking at $2.330 billion to $2.4 billion for next year***."    Young explained that the consolidated revenue guidance contained "***$1.420 billion to $1.450***

87

*billion [from healthcare]*" and "*$910 million to $950 million [from Masimo Consumer]*."

313.    Defendant Young's statements regarding Masimo's guidance in ¶312 were materially false and misleading when made for the reasons discussed in ¶276. Furthermore, insofar as Defendant Young's statements in ¶312 addressed the Company's prospects for growth, those statements were false and misleading for the reasons discussed in ¶268(a)-(f).

314.    Regarding the Sound United acquisition, Defendant Young stated:

> *[T]he power of this acquisition is it provides immediate critical mass for what we're doing today and all the things that we're showing you today with new products, all the things we're coming out with consumer health.* And also it plays a key role with our future of telemonitoring . . . .

315.    In addition to the purported logistical advantages of the Sound United acquisition, Defendant Young also touted its purported financial benefits.   Young falsely claimed:

> *[W]hat we found was a company that had all the majority of the things we were looking for, and it was a reasonable valuation, 1x revenue, 8x EBITDA, and it gave us immediately accretive earnings. And the biggest thing here for us too is it provides significant upside optionality.*

316.    Defendant Young's statements in ¶¶314-15 regarding the acquisition of Sound United were materially false and misleading for the reasons stated in ¶¶276, 278(a)-(c), 279, and 281.

317.    Finally, Defendant Young made the following statements about Masimo's plan "to deliver sustainable revenue growth."  He said:

> *[I]f you look at our plan, high-single digit growth, 7% to 9% combined, and we're going to do that through market-leading performance of our core businesses.* When you think about the consumer audio, the traditional healthcare business. And then we have a lot of upside optionality to capture. And we plan to make the right investments as we move forward and balance reinvestment within what the guidance we provided to really capture that upside optionality and hopefully drive significantly better results than what we're even targeting today. And then, of course, leverage earnings growth.
>
> If you look at our long-term outlook, we're providing 10% to 12% earnings growth. *We're going to do that to driving gross margin*

88

*improvements, continue to leverage operating expenses and balancing reinvestment to support those new product initiatives and that will help us capture the upside as well as continue to deliver sustainable revenue and earnings growth as we move forward.*

318. Defendant Young's statements in ¶317 about Masimo's plan for sustainable revenue growth were materially false and misleading for the reasons discussed in ¶¶268(a)-(f), 276, 301(a)-(c).

319. The market reacted positively to Defendants' comments during the Analyst/Investor Day on December 13, 2022. That day, Masimo's common stock price rose to a closing price of $150.36 per share, up 4.9% from the prior day's closing price of $143.36 per share.

## H.    January 11, 2023 – J.P. Morgan Healthcare Conference

320. On January 11, 2023, Defendant Young presented on behalf of Masimo at the J.P. Morgan Healthcare Conference. Following his scripted presentation, the host asked him to "provide a little bit more color on the benefits of the Sound United acquisition from a strategic and financial perspective[.]" Young responded:

> We looked at a lot of companies. Some were just -- the financials didn't make sense. There's other areas that just wasn't strategic fit for us. We liked how a lot of those boxes checked down the line for Sound United. And again, we weren't focused on audio. We were focused on what we could do together to deliver the best product in consumer health as well as they happen to be a great fit for hearables as well, and that's a big market that we're going after.
>
> And it would've been heavy multiyear investment, highly diluted to earnings, and we didn't want to do that. ***And it just happened to be a company that had pretty good financial metrics, and they were immediately accretive to earnings.*** And it gave us a very scalable platform and something that we can drive a lot of synergies on over the next 5 to 10 years.

321. Defendant Young's statements in ¶320 regarding why Masimo bought Sound United and its financial health were materially false for the reasons discussed in ¶¶276, 278(a)-(c), 279, and 281.

322. The market reacted positively to Defendant Young's comments during the J.P. Morgan Healthcare Conference on January 13, 2023. That day, Masimo's common

89

1  stock price rose to a closing price of $156.75 per share, up 1.2% from the prior day's

2  closing price of $154.91 per share.

### I.    February 28, 2023 – Press Release Announcing Q4 2022 Results and Full-Year Guidance for 2023

323.   After the stock market closed on February 28, 2023, Masimo published a press release announcing its financial results for Q4 2022 and for the full-year 2022 and held a conference call to discuss the results.

#### 1.    February 28, 2023 – Q4 2022 Earnings Release

324.   In the Q4 2022 press release announcing Masimo's financial results, Defendant Kiani said:

> 2022 was a momentous year for Masimo. Our healthcare business outperformed expectations. We continued to innovate and deliver clinically proven new products in our professional healthcare markets. In addition, we accelerated our strategy to capture the vast consumer health market opportunity with the acquisition of Sound United and the introduction of new wearable technologies such as our W1™ biosensing watch. The acquisition has provided us with immediate scale across consumer engineering, sales, marketing and distribution that would have otherwise taken many years of dilutive investment to build. ***Instead, we've already completed the integration and are working to realize the tremendous potential of the hearables, wearables and telemonitoring markets unlocked by our unique combination of healthcare and consumer technology capabilities***.

325.   Defendant Kiani's statement that the Sound United integration was "already completed" in ¶324 was materially false and misleading for the reasons discussed in ¶281.

#### 2.    February 28, 2023 Earnings Call

326.   During his prepared remarks on the February 28, 2023 earnings call, Defendant Kiani repeated the false statement he made in the press release regarding the Sound United integration, saying, "***we've already completed the integration of Sound United***[.]"

327.   Defendant Kiani's statement that the Sound United integration was "already completed" in ¶326 was materially false and misleading for the reasons discussed in ¶281.

1    328.  Later during the Q4 2022 earnings call, Defendant Young increased
2    Masimo's guidance, stating:

3    ***For the full year 2023, we are now projecting a consolidated revenue
     range of $2.415 billion to $2.460 billion, representing 6% to 8% growth
4    on a pro forma and constant currency basis.*** Compared to our prior
     guidance, this represents an increase of $73 million at the midpoint of the
5    range, which is comprised of an increase of $58 million due to foreign
     exchange improvement and an increase of $15 million due to our
6    improved sales expectations.

7    329.  Defendant Young's statement in ¶328 raising Masimo's full year guidance
8    was materially false and misleading for the reasons discussed in ¶¶268(a)-(f), 276.

9    330.  Analysts credited Defendants' false representations in the Q4 2022
10   earnings release and conference call.  For example, on February 28, 2023, Wolfe
11   Research published a report titled, "*MASI: Holy Guacamole that was an Epic Q&A*
12   *Talk Up (Bullish)*," in which it raised its price target for Masimo's stock.  Raymond
13   James analyst also published a positive report following the earnings call on February
14   28, 2023 titled, "*Estimates Higher, a Lot of Optionality Still on the Board;*
15   *Outperform*," and declared "[t]he MASI story remains catalyst-rich with various
16   pipeline, litigation, and corporation [sic] development activities that offer potential
17   value creation opportunities."  Similarly, analysts at Jefferies LLC ("Jefferies")
18   published a report on March 1, 2023 titled, "*Beat and Raise; Pipeline Offers Upside;*
19   *Raising Numbers and PT.*"

20   331.  The market reacted positively to Defendants' after-hours comments on
21   February 28, 2023.  The next day, on March 1, 2023, Masimo's common stock price
22   rose to a closing price of $175.93 per share, up 5.2% from the prior day's closing price
23   of $167.31 per share.

24   **J.    March 1, 2023 – Q4 2022 and Full-Year 2022 Form 10-K**

25   332.  On March 1, 2023, Masimo filed its Form 10-K for the period ending
26   December 31, 2022, for the fourth quarter and full-year of 2022 (the "2022 10-K").
27   The 2022 10-K was signed by Defendants Kiani and Young.

28

333.   The 2022 10-K reported *consolidated revenue of $2,035 million, with $1,340.3 million from the healthcare segment and $695.5 million from legacy Sound United*. The 2022 10-K stated that "*[t]he increase in healthcare segment revenue was . . . offset by the impact of unfavorable foreign exchange rate movements*," and that "*[t]he non-healthcare segment saw strong demand for consumer audio products, which was partially offset by the impact of unfavorable foreign exchange rate movements*."

334.   Defendants' revenue statements in ¶333 were materially false and misleading when made for the reasons discussed in ¶¶268(a)-(f), 276.  Additionally, the Defendants' statements in ¶333 were materially false and misleading because they omitted to disclose that both segments at Masimo were experiencing problems associated with ballooning inventory.  ¶301(a)-(c).

### K.   May 9, 2023 – Press Release Announcing Q1 2023 Results

335.   On May 9, 2023, after the market closed, Masimo issued a press release announcing earnings for the quarter ending April 1, 2023, filed with the SEC on Form 8-K.  *The Company reported consolidated revenue of $565.0 million, healthcare revenue of $346.7 million, and non-healthcare revenue of $218.3 million*.

336.   Masimo's statement regarding the Company's revenue figures reported in ¶335 was materially false and misleading for the reasons discussed in ¶¶268(a)-(f), 276.

### L.   May 9, 2023 – Q1 2023 Earnings Call

337.   During the Q1 2023 earnings call, Defendant Young repeated the misleading revenue statistics that were contained in the press release (*see* ¶¶335-36) and also declared, "*[O]ur healthcare business again realized steady gains in market share across the portfolio*."

338.   Defendant Young's statement that Masimo's healthcare products gained market share "across the portfolio" in ¶338 was materially false and misleading for the reasons discussed in ¶¶258(a)-(c).

339.    Analysts credited Defendants' statements on the earnings call.    For example, analysts at Jefferies published a report on May 9, 2023 titled, "*1Q Beat; Guidance Maintained; Good Underlying Trends; Litigation 'Do Over,'*" in which they wrote, "Given a good start to the year with positive trends in HC and non HC plus more confidence in the pipeline for '24+, we are leaving '23 numbers largely unchanged but raising our out year numbers and PT."  Similarly, analysts at BTIG published a note on May 10, 2023 titled, "*Plenty to Like with Fast Start to the Year; Maintained Guide Points to a Shift Back to the Pre-Pandemic Quarterly Cadence; Reiterate Buy,*" and wrote, "We would be buyers on any potential weakness" as "[a]ll key metrics for MASI's core HC business were positive" and "[t]he Consumer business has remained resilient[.]"

**M.    May 10, 2023 – Q1 2023 Form 10-Q**

340.    On May 10, 2023, Masimo filed its Form 10-Q for the period ending April 1, 2023 (the "Q1 2023 10-Q").  The Q1 2023 10-Q was signed by Defendants Kiani and Young.

341.    The Q1 2023 10-Q contained the same false statement regarding Masimo's internal controls as in the Q1 2022 10-Q discussed at ¶260.  The Q1 2023 10-Q statement regarding Masimo's internal controls was false for the reasons stated in ¶261.

**N.    June 8, 2023 – Jefferies Healthcare Conference**

342.    At the June 8, 2023 Jefferies Healthcare Conference, Defendant Kammerman presented on behalf of Masimo.  At the conference, Kammerman fielded a question about "trends" the Company was seeing with Masimo's sensors of Masimo's hospital automation product line and its growth potential.  In response to this question, Kammerman said:

> Yes, you're right in saying that our sensor sales are tied to overall sensors in the hospitals. Our sensors are used with both surgery patients as well as medical treatment patients. And so you can see that hospital traffic is really the key variable there. Hospital traffic now has basically gotten back to trend line growth as you can see in the hospital reports

93

coming out quarterly. ***We're looking at sensors growth in the range of 1% to 3% nowadays.***

So it's made a nice recovery from the levels during COVID when people were postponing a lot of elective surgeries. ***For us, the key metric to look at for forecasting our growth is the installed base growth. And there, we're tracking very much on trend at about 7%.*** Some of the OEM monitoring companies had some hiccups with installations over the past 18 months. But a lot of those have now been addressed. They had supply chain problems themselves. ***So at this stage, I would say, things have gotten largely back to normal.***

343.    Defendant Kammerman's statements in ¶342 regarding sensor growth were materially false and misleading when made for the reasons discussed in ¶¶258(a)-(c); 301(b)-(c).

## VI.    THE TRUTH EMERGES

344.    The truth about the state of Masimo's business segments was revealed to the market through two disclosures.  *First*, on July 17, 2023, Masimo issued a preannouncement of its Q2 2023 earnings revealing a substantial cut to its full-year guidance due to weaknesses in both its healthcare and non-healthcare segments.  The preannouncement stunned investors and they reacted swiftly as Masimo's common stock price plunged nearly 20%.

345.    *Second*, three weeks later, on August 8, 2023, Masimo released its official earnings results and filed its Q2 2023 Form 10-Q with the SEC that same day.  In addition to providing more detail surrounding the dismal revenues from both the healthcare and non-healthcare business segments, Masimo revealed that it was implementing a $100 million reduction in expenses to address the shortfall in Q2 2023 revenues.  This further revelation of the extent to which Masimo's business was failing to meet the revenue and earnings targets it had set caused the Company's stock price to decline once again.

### A.    July 17, 2023 – Preliminary Q2 2023 Announcement

346.    On July 17, 2023, after the market closed, Masimo announced its preliminary revenue results for the quarter ending July 1, 2023.  The preliminary revenue announcement press release was filed with the SEC on Form 8-K the same

94

day.    In the preannouncement, Masimo revealed, among other information, the following:

> **Masimo expects its consolidated revenue for the second quarter 2023 to range from $453 million to $457 million, with healthcare revenue expected to range from $280 million to $282 million and non-healthcare revenue expected to range from $173 million to $175 million**.[12]
>
> Though the healthcare business made significant market share gains through new contracting in the second quarter, **healthcare revenue for the second quarter 2023 was lower than expected due to multiple factors**, including the following:
>
> - Large orders that were anticipated for the second quarter were delayed to the second half of the year.
>
> - **Single-patient use sensor sales were down due to**:
>
>   - **Lower than expected U.S. hospital inpatient census, which drives usage of single-patient use sensors**; and
>
>   - **Elevated sensor inventory levels at some customers due to discounting in prior quarters, which was discontinued during the second quarter, and the abnormally early end of the flu season, which faded quickly in the first quarter this year**.
>
> - **Conversions of new customers who have contracted to switch to Masimo were less than expected due to labor shortages in hospitals, and our OEM partners not being able to provide the patient monitoring equipment needed to complete the installations in a timely manner**.
>
> - Continued increased hospital labor costs have strained hospital budgets, lowering demand for capital equipment in the second quarter.
>
> **Non-healthcare revenue for the second quarter 2023 fell below expectations as the decline in demand previously seen in lower-end consumer audio categories extended into the premium and luxury audio categories and across more geographies**.

347.    In the aftermath of the preannouncement, analysts expressed surprise and lowered their estimates and/or price targets for Masimo.  For example, in a July 17, 2023 report titled, "*MASI: Preliminary Q2 Revenues Well Below Expectations; Lowering Estimates and Price Target*," analysts at Wells Fargo wrote that the Q2 2023

---

[12] Text that is **bolded and underlined** indicates partial revelation of the truth.

results "fell well short of expectations" and noted that they "expect the stock to come under significant pressure tomorrow due to the revenue miss and lowered guidance."

348.   Similarly, on July 17, 2023, analysts at Piper Sandler published a report titled, "*Preannounced Wide Miss for Healthcare and Consumer Revenue in 2Q*," and noted that the results "came in significantly below Street's 2Q projections, with weaknesses tied to both the company's traditional Healthcare/pulse ox franchise and the Consumer/audio equipment business."  The Piper Sandler analysts explained that "[t]here's quite a bit to unpack" and noted that several issues appear "potentially more problematic for at least the intermediate term[.]" The Piper Sandler analysts continued:

> We're not often left flummoxed, but today's pre-announcement certainly qualifies.  For the second time in five quarters, MASI meaningfully missed sensor revenue expectations (today's announced shortfall is >2x that of 1Q-22), and the multitude of factors cited for a business with a strong history of predictability raises several questions.  The most relevant are 1) the persistence of elevated channel inventory (and secondarily how/why this inventory managed to move as high as it did), and 2) whether hospital census is finally "normalizing" after experiencing a multi-year benefit from COVID-related hospitalizations.

349.   Analysts at Raymond James also expressed surprise and confusion after the preliminary announcement in a July 18, 2023 note titled, "*Messy MASI, 2Q Shortfall Spurs New Questions…and Likely More Action*."  Deeming the preannounced results "not only disappointing, but also head-scratching[,]" the Raymond James analysts wrote that the Q2 shortfall puzzled them because "over two-thirds of the [healthcare] business is recurring and historically, MASI has been very good at forecasting the business."  The Raymond James analysts continued, "**The Sound United acquisition [] has clearly jolted the stock, and is now having a greater impact on the base business[] . . . [and] [t]he miss will invite further scrutiny around the strategy to buy Sound United**."

350.   On July 18, 2023, more analysts published reports that expressed surprise at Masimo's earnings preannouncement for Q2 2023.  In a report titled, "*MASI: Difficult 2Q23 Strengthens Case for Separating Sound United*," analysts at Needham & Co. described Masimo's "non-healthcare" challenges as "longer term" and "lowered

96

our estimates significantly." Analysts at BTIG also published a report titled, in part, "*Slashing Forecast*," which "acknowledge[d] a loss of management credibility" and predicted that "the stock price, down 25% aftermarket, may take months to regain footing."

351. The press also reacted with shock and surprise at the revelation in Masimo's July 17, 2023 earnings preliminary announcement. For example, on July 18, 2023 Investor's Business Daily published an article by Allison Gatlin titled, "*Masimo Crashes To Four-Year Low; Why It Could Take 'Months to Regain Footing'*," and noted, "investors hammered MASI stock on a massive sales miss." Similarly, on July 19, 2023, Medical Device and Diagnostic Industry published an article by Omar Ford titled, "More Hard Times for Masimo," and wrote, "[j]ust a few weeks shy of a proxy battle with Politan Capital Management, the company is now reporting preliminary quarterly revenue coming in nearly $100 million below expectations."

352. The revelations in Masimo's July 17, 2023 preliminary announcement shocked the market, as investors and analysts reacted swiftly and the price of Masimo's common stock plunged over two trading days. After closing at $147.16 per share on July 17, 2023, Masimo's common stock price plummeted nearly 20% on July 18, 2023, to a closing price of $117.73, on unusually high trading volume of 7.1 million shares. On July 19, 2023, Masimo's stock price fell further as investors continued to digest the shocking news in the Company's preannouncement for Q2 2023, closing at $112.28 per share, after another atypically high trading volume day with 2.5 million shares traded.

**B.    August 8, 2023 – Q2 2023 Earnings Press Release, Form 10-Q, and Earnings Call**

353. On August 8, 2023, after the market closed, Masimo issued its Q2 2023 earnings press release, which was filed with the SEC on Form 8-K. In the earnings press release, Masimo announced that **consolidated revenue was $455.3 million**, **healthcare revenue was $281.1 million**, and **non-healthcare revenue was $174.2**

**million**.  The release included a statement from Defendant Kiani, who said, "Second 0.quarter 2023 was a tale of two realities. Our healthcare revenues and earnings declined sequentially and annually, but we gained new hospital customers at a record level, despite strong results in the prior three years, and retained existing hospital customers. **We are disappointed with our results this quarter**. **Our updated guidance assumes inpatient volumes will not return to the levels we expected this year and we will not receive some of the new large orders we are expecting**[.]"

354.  On the related Q2 2023 earnings call on August 8, 2023, during his prepared remarks, Defendant Kiani revealed that, in order "**to mitigate the impact of the shortfall on revenues**," Masimo would "**reduce our expenses by $100 million**."

355.  Following Defendant Kiani's remarks, Defendant Young provided more detail regarding Masimo's enormous earnings and revenue miss:

> **For our healthcare segment, second quarter revenues were $281 million, reflecting a 21% decline.** Please recall that our second quarter 2022 revenues benefited from the shift of approximately $25 million to $30 million of revenues from the first quarter of 2022 into the second quarter due to supply chain delays in the first quarter of 2022, making the year-over-year comparison even more difficult.
>
> **For the second quarter of 2023, we missed expectations by approximately $66 million. Of this amount, approximately half was related to lower-than-expected sensor orders[.] [R]oughly 40% of the shortfall was related to large orders that had been expected but have not closed yet. The remainder was attributable to lower to weaker demand for capital equipment from hospitals as well as slower-than-expected installations.**
>
> \*\*\*
>
> **For our non-healthcare segment, second quarter revenues were $174 million, representing a decline of 17% on a pro forma and constant currency basis. This business is grappling with reduced discretionary spending on high-end audio systems and a return of competitors who have previously been hampered by supply chain interruptions now being aggressive with price cuts as they get back into the market. Although we are unable to raise prices to the level we had planned coming into this year, we did not reduce our prices and have put discipline in place to sell based on our features and advances.**

356.  Several analysts published reports expressing concern about Masimo's future trajectory following the Q2 2023 earnings announcement.  For example, analysts

98

at Jefferies published a report on August 8, 2023 titled, "*Rebasing '23 For Ongoing Pressure; '24 Could Have 'Normal' Growth*," and wrote:

> Overall this was a disappointing quarter and the revised guidance did not have the upside we had hoped for at the high end. While MASI has seen some green shoots of ordering improving and leading indicators pointing to a better '24, we think it will take time for growth trends to improve.

357.   Similarly, analysts at Piper Sandler published a report on August 9, 2023 titled, "*Rebasing Revenue in 2023, More Questions than Answers for Now*," and wrote:

> [W]e can't ignore the reality that the structural growth profile of MASI is in greater question today than in recent years (management seems caught off guard by the magnitude of the issues with board and sensors in recent months), a rebound in 2024 earnings growth isn't a guarantee as comp savings are likely to return next year, and a shift in strategic direction with Sound United doesn't look to be a near-term consideration.

358.   In reaction to the extent to which Masimo missed earnings and revenue targets, in combination with the announcement of the $100 reduction in expenses, Masimo's common stock price fell during the next trading day, August 9, 2023, from the prior day's close of $120.00 per share to $117.96 per share.

359.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock price, Lead Plaintiffs and other Class members have suffered significant losses and damages.

## VII.   ADDITIONAL INDICIA OF SCIENTER

360.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding Masimo, their control over, or receipt, or modification of Masimo's allegedly materially misleading misstatements, were active and culpable participants in the

99

fraudulent scheme alleged herein. The following allegations all support a strong inference of scienter:

> (a)    the CW accounts detailed above (*see* Section IV.B.);

> (b)    the Individual Defendants' close monitoring of Masimo's sales and accounting metrics;

> (c)    the magnitude of the Sound United acquisition, the market's reaction to the announcement of the acquisition, and Defendants' knowledge, throughout the Class Period, of severe internal control issues at legacy Sound United;

> (d)    Defendants' reaction to, including later dismissal of, one key financial employee for his refusal to sign a SOX sub-certification; and

> (e)    the fact that the Defendants' statements concerned key aspects of the Company's business.

**A.    The Individual Defendants' Close Personal Monitoring of Masimo's New Sales and Accounting Metrics Support That They Had Actual Knowledge or Were Reckless in Not Knowing About Sputtering Demand for Non-Pulse Oximeter Products and Ballooning Inventory**

361.    Each of the Individual Defendants had direct access to detailed information regarding Masimo's sales and accounting metrics in meetings and on multiple software platforms maintained at the Company during the Class Period. As discussed above, multiple former employees stated this information was transmitted and learned through meetings, reports, and other regular communications. For example, former employees recall that CEO Joseph Kiani and CFO Micah Young, as well as their respective staff, had the capability of accessing the data from the dashboards at any time. Additionally, COO Bilal Muhsin, sales leadership, and senior financial people often retrieved sales, financials and SOX related data, and inventory information from the dashboards to review them with Young.

362.    Additionally, as set forth above, Defendant Young hosted Quarterly CFO Calls, at which declining sales and ballooning inventory at legacy Sound United were

1    discussed.  Young insisted on these calls that "We're on top of it" also asked the

2    participants on the Quarterly CFO Calls "what is going on with inventory?"

3        363.    Eventually, the forecasting got to the point of being so poor that Young

4    stopped attending the weekly CFO Calls approximately three months before the 2Q

5    2023 earnings call, even though he was already well aware of all the accounting and

6    inventory issues plaguing both segments of Masimo by this time.

7        **B.    The Magnitude of the Sound United Acquisition, Defendants'
        Knowledge of the Market's Reaction to the Announcement of the
8        Acquisition, and Defendants' Knowledge, Throughout the Class
        Period, of Severe Internal Control Issues at Legacy Sound United**
9

10        364.    The fact that Sound United was Masimo's largest-ever acquisition at

11   $1.025 billion in cash served as a red flag for Defendants to closely follow the status

12   of its integration.  Additionally, given the market's reaction to the announcement of the

13   deal was to eliminate $5 billion of market capitalization from Masimo, the Defendants

14   were on notice that investors would be hyper-focused on Masimo's integration efforts.

15   This focus was further underscored by analysts' unwavering attention to the deal during

16   earnings calls and at investor conferences.  Indeed, the Individual Defendants' repeated

17   false statements regarding the Sound United acquisition and the status of its integration

18   (*see* Section V.A.-N.) lend support to the inference of scienter.

19       **C.    Defendants Required Senior Level Employees to Sign Certifications
        Attesting Those Employees Did Not Suspect Any Irregularities in
20       Masimo's Financial Reporting and Fired at Least One Employee
        Who Raised Objections**

21        365.    Defendants' awareness of the fraudulent accounting practices throughout

22   Masimo following the acquisition of Sound United is underscored by the lengths they

23   went to try to cover their tracks through obtaining SOX sub-certifications from senior

24   level employees attesting to the financial reporting's accuracy.  Defendants' concerted

25   attempt to cover their tracks by forcing subordinates to sign the sub-certifications or

26   face likely termination as discussed in Section IV.B.4.d. above, underscores that they

27   acted with scienter.

28

101

366.   When informed of the reasons that CW-14 would not sign the sub-cert representation letter assigned to him in March 2023, Defendants chose to find another employee who would sign the sub-cert without question, rather than address and fix the issues CW-14 raised in his objection, which he had been raising since the acquisition closed and Sound United became a part of Masimo.

367.   Defendants' manufactured "vetting" process to legitimize their misleading statements and omissions about the Company's financial results, even after confronted with evidence that the Company's accounting procedures were failing, supports the inference of scienter.  This fact is underscored by the Defendants' decision to terminate CW-14 for his refusal to sign the sub cert representation letter in March 2023.

**D.    The Demand for Masimo's Healthcare and Non-Healthcare Products and Their Respective Revenue Generation Were Critical to the Company's Core Operations**

368.   The Individual Defendants' knowledge of the demand for Masimo's healthcare products and their respective revenue generation and issued related thereto can be inferred because these facts were critical to Masimo's core operations.

369.   As an initial matter, selling products is what Masimo's business is focused on since its revenue model is highly dependent on customers' recurring purchases of sensors to use with the devices it sells.

370.   Prior to Class Period, Masimo focused on selling healthcare products exclusively.  Then, with the acquisition of Sound United, Masimo added selling consumer audio products to its business model.  Throughout the Class Period, the Defendants made public statements touting the "strong demand" for the Company's products in both the healthcare and non-healthcare segments.

371.   Additionally, in public filings with the SEC, the Company touted the importance of growing sales in both the healthcare and non-healthcare segments as critical for the Company's continued success.  For example, in the Q1 2022 Form 10-Q, the Company admitted, "We are highly dependent upon the continued success and

1  market acceptance of our proprietary Masimo SET ® and Masimo rainbow
2  SET ® technologies that serve as the basis of our primary product offerings."
3  Similarly, in the same filing, the Company admitted, "Our new products and changes
4  to existing products as a result of our recent acquisition of Sound United could fail to
5  attract or retain users or generate revenue and profits."  These statements, buried in the
6  Company's risk factors, illustrate how important these metrics would have been to
7  Defendants during the Class Period and suggest that they would have been watching
8  the sales and revenue figures closely.

9       372.  Given the critical importance of selling products through both the
10  healthcare and non-healthcare segments at Masimo was to the Company's business,
11  knowledge of the issues associated with stagnating, and eventually falling, demand for
12  those products, as well as the ballooning inventory caused by the internal controls
13  weakness at legacy Sound United and the sensors discounting offered in the healthcare
14  segment, can be inferred to Defendants.

15       **E.    Corporate Scienter**

16       373.  Masimo knowingly and/or with deliberate recklessness made, controlled,
17  or had ultimate authority over the materially false and/or misleading statements and
18  omissions alleged herein based on the fact that the Individual Defendants knew and/or
19  were deliberately reckless in not knowing or disregarding that the Defendants'
20  statements set forth in Section V. were materially false and/or misleading, and/or
21  omitted material facts at the times that such statements were made.  Each of the
22  Individual Defendants was among the most senior employees of the Company
23  throughout the Class Period, was acting within the scope of their authority, and was a
24  member of the Company's senior management.  Their scienter may be imputed to the
25  Company.

26       374.  Finally, the scienter of any employees who ordered or approved the
27  misstatements or their making or issuance, or who furnished information or language
28  for inclusion therein, or the like, may be imputed to the Company.

1

**VIII. LOSS CAUSATION**

2   375.   Lead Plaintiffs incorporate by reference the allegations set forth above.
3   During the Class Period, Defendants publicly disseminated materially false and
4   misleading statements and omitted material facts concerning the Company's operations
5   and its true financial condition.

6   376.   The material misrepresentations and omissions include issues concerning:
7   (i) the status of Masimo's healthcare business beyond the "core" SET pulse oximetry
8   business; (ii) the status of the integration of legacy Sound United into the Company as
9   Masimo's new consumer, nonhealthcare segment; and (iii) the rampant accounting
10  issues throughout the Company, and at Sound United in particular, impacting the
11  Company's ability to track inventory.  The conduct alleged and the materially false and
12  misleading statements and omissions made during the Class Period caused Masimo's
13  common stock to trade at artificially inflated prices, reaching as high as $198.00 per
14  share during the Class Period, operating as a fraud on investors in the Company's
15  common stock.

16  377.   When the truth was disclosed through two disclosures in the summer of
17  2023, Masimo's common stock price declined significantly, as the artificial inflation
18  was removed from the common stock price.

19  378.   On July 17, 2023, after the market closed, Masimo surprised the market
20  by releasing a preliminary earnings report for the second quarter of 2023 announcing
21  revenue and earnings would miss estimates by nearly $100 million and revised its full-
22  year 2023 guidance downward.  The Company also lowered its full year revenue
23  guidance: (i) for Healthcare to $1.3 billion from $1.45 billion on the low-end while
24  reserving comment on the revision to the high-end; and (ii) for legacy Sound United
25  business lowered the full year guidance "to $800 million to $850 million from $965
26  million to $995 million."

27  379.   On this news, the price of the Company's common stock fell over the
28  course of the following two trading days, on usually high volume.  After closing at

1  $147.16 per share on July 17, 2023, Masimo's common stock price plummeted nearly

2  20% on July 18, 2023 to a closing price of $117.73, on unusually high trading volume

3  of 7 million shares.  On July 19, 2023, Masimo's common stock price resumed its

4  downward slide as investors continued to digest the shocking news in the preliminary

5  earnings announcement for Q2 2023, closing at $112.28 per share, after another

6  atypically high trading volume day with 2.5 million shares traded.

7      380.  In reaction to the preannouncement, multiple analysts expressed shock

8  and surprise, and explained the significance of the disclosure.  For example, in a July

9  17, 2023 report, analysts at Piper Sandler lowered their estimates for Masimo and noted

10  that the results "came in significantly below Street's 2Q projections, with weaknesses

11  tied to both the company's traditional Healthcare/pulse ox franchise and the

12  Consumer/audio equipment business."

13      381.  Three weeks later, on August 8, 2023, after the market closed, Masimo

14  confirmed the revenue and earnings shortfall in its official earnings press release for

15  the second quarter of 2023, by revealing that consolidated revenue was $455.3 million,

16  healthcare revenue was $281.1 million, and non-healthcare revenue was $174.2

17  million.  Additionally, during the related earnings call, Defendants revealed that the

18  Company would be reducing expenses by $100 million in response to the shortfall.

19      382.  In response to this news, Masimo's common stock price fell during the

20  next trading day, August 9, 2023, from the prior day's close of $120.00 per share to

21  $117.96 per share.

22      383.  After the August 8, 2023 announcement, analysts reacted to the

23  disclosure.  For example, analysts at Jefferies published a report on August 8, 2023,

24  and wrote, "Overall this was a disappointing quarter and the revised guidance did not

25  have the upside we had hoped for at the high end."

26      384.  The timing and magnitude of the decline in the Company's share price

27  following these disclosures negates any inference that the losses suffered by Lead

28  Plaintiffs and the other proposed Class members were caused by changed market

1  conditions, macroeconomic or industry factors, or Company-specific facts unrelated to
2  Defendants' violations of the federal securities laws as alleged herein.

3  ## IX.  CONTROL PERSON ALLEGATIONS

4      385.  The Individual Defendants, by virtue of their high-level and controlling
5  positions at Masimo, directly participated in the management of the Company, were
6  directly involved in the day-to-day operations of the Company at the highest levels,
7  and were privy to confidential proprietary information about the Company, its business,
8  operations, internal controls, growth, financial statements, and financial conditions as
9  alleged herein.  As set forth above, the materially misstated information conveyed to
10  the public was the result of the collective actions of the Individual Defendants.

11  ## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

12  
13      386.  To the extent that Lead Plaintiffs allege that Defendants made affirmative
      misstatements, Lead Plaintiffs will rely upon the presumption of reliance established
14  by the fraud-on-the-market doctrine in that, among other things:

15      (a)  Defendants made public misrepresentations or failed to disclose
16  material facts during the Class Period;

17      (b)  The omissions and misrepresentations were material;
18
19      (c)  Masimo common stock traded in an efficient market;

20      (d)  The misrepresentations alleged would tend to induce a reasonable
21  investor to misjudge the value of the Company's common stock;

22      (e)  Lead Plaintiffs and other members of the proposed Class purchased
23  Masimo common stock between the time Defendants misrepresented or failed to
24  disclose material facts and the time the true facts were disclosed, without knowledge
25  of the misrepresented or omitted facts;

26      (f)  Masimo common stock met the requirements for listing and was
27  listed and actively traded on NASDAQ, a highly efficient and automated market;

28

106

(g)   As a regulated issuer, Masimo filed periodic public reports with the SEC and NASDAQ;

(h)   Masimo regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)   Masimo was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Piper Sandler, Needham & Co., Raymond James, Stifel, and Wells Fargo, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

387.   As a result of the foregoing, the market for Masimo common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in Masimo' common stock price.  Under these circumstances, all persons and entities who or which otherwise acquired Masimo common stock during the Class Period suffered injuries through their purchase of Masimo common stock at artificially inflated and artificially maintained prices; thus, the presumption of reliance applies.

388.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Masimo common stock.

389.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the proposed Class purchased shares of Masimo common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

390.   To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Masimo's business, Lead Plaintiffs are entitled to a

1  presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United*
2  *States*, 406 U.S. 128, 153 (1972).

3  **XI.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

4       391.   The statutory safe harbor provided by the PSLRA for forward-looking
5  statements under certain circumstances does not apply to any of the materially false
6  and misleading statements alleged in this pleading.  First, many of the statements
7  alleged to be false and misleading relate to historical facts or existing conditions.
8  Second, to the extent any of the allegedly false and misleading statements may be
9  characterized as forward-looking, they were not adequately identified as "forward-
10  looking" statements when made.  Third, any purported forward-looking statements
11  were not accompanied by meaningful cautionary language because, among other
12  reasons, the risks that Defendants warned of had already come to pass.

13       392.   To the extent any statements alleged to be false and misleading may be
14  construed to discuss future intent, they are mixed statements of present or historical
15  facts and future intent and are not entitled to PSLRA safe harbor protection – at least
16  with respect to the part of the statement that refers to the past and/or the present.

17       393.   In addition, the PSLRA imposes an additional burden on oral forward-
18  looking statements, requiring Defendants to include a cautionary statement that the
19  particular oral statement is a forward-looking statement, and that "actual results might
20  differ materially from those projected in the forward-looking statement."  15 U.S.C.
21  §78u-5(c)(2)(A)(i)-(ii).  Defendants failed to both identify certain oral statements as
22  forward-looking and include the cautionary language required by the PSLRA.

23       394.  Furthermore, Defendants did not accompany their statements with
24  meaningful cautionary language identifying important factors that could cause actual
25  results to differ materially from any results projected.  To the extent Defendants
26  included any cautionary language, that language was not meaningful because, among
27  other reasons, any potential risks identified by Defendants had already passed or
28  manifested.  As detailed herein, Defendants failed to disclose to the market that,

throughout the Class Period, Masimo was experiencing difficulty selling healthcare products beyond its core pulse oximetry business, and even offering discounts in order to sell more products, while directing sales personnel to abandon the products they were hired to sell in favor of selling other products. Additionally, Defendants failed to disclose that legacy Sound United had rampant weaknesses in its internal controls over financial reporting and that the Company failed to integrate Sound United following the acquisition.

395.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statement pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker had actual knowledge that those forward-looking statements were materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Masimo who knew that those statements were false when made.

## XII.   CLASS ACTION ALLEGATIONS

396.  Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons or entities who or which purchased or otherwise acquired the publicly traded common stock Masimo during the Class Period (the "Class") and were damaged thereby. Excluded from the proposed Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Masimo during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Masimo's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

397.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Masimo common stock was actively traded on NASDAQ.  As of July 1, 2023, there were more than 52.8 million shares of Masimo common stock outstanding.  Although the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Masimo or its transfer agent(s) and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

398.   Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

399.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

400.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

(c)    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Defendants caused the Company to issue false and misleading statements during the Class Period;

(e)    whether Defendants acted knowingly or with deliberate recklessness in issuing the false filings;

(f)    whether the price of Masimo common stock during the Class Period was artificially inflated or artificially maintained because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

401.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against Masimo and the Individual Defendants

402.    Lead Plaintiffs repeat and re-allege the above paragraphs as though fully set forth herein.

403.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Masimo and the Individual Defendants.

404.    As alleged herein, throughout the Class Period, Masimo and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state

111

material facts necessary to make their statements not misleading, and carried out a plan, scheme, and course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Masimo and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiffs and members of the proposed Class; (ii) artificially inflate and maintain the price of Masimo common stock; and (iii) cause Lead Plaintiffs and members of the proposed Class to purchase Masimo common stock at artificially inflated and artificially maintained prices.

405. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and members of the proposed Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained false statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

406. As set forth above, Masimo and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the proposed Class who purchased Masimo common stock during the Class Period.

407. In ignorance of the false and misleading nature of Masimo's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Masimo common stock, Lead Plaintiffs and other members of the proposed Class purchased Masimo common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the proposed Class would not have purchased Masimo common stock at such artificially inflated and artificially maintained prices. As set

112

forth herein, when the true facts were subsequently disclosed, the price of Masimo common stock declined precipitously, and Lead Plaintiffs and members of the proposed Class were damaged and harmed as a direct and proximate result of their purchases of Masimo common stock at artificially inflated and artificially maintained prices and the subsequent decline in the price of that security when the truth was disclosed.

408.    By virtue of the foregoing, Masimo and the Individual Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

409.    Lead Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

410.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

411.    The Individual Defendants had control over Masimo and made the materially false and misleading statements and omissions on behalf of Masimo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

113

412.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities laws violations alleged herein.

413.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the proposed Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

114

1  Dated:        February 12, 2024

2                                    **LABATON KELLER SUCHAROW LLP**

3

4                                    By: _____
                                        Carol C. Villegas (SBN 4154324) (*pro hac*
5                                       *vice*)
                                        Christine M. Fox (SBN 2704641) (*pro hac*
6                                       *vice*)
                                        James M. Fee (SBN 5426168) (*pro hac vice*)
7                                       140 Broadway
                                        New York, NY 10005
8                                       Telephone: (212) 907-0700
                                        Fax: (212) 818-0477
9                                       cvillegas@labaton.com
                                        cfox@labaton.com
10                                      jfee@labaton.com

11                                      *Attorneys for Co-Lead Plaintiffs Boston*
                                        *Retirement System, Central Pennsylvania*
12                                      *Teamsters Pension Fund-Defined Benefit Plan,*
                                        *and Central Pennsylvania Teamsters Pension*
13                                      *Fund-Retirement Income Plan 1987, and Lead*
                                        *Counsel for the Proposed Class*

14                                      **HAGENS BERMAN SOBOL**
15                                      **SHAPIRO LLP**
                                        Lucas E. Gilmore (SBN 250893)
16                                      715 Hearst Avenue, Suite 300
                                        Berkeley, CA 94710
17                                      Tel: (510) 725-3000
                                        Fax: (510) 725-3001
18                                      lucasg@hbsslaw.com

19                                      *Liaison Counsel for the Proposed Class*

20

21

22

23

24

25

26

27

28