Lauren A. Ormsbee (*pro hac vice*)
Nicole M. Zeiss (*pro hac vice*)
David M. Saldamando (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
nzeiss@labaton.com
dsaldamando@labaton.com

*Attorneys for Lead Plaintiffs*
*and Lead Counsel for the Proposed Class*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO VAZQUEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MASIMO CORPORATION, JOSEPH KIANI, MICAH YOUNG, BILAL MUHSIN, and ELI KAMMERMAN<br><br>Defendants. | Case No.: 3:23-cv-01546-DEB<br><br>**DECLARATION OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**<br><br>Judge: Hon. Daniel E. Butcher<br>Date: May 5, 2026<br>Time: 9:30 a.m.<br>Courtroom: 2B |

I, Lauren A. Ormsbee, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a member of the law firm of Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), which serves as Lead Counsel for court-appointed Lead Plaintiffs Boston Retirement System, Central Pennsylvania Teamsters Pension Fund-Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund-

Retirement Income Plan (collectively, "Lead Plaintiffs"), and for all other members of the proposed Settlement Class in the above-captioned litigation (the "Action").[1] I am admitted to practice before this Court *pro hac vice* and have been actively involved throughout the prosecution and resolution of the Action, am familiar with the proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision of and participation in the Action.

2.      I respectfully submit this Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed class action settlement with Masimo Corporation ("Masimo" or the "Company"), Micah Young, Bilal Muhsin, and Eli Kammerman (collectively, "Settling Defendants" and, together with Lead Plaintiffs, the "Settling Parties"),[2] for $33,750,000 in cash.

3.      If approved, the Settlement will resolve all claims in the Action, and related claims, on behalf of the Settlement Class, which consists of all persons and entities who or that purchased or acquired the publicly traded common stock of Masimo during the period from May 4, 2022 through August 8, 2023, both dates inclusive (the "Class Period"), and were allegedly damaged thereby.[3] The Court preliminarily approved the Settlement and directed notice to the Settlement Class by Order dated February 2, 2026 ("Preliminary Approval Order"). ECF No. 98.

---

[1] All capitalized terms herein that are not otherwise defined have the same meanings as provided in the Stipulation and Agreement of Settlement, dated as of August 14, 2025 (the "Stipulation"). ECF No. 97-2.

[2] The defined term "Settling Defendants" does not include Defendant Joseph Kiani. Any mention of "Defendants" generally is intended to include the Settling Defendants and Defendant Kiani, who is receiving a release in the Settlement.

[3] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the Immediate Families, or any individual trust or family trust, of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Masimo during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest and/or beneficial interest; (v) parents, affiliates, as defined by 17 C.F.R. § 240.12b-2, or subsidiaries of Masimo; and (vi) the legal representatives, heirs, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such. Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

4.      I also respectfully submit this Declaration in support of: (i) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees of 25% of the Settlement Fund, which includes accrued interest; payment of Litigation Expenses incurred by Plaintiffs' Counsel in the total amount of $265,418.12, plus accrued interest; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursement of $3,702.74 to Lead Plaintiffs in connection with the time they dedicated to representing the Settlement Class ("Fee and Expense Application").

5.      For the reasons discussed below and in the accompanying memoranda of law,[4] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Lead Plaintiffs—sophisticated, institutional investors that actively supervised the Action since its inception. *See* Declaration of Timothy J. Smyth, Esq., on behalf of Boston Retirement System, attached hereto as Exhibit 1, and Declaration of Joseph J. Samolewicz, on behalf of Central Pennsylvania, attached hereto as Exhibit 2.[5]

---

[4] In conjunction with this Declaration, Lead Plaintiffs and Lead Counsel are submitting Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Memorandum of Points and Authorities in Support Thereof ("Settlement Memorandum") and Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Memorandum of Points and Authorities in Support Thereof ("Fee and Expense Memorandum").

[5] All exhibits to the motions are annexed hereto. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

---

DECL. OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

23-cv-01546

3

## I.    PRELIMINARY STATEMENT

6.    The proposed Settlement now before the Court provides for the full resolution of the Action, and related Released Plaintiffs' Claims, in exchange for a cash payment of $33,750,000. As detailed herein, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement represents an excellent result for the Settlement Class, particularly in light of the significant risks of continuing to litigate the Action.

7.    In choosing to settle, Lead Plaintiffs and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through trial, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all. The decision to settle was informed by a comprehensive investigation into the claims and defenses in the Action, substantive motion practice, discovery, and vigorous arm's-length negotiations with experienced counsel that included a full day mediation and subsequent negotiations and discussions with the Mediator.

8.    The case—which was litigated efficiently and aggressively until the agreement to settle—was settled only after Lead Plaintiffs, among other things: (i) conducted a rigorous investigation of the claims at issue, which included reviewing and analyzing Masimo's SEC filings, press releases, earnings call transcripts, and research reports, as well as contacting and interviewing many former employees of Masimo; (ii) prepared and filed a detailed amended complaint, which expanded the scope of the initial complaint by adding additional misrepresentations, disclosures, and other allegations in support of the claims at issue, and included the accounts of sixteen former Masimo employees; (iii) responded to Defendants' motion to dismiss and request for judicial notice; (iv) propounded discovery requests on Defendants; (v) reviewed over 61,500 pages of documents produced in discovery; (vi) negotiated discovery parameters and raised discovery disputes; (vii) consulted with experts in the

fields of loss causation, damages, and accounting; and (viii) exchanged extensive mediation material and participated in arm's-length mediated settlement discussions.

9. Lead Plaintiffs and Lead Counsel believe the $33.75 million recovery is also fair and reasonable when considering other securities class action recoveries. According to NERA Economic Research, the $33.75 million recovery is more than twice the $12.5 million median recovery in mid-2025, when the Settlement was reached, and significantly more than the $17 million median recovery for all of 2025. *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: H1 2025 Update* (NERA, Inc. 2025), Ex. 3 at 2; Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA, Inc. Jan. 2026), Ex. 4 at 24.

10. Lead Plaintiffs consulted with experts in the fields of damages and loss causation who analyzed class-wide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. Lead Plaintiffs' damages expert has estimated that maximum damages attributable to the corrective disclosures during the Class Period (May 4, 2022 through August 8, 2023) were approximately $755.5 million, depending on the trading model and assumptions used. If disaggregation of confounding information was required, damages could have been reduced to approximately $272.9 million, a reduction of more than 60%. Accordingly, the Settlement recovers a range of approximately 4.5% to 12.4% of these estimated damages. According to NERA's full-year 2025 report, for cases with total NERA-defined investor losses of between $200 million and $399 million, the median percentage of recovery from 2016 to 2025 was 2.7% of estimated losses. *See* Ex. 4 at 27. For cases with NERA losses of $600 million to $999 million, the median percentage of recovery during this time period was 1.7%. *Id*.

11. In addition to seeking approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of

Allocation was developed with the assistance of Lead Plaintiffs' damages expert and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the claims.

12.    With respect to Lead Counsel's request for an award of attorneys' fees and payment of expenses on behalf of itself and Liaison Counsel Hagens Berman Sobol Shapiro LLP, the requested fee of 25% would be fair both to the Settlement Class and counsel, and warrants the Court's approval. The fee request is within the range of fee percentages frequently awarded in connection with similar settlements and, under the facts of this case, is justified considering the benefits that Plaintiffs' Counsel conferred on the Settlement Class, the risks they undertook, the quality of the representation, the nature and extent of the legal services, and the fact that Plaintiffs' Counsel pursued the case at their own financial risk. Lead Counsel also seeks expenses in the amount of $265,418.12, plus reimbursement to Lead Plaintiffs, pursuant to the PSLRA, for their efforts on behalf of the Settlement Class in the aggregate amount of $3,702.74. The expense amounts are less than the $400,000 maximum provided for in the notices.

13.    Lead Counsel has worked with the Court-authorized Claims Administrator, A.B. Data, Ltd. ("A.B. Data" or "Claims Administrator"), to disseminate notice of the Settlement to Settlement Class Members as directed in the Preliminary Approval Order. In this regard, notice of the Settlement has been disseminated to 83,065 potential Settlement Members or their Nominees, which includes 45,460 mailed Postcard Notices and 37,605 emailed links to the Settlement Website.[6] A.B. Data has posted the long-form Notice, Postcard Notice, and Claim Form, along with other relevant documents, on the website www.MasimoSecuritiesSettlement.com, and has caused the Summary Notice to be

---

[6] *See* Declaration of Adam D. Walter Regarding (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date, dated March 27, 2026, attached hereto as Exhibit 5 ("Mailing Decl."), ¶¶3-10.

published in *The Wall Street Journal* and transmitted over *PR Newswire*. *See* Ex. 5, Mailing Decl., ¶¶6, 11. As ordered by the Court and stated in the notices, objections and requests for exclusion from the Settlement Class are due no later than April 14, 2026. To date, there have been no objections to any aspect of the Settlement and no requests for exclusion.[7]

## II.    SUMMARY OF LEAD PLAINTIFFS' CLAIMS

14.    Lead Plaintiffs' claims in this Action are set forth in the First Amended Complaint for Violations of the Federal Securities Laws, filed on February 12, 2024 (ECF No. 28) (the "Complaint"), which asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Defendants.

15.    Masimo is a global medical technology company that develops, manufactures, and markets a variety of non-invasive monitoring technologies. ¶57.[8] The Company was founded in 1989 and went public on August 8, 2007. ¶¶57-58. Prior to 2022, Masimo's business solely focused on its products related to healthcare. ¶59. Specifically, Masimo developed and sold patient-monitoring technologies, hospital automation and connectivity solutions, remote monitoring devices, and consumer health products. *Id.* However, in February 2022, Masimo entered into an agreement to acquire Sound United—a company that focused on developing, manufacturing, distributing, and selling an array of premium audio products, including loudspeakers, sound bars, AV receivers, wireless speakers, amplifiers, turntables, and headphones. ¶¶61-65. The acquisition was completed just two months later, on April 12, 2022. ¶66.

16.    According to the Complaint, Defendants allegedly disseminated materially false and misleading statements and concealed adverse facts related to

---

[7] Lead Plaintiffs and Lead Counsel will report on any objections and requests for exclusion that may be received after this submission in their reply submission to be filed with the Court on or before April 28, 2026.

[8] References to "¶" or "¶¶" are to paragraphs in the Complaint.

Masimo's two core businesses—its traditional healthcare unit and its new Sound United acquisition (non-healthcare unit) in violation of the Exchange Act. ¶3. First, the Complaint alleged that Defendants misled the market about the healthcare division's inability to introduce successful new products to the marketplace that would support Defendants' revenue forecasts during the Class Period. *Id.* The Complaint also alleged that Defendants concealed that the healthcare business was accumulating excessive inventory of single-use sensors—a key driver of the Company's financial success—as customers shifted their preferences to using reusable sensors in many care settings to reduce costs. *Id.*

17.    Second, the Complaint alleged that Masimo misled the market about the Company's non-healthcare business (*i.e.*, Sound United). ¶4. Despite purchasing Sound United for $1.025 billion in cash, and touting synergies and expansion opportunities for the combined companies, Lead Plaintiffs alleged that Defendants failed to integrate the two companies following the acquisition. *Id.* Moreover, the Complaint alleged that Defendants failed to disclose a known and pervasive lack of internal controls and inadequate accounting practices that hindered Masimo's Sound United business and presented significant obstacles to a successful integration. *Id.* Further, Lead Plaintiffs alleged that Defendants also hid Sound United's ballooning inventory costs, which prevented Masimo from investing in new products. *Id.*

18.    Accordingly, the Complaint alleged that when the truth about Masimo's declining business in both of its two core segments was revealed to the market in a series of disclosures on July 17, 2023 and August 8, 2023, Masimo's stock price declined precipitously, eventually closing at $113.62 per share by the end of the trading week following the second disclosure in early August 2023, down *42.6*% from the Class Period high of $198.00 per share on April 21, 2023. *Id.*

19.    As discussed below, on November 5, 2024, the Court entered an order granting in part and denying in part Defendants' motion to dismiss (the "MTD Order"), which narrowed the operative claims. ECF No. 46.

## III. RELEVANT PROCEDURAL HISTORY OF THE ACTION AND LEAD COUNSEL'S LITIGATION EFFORTS

### A. Commencement of the Action

20. On August 22, 2023, the Action was commenced by the filing of an initial complaint in the United States District Court for the Southern District of California, alleging violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants Masimo, Young, and Kiani. ECF No. 1.

21. The selection of lead plaintiff was initially contested. On October 23, 2023, Boston Retirement System, Central Pennsylvania Teamsters Pension Fund-Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund-Retirement Income Plan filed a motion seeking to be appointed Lead Plaintiffs and seeking appointment of their counsel, Labaton. ECF No. 12. Three other motions were filed by class members seeking lead plaintiff appointment. ECF Nos. 11, 13-14. The other class members subsequently filed notices of non-opposition. ECF Nos. 15-17. By an Order dated November 14, 2023, the Court: (i) appointed Boston Retirement System, Central Pennsylvania Teamsters Pension Fund-Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund-Retirement Income Plan as Lead Plaintiffs; and (ii) approved Labaton as Lead Counsel and Hagens Berman as Liaison Counsel. ECF No. 19.

22. On November 29, 2023, this Court entered and so-ordered a joint motion, filed by the parties on the previous day, which ordered Lead Plaintiffs to file their amended complaint on or before February 12, 2024. ECF No. 21.

### B. Lead Plaintiffs and Lead Counsel's Investigation and Filing of the Complaint

23. Prior to filing the Complaint, Lead Counsel conducted an extensive investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included reviewing and analyzing: (i) Masimo's filings with the SEC; (ii) Company press releases and conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports and

media reports about the Company; (v) public court dockets and filings; (vi) interviews with former employees of Masimo regarding the facts and events at issue in this litigation; and (vii) internal Masimo documents provided to Lead Plaintiffs by a former employee.

24.    In addition, Lead Counsel engaged experts to assist with its investigation of the claims asserted in the Complaint. For example, Lead Counsel engaged an accounting expert who analyzed Masimo's allegedly improper accounting practices and lack of internal controls. This involved analyzing Masimo's disclosures during and after the Class Period, as well as information and evidence provided by Masimo's former employees, and conducting a comprehensive internal controls analysis under Sections 302 and 404 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX"), and the COSO Framework.

25.    Lead Counsel also conducted extensive legal research before filing the Complaint to determine which theories of liability to allege. For example, Lead Counsel comprehensively researched the law in the Ninth Circuit relating to the pleading standards for falsity, materiality, scienter, loss causation, and allegations based on confidential witnesses, in connection with pleading violations of Sections 10(b) and 20(a) of the Exchange Act.

26.    After Lead Counsel's thorough investigation, on February 12, 2024, Lead Plaintiffs filed a detailed amended complaint (ECF No. 28) asserting claims for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, against Defendants.

27.    As discussed below, throughout the litigation, Defendants vehemently denied the claims, including that any of the alleged misstatements were materially false and misleading, that Defendants acted with scienter, and that the disclosures were corrective or provided any basis for the Settlement Class to recover damages.

## C.   Defendants' Motion to Dismiss the Complaint and Lead Plaintiffs' Opposition

28.   On April 29, 2024, Defendants filed a motion to dismiss the Complaint (ECF No. 38, "Motion to Dismiss"), and in connection with their motion, a request for consideration under incorporation by reference and judicial notice (ECF No. 38-3, "Request for Consideration").

29.   In their Motion to Dismiss, Defendants argued that the Complaint should be dismissed on numerous grounds, including failure to sufficiently allege falsity and scienter. With respect to falsity, Defendants argued that the Complaint: (i) failed to allege that any statement regarding Masimo's past performance was materially false and misleading because the statements were not false or they constituted inactionable corporate optimism; (ii) failed to allege that any statement regarding Masimo's future performance was materially false and misleading because they were not false, constituted a genuinely held opinion, or were subject to the PSLRA safe harbor; (iii) failed to allege that any statement regarding Masimo's acquisition of Sound United was materially false and misleading because the statements were not false, constituted inactionable corporate optimism, or inactionable opinions; and (iv) failed to allege that any statement regarding Masimo's disclosure controls was materially false and misleading because the alleged misstatements pertained to disclosure controls, not internal controls, and Masimo told investors that its internal controls assessment "does not include Sound United." *Id.* at 9-24.

30.   With respect to scienter, Defendants argued that the Complaint failed to plead a strong inference of scienter because: (i) Defendants had no motivation to lie or mislead investors and Lead Plaintiffs did not allege that Defendants profited from this purported misconduct; (ii) the confidential witness ("CW") allegations were insufficient because none of the former Masimo employees had direct contact with Defendants and, thus, had no insight into their state of mind during the Class Period; (iii) Lead Plaintiffs' allegations regarding the importance of the Sound United

acquisition to investors, and the fact that "selling products" constituted a core operation of Masimo, do not demonstrate Defendants' knowledge with respect to the purported fraud or wrongdoing alleged in the Complaint; and (iv) Masimo's independent auditor disagreed with the opinions of one of the former employees pled in the Complaint and issued an unqualified audit opinion during the Class Period. *Id.* at 24-30. Moreover, Defendants argued that the more compelling inference was that Defendants, in good faith, bought a company that offered Masimo access to consumer-facing markets that it could use to accelerate the rollout of its new consumer products, but this strategy faced complications and "uncertainties" in light of the post-COVID environment and Defendants disclosed this information and reset future expectations as soon as they became aware of these developments. *Id.* at 30.

31.    Finally, Defendants' Motion to Dismiss argued that the Complaint could not support control person liability under Section 20(a) because Lead Plaintiffs failed to adequately plead a predicate Section 10(b) claim. *Id.*

32.    Separately, Defendants filed a Request for Consideration that asked the Court to consider fourteen (14) individual documents in connection with their Motion to Dismiss. ECF No. 38-3. Defendants argued that each of these documents were appropriate for consideration because they were incorporated by reference within the Complaint and/or the content within the documents was capable of accurate and ready determination and, thus, was judicially noticeable. *Id.* at 3-6.

33.    Lead Counsel reviewed and analyzed Defendants' Motion to Dismiss and Request for Consideration, and the legal authority cited therein. Lead Counsel also conducted extensive legal research into Defendants' arguments and potential responses thereto. On June 27, 2024, Lead Plaintiffs filed oppositions to Defendants' Motion to Dismiss and Request for Consideration. ECF Nos. 42-43. Lead Counsel devoted substantial time and resources to researching and drafting the opposition briefs.

34.    Lead Plaintiffs rebutted the arguments and authorities in the Motion to Dismiss and argued that the Complaint adequately alleged all elements of their

Exchange Act Claims. With respect to falsity, Lead Plaintiffs' opposition argued that: (i) Defendants' alleged misstatements regarding Masimo's past financial performance, future financial performance and growth prospects, acquisition of Sound United and its integration within the Company, and internal controls, were materially false and misleading; (ii) Defendants' alleged misstatements were not inactionable corporate optimism or opinions; and (iii) Defendants' alleged misstatements were not protected by the PSLRA safe harbor.

35. With respect to scienter, Lead Plaintiffs' opposition argued that: (i) Defendants had access to information that rendered their public statements materially false and misleading; (ii) the CW allegations pled in the Complaint supported a strong inference of scienter for the pleadings stage; (iii) the specificity of Defendants' alleged misstatements supported a strong inference of scienter; (iv) the core operations doctrine supported scienter; and (v) the scienter allegations that applied to Defendants Kiani, Young, Muhsin, and Kammerman, as employees in senior positions at the Company, were adequate to impute the scienter of those defendants to Masimo.

36. Finally, Lead Plaintiffs' opposition argued that the Complaint adequately pled a predicate violation of Section 10(b) and Rule 10b-5 and satisfied the low pleading hurdle for the Section 20(a) claims against Defendants Kiani, Young, Muhsin, and Kammerman.

37. On July 26, 2024, Defendants filed reply briefs in further support of their Motion to Dismiss and Motion for Consideration. ECF Nos. 44-45.

**D.     The Court's Opinion Granting in Part and Denying in Part Defendants' Motion to Dismiss**

38. On November 5, 2024, the Court entered an order granting in part and denying in part the Motion to Dismiss. ECF No. 46.

39. The MTD Order sustained two categories of alleged misstatements regarding the Sound United integration and Sound United's allegedly improper use of

DECL. OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES                    13

23-cv-01546

"plugs" and other accounting manipulations to fraudulently balance Sound United's (and, as a result, Masimo's) books. *Id.* at 13-17.

40. The Court granted Defendants' Motion to Dismiss in part, and dismissed several categories of alleged misstatements, including: (i) claims based on allegations that Defendants misrepresented Masimo's past financial performance, including that Masimo offered large customer discounts to take additional product before quarter end, which led to excess inventories (*id.* at 11-13); (ii) claims based on alleged misrepresentations of Masimo's internal controls (*id.* at 17-18); and (iii) claims based on statements made by Defendants Kiani, Muhsin, and Kammerman, as the Court found Lead Plaintiffs failed to adequately plead scienter as to those defendants (*id.* at 18-23).

41. As a result of the MTD Order, the Section 10(b) claims against Kiani, Muhsin, and Kammerman were dismissed, which meant that the remaining Section 10(b) claims were only those against Masimo and Young. *Id.* at 23. The Section 20(a) claims against Kiani, Young, Muhsin, and Kammerman remained. *Id.* at 23-24. Moreover, the Court also granted Lead Plaintiffs leave to amend the Complaint. *Id.* at 24.

42. Within the MTD Order, the Court also found that all of the documents submitted in connection with Defendants' Request for Consideration were properly incorporated by reference in the Complaint, subject to judicial notice, or both. *Id.* at 8. However, the MTD Order clarified that "the documents may not be used to dispute well-pleaded facts." *Id.*

43. On December 3, 2024, Lead Plaintiffs filed a notice informing the Court that Lead Plaintiffs did not intend to amend the Complaint, but that Lead Plaintiffs reserved the right to seek to amend the Complaint for good cause in the future, if warranted. ECF No. 49.

## E.    Defendants' Answer

44.    On January 21, 2025, the Settling Defendants and Defendant Kiani each filed their respective Answers to the Complaint. ECF Nos. 59-60. In their respective Answers, Defendants denied that they made any material false statement or misrepresentation; denied that they omitted to state any facts the omission of which rendered any of their statements materially false or misleading; denied that they engaged in any wrongdoing; denied that they acted with scienter in that they knew or were reckless in making public statements that were materially false and misleading; denied that any alleged statement, misrepresentation, or omission caused any damages; and denied that Lead Plaintiffs or any putative class members were damaged.

45.    The Settling Defendants' Answer asserted seventeen (17) affirmative or other defenses, including a "good faith" defense (*i.e.*, they acted with an honest, reasonable belief in the lawfulness of their actions); a truth on the market defense (*i.e.*, Lead Plaintiffs or class members knew or had constructive knowledge of any alleged untruth or omission at the time they acquired Masimo stock); a causation or disaggregation defense (*i.e.*, all or a portion of the damages alleged by Lead Plaintiffs were attributable to causes other than any actions or omission for which Defendants allegedly were responsible); and a defense under the assumption of risk doctrine (*i.e.*, Lead Plaintiffs or class members assumed the risk of a decline in value of their investments when they chose to invest in Masimo stock). ECF No. 60.

46.    Defendant Kiani's answer raised similar defenses, including the defense that he conducted a reasonable investigation and had reasonable grounds to believe that the statements attributable to him were not materially false and misleading, as well as the defense that he relied on the advice of professionals, and thus, did not have scienter for the claims alleged in Lead Plaintiffs' Complaint.

## IV.   DISCOVERY EFFORTS

47.   Following the issuance of the MTD Order, Lead Plaintiffs undertook comprehensive discovery, which was geared towards complying with the deadlines for fact discovery, class certification, expert discovery, and dispositive and pretrial motions, all in advance of the June 8, 2026 final pretrial conference hearing.

### A.   **Early Neutral Evaluation**

48.   Following the Court's MTD Order, on January 21, 2025, the Court entered its Early Neutral Evaluation ("ENE") Conference Order pursuant to Local Rule 16.1(c), setting an ENE for March 5, 2025 before Magistrate Judge Daniel E. Butcher. ECF No. 61 (the "ENE Order"). According to the ENE Order, the purpose of the ENE is to "permit an informal discussion between the attorneys, parties, and the Magistrate Judge of every aspect of the lawsuit to achieve an early resolution of the case." *Id.*

49.   According to the ENE Order, if the case did not settle during the ENE, "the Court will hold a Case Management Conference ('CMC') pursuant to Fed. R. Civ. P. 16(b) immediately following the conclusion of the ENE." On January 31, 2025, and based upon calendaring conflicts, the Court reset the ENE from March 5, 2025 to March 17, 2025. ECF No. 65.

50.   On February 28, 2025, the Parties filed a Joint Motion to Excuse the Parties from ENE informing the Court that they held an initial Rule 26(f) conference on December 18, 2024, in which the topic of private mediation was raised. ECF No. 66. According to the Joint Motion, "[t]hereafter, the Parties have continued those discussions and have agreed to conduct a private mediation, which has now been scheduled to occur in May 2025. On February 25, 2025, the Parties conducted a telephonic conference in which they met and conferred concerning a variety of issues, including whether, given the scheduled private mediation, an ENE would be productive at this stage in the litigation." *Id.*

51.   On February 28, 2025, Magistrate Judge Butcher granted the Parties' Joint Motion to Excuse the Parties from ENE, finding that there was "good cause, as stated

in the Joint Motion." ECF No. 67. The Court accordingly excused the Parties from the ENE but maintained the CMC scheduled for March 17, 2025. *Id.*

### B. Case Management Conference, Initial Disclosures, Protective Order, and Electronic Discovery Agreement

52.     Following a series of meet and confers, and in advance of the March 17, 2025 CMC, on March 10, 2025, the Parties filed with the Court: (i) their Notice of Electronic Discovery Agreement (ECF No. 71); (ii) their Joint Motion for a Protective Order (ECF No. 72); and (iii) their Joint Discovery Plan. ECF No. 73. On March 10, 2025, the Parties also formally commenced discovery by exchanging initial disclosures pursuant to Rule 26(a).

53.     On March 11, 2025, the Court approved and signed the Protective Order (ECF No. 74) and on March 13, 2025, the Court approved and ordered the Electronic Discovery Agreement (ECF No. 76).

54.     Following the March 17, 2025 CMC, on March 18, 2025, the Court entered its Rule 16 Scheduling Order Regulating Discovery and other Pre-Trial Proceedings, establishing that all fact discovery was to be completed by the Parties no later than November 14, 2025. ECF No. 78. Additionally, the Court ordered that all discovery related to class certification must be completed by August 15, 2025; that the class certification motion must be filed by September 12, 2025; that expert discovery must be completed by February 6, 2026; that all pretrial motions, including *Daubert* motions, must be filed no later than March 6, 2026; that all pretrial disclosures must occur before May 11, 2026; and that the final pretrial conference order must be served and filed no later than June 1, 2026. *Id.*

55.     In the Scheduling Order, the Court also mandated a continuing Status Conference regarding discovery set for June 13, 2025, and ordered that a Mandatory Settlement Conference must be conducted on October 8, 2025 before Magistrate Judge Butcher. ECF No. 78.

## C.    Discovery Propounded on Defendants

56.    Thereafter, on March 27, 2025, Lead Plaintiffs served on Defendants their first set of requests for the production of documents ("RFP Set 1"), consisting of sixty (60) separate requests for production of documents. Defendant Kiani served his responses and objections to RFP Set 1 on April 28, 2025, and the Settling Defendants served responses and objections to RFP Set 1 on May 6, 2025.

57.    The Parties engaged in multiple meet-and-confer conferences and exchanged meet-and-confer correspondence, as to the scope and manner of the requested document productions, including issues pertaining to search terms, relevant time periods, document custodians, and other disputes related to the requests. Through this comprehensive effort, the Parties were able to reach an understanding as to the initial scope of Defendants' discovery and reached many compromises without having to seek the Court's assistance.

58.    Indeed, by the time the Settling Parties reached a settlement and filed their Unopposed Motion for Preliminary Approval of Class Action Settlement on August 14, 2025 (ECF No. 86), Lead Plaintiffs had already received and reviewed over 61,500 pages of documents produced in discovery.

59.    Lead Counsel conducted an efficient review of those documents, with a team of experienced attorneys reviewing and analyzing the documents as they were received. These attorneys have all worked on multiple securities cases, specialize in securities litigation, and are experienced in utilizing the latest technology with respect to document review. They were integral to the litigation team and focused on reviewing Defendants' document productions for the purpose of preparing for class certification (which was due on September 12, 2025) and for preparing for fact depositions, as the close of fact discovery was on November 14, 2025.

60.    To efficiently focus on the most relevant documents, Lead Counsel used data analytic software tools housed in a Relativity eDiscovery platform to search and analyze the documents produced by Defendants and third parties. While the analytics

were used to target the most important communications, workpapers, and reports, it was necessary to review the results of these searches in a document-by-document, or linear, manner.

61. The attorneys conducted targeted searches to isolate evidence and group documents by issue, potential deponent, and time period. The searches utilized text, file names, document types (*e.g.*, emails, memoranda, SEC filings, and correspondence), dates, bates numbers, etc., to identify relevant, irrelevant, and "hot" documents. Certain more complex documents were allocated and elevated to be reviewed by specific subject matter experts retained by Lead Counsel (including an accounting expert). Through experience and their increasing familiarity with the documents, the document review team, with the assistance of retained experts, identified key documents for use in connection with class certification, mediation efforts, fact and expert depositions, summary judgment, and trial preparation. The review team analyzed and coded these documents, prepared for weekly and ad hoc "hot" document meetings, conducted privilege log review, and began to create deposition preparation exhibit kits, which included reviewing and coding all deponent custodial documents if practicable, or in the alternative, the use of targeted searches, and organizing the final set of documents for use at deposition.

62. At the start of the document review, attorneys on the litigation team worked with the document review team to establish a document coding protocol, which set out the guidelines and framework within which the team would categorize each of the reviewed documents. To maintain performance standards and accuracy, the litigation and review teams held weekly document review sessions to discuss the results of their ongoing review, provide feedback, track progress on existing projects, and allocate new projects to be undertaken by specific members of the team. Throughout the case, the attorneys reviewing the documents prepared meaningful work product, including analyses of newly uncovered important documents, which updated and refined the team's knowledge and direction as to the issues and evidence in the case.

DECL. OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

19

23-cv-01546

63.     Building upon the knowledge learned through the document discovery process, on May 9, 2025, Lead Plaintiffs served their second set of requests for production of documents on Defendants ("RFP Set 2"), consisting of a narrow set of document requests concerning documents related to the termination of Individual Defendant Kiani.

64.     In their responses and objections served on Lead Plaintiffs on June 9, 2025, Defendants objected to the production of the documents called for by RFP Set 2. Defendants again confirmed their complete objection to the production of documents called for by RFP Set 2 in a June 11, 2025 meet and confer between the Parties.

**D.     Discovery Dispute Regarding RFP Set 2**

65.     At the previously-ordered June 13, 2025 Status Conference (ECF No. 78), and pursuant to Magistrate Judge Butcher's Civil Chambers Rule V.C., the Parties informed the Court of the ongoing discovery dispute regarding RFP Set 2. At the Status Conference, the Court ordered the Parties to submit letter briefs concerning the dispute over RFP Set 2 by the close of business on June 24, 2025, and set a Discovery Conference concerning RFP Set 2 for June 27, 2025 before Magistrate Judge Butcher.

66.     Lead Plaintiffs thereafter prepared their letter brief and associated motion to compel production of the documents called for by Lead Plaintiffs' RFP Set 2. As instructed by the Court, on June 24, 2025, Lead Plaintiffs served their motion to compel letter brief. On June 24, 2025, Defendants for Masimo and Kiani served their respective letter briefs.

67.     However, as discussed further below, by the afternoon of June 26, 2025, the Settling Parties had reached an agreement in principle to settle after arm's-length discussions. They notified the Court on June 26, 2025 of their agreement in principle. The parties' correspondence to the Court also requested that the June 27, 2025 Discovery Conference regarding RFP Set 2 be taken off the calendar, in light of the agreement to settle. On June 26, 2025, the Court vacated the June 27, 2025 Discovery Conference in light of the parties' correspondence.

DECL. OF LAUREN A. ORMSBEE IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

20

23-cv-01546

## E.    Discovery Propounded on Lead Plaintiffs

68.    On April 27, 2025, Defendant Masimo served on Lead Plaintiffs Interrogatory No. 1, which called for discovery related to the identification of Lead Plaintiffs' confidential witnesses referenced in Lead Plaintiffs' Complaint.

69.    Lead Plaintiffs served their responses and objections to Interrogatory No. 1 on May 28, 2025. In Lead Plaintiffs' responses and objections, Lead Plaintiffs reserved all rights, and *inter alia*, objected on the basis of the work product doctrine, and that the information Defendants sought was already within the Defendants' possession, custody, and control, as the confidential witnesses were former employees of Masimo. Lead Plaintiffs also explained in their responses and objections that subject to, and without waiving their objections, they would meet and confer with Defendants regarding Interrogatory No. 1. On June 11, 2025, Lead Plaintiffs and Defendants met and conferred regarding Interrogatory No. 1, which remained unresolved at the time the Settlement was reached.

## F.    Discovery Propounded on Third Parties

70.    On March 21, 2025, Lead Plaintiffs served a non-party subpoena on a former employee at Masimo, seeking the production of all documents the former employee had provided to the United States Securities & Exchange Commission ("SEC") in connection with any SEC investigation concerning Masimo. In response to the subpoena, the former employee produced to Lead Plaintiffs 5,568 pages of documents, which Lead Plaintiffs then reviewed.

## G.    Expert Discovery

71.    The complex subject matter of the Action required Lead Plaintiffs to retain several experts. In that regard, Lead Plaintiffs retained:

(i)    an accounting expert who helped Lead Plaintiffs understand the alleged accounting implications concerning the accounting manipulations and "plugs" involving Sound United; and

(ii)    a market-efficiency and damages expert, who worked on estimating damages and analyzing potential loss causation issues.

72.     These experts were essential to analyzing Lead Plaintiffs' claims at the pleading stage and defending against Defendants' anticipated class certification attacks. While no expert reports or expert discovery had yet been exchanged as of the time of the Settlement, Lead Plaintiffs were in the process of coordinating with their experts regarding the production of expert reports, as well as all associated discovery that would follow.

## V.     THE SETTLEMENT

### A.     The Parties' Settlement Negotiations

73.     The Settling Parties began exploring the possibility of a settlement in December 2024. Thereafter, they agreed to engage in private mediation and retained David Murphy of Phillips ADR Enterprises to act as the mediator in the case (the "Mediator"). On May 28, 2025, counsel for the parties participated in a full-day mediation session before Mr. Murphy. Mr. Murphy is a skilled mediator and former litigator with decades of experience in complex commercial litigation and mediating securities class actions and related cases. Attached as Exhibit 6 is the Declaration of David M. Murphy, dated March 30, 2026, which provides an overview of the mediation process and supports approval of the proposed Settlement.

74.     In preparation for the mediation, both Lead Counsel and counsel for Defendants prepared and exchanged detailed opening and reply mediation statements to the Mediator, together with numerous supporting exhibits, which addressed both liability and damages issues.

75.     On May 28, 2025, Lead Counsel and Defendants' Counsel, among others, participated in a full-day, in-person mediation session before the Mediator. During the mediation, the parties weighed the risks and benefits of settlement. Lead Plaintiff Boston Retirement System's General Counsel, Natacha Thomas, Esq., participated in this in-person mediation session.

76. The May 28, 2025 mediation session ended without any agreement being reached. The parties continued discussions with the Mediator in the days following the mediation to further explore the possibility of a settlement.

77. On June 16, 2025, the Mediator issued a mediator's recommendation to the parties to settle the claims for $33.75 million, and that recommendation was accepted by the Settling Parties on June 26, 2025, subject to the execution of a formal settlement agreement. *See* Ex. 6, ¶¶9-10.

78. On July 11, 2025, the Settling Parties filed a Joint Motion Regarding Settlement, informing the Court that they had reached a settlement in principle to resolve all claims in the litigation on a class-wide basis, and requesting that the Court vacate all deadlines, hearings, and the Trial Date to allow the Settling Parties to finalize documentation of the Settlement and Lead Plaintiffs to submit a motion for preliminary approval of the proposed class action settlement. ECF No. 83.

79. On July 16, 2025, the Court issued an order granting the Settling Parties' joint motion, in light of the settlement in principle, that: (i) vacated all deadlines, hearings, and pre-trial conferences in the Action; and (2) set August 14, 2025 as the deadline for Lead Plaintiffs to file a motion for preliminary approval of the proposed class action settlement. ECF No. 85.

80. The Settling Parties' settlement in principle was subsequently memorialized in a term sheet executed and finalized on July 24, 2025 (the "Term Sheet"), subject to the execution of a formal settlement agreement, related papers, and approval by the Court.

**B.   Preparation of Settlement Documentation and Preliminary Approval Motion**

81. Once the Settling Parties agreed in principle to settle, they worked diligently to negotiate the full settlement terms set forth in the Stipulation and its exhibits, as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"). On August 14, 2025, the Settling Parties

executed the Stipulation setting forth the full terms and conditions of the Settlement, ECF No. 86-2, and the Supplemental Agreement.

82. The Settlement provides for, among other things, the payment of $33.75 million in cash into an interest-bearing Escrow Account, *see* Stipulation at ¶6, which has been deposited. The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees and Litigation Expenses, Notice and Administration Expenses, Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Settlement Class Members who submit timely and valid Claims, in accordance with a plan of allocation approved by the Court.

83. In exchange for payment of the Settlement Amount, on the Effective Date of the Settlement, Lead Plaintiffs and the Settlement Class will release the Released Defendant Parties from all of the Released Plaintiffs' Claims, and Settling Defendants will release the Released Plaintiff Parties from all of the Released Defendants' Claims. *See* Stipulation ¶¶1(ee)-(ii), 4, and 5. The Settlement is not "claims-made" and there is no reversion of unclaimed funds to Defendants. *See* Stipulation ¶12.

84. On August 14, 2025, Lead Plaintiffs submitted their unopposed motion for an order preliminarily approving the Settlement, approving the manner and form of notice to be sent to Settlement Class Members, and scheduling a hearing for final approval of the Settlement ("Preliminary Approval Motion"). ECF No. 86.

85. On September 2, 2025, Lead Plaintiffs filed a letter informing the Court that no opposition to the August 14, 2025 Motion had been filed or served on the parties. ECF No. 87.

86. On September 11, 2025, Lead Plaintiffs filed a Notice of Filing the Notice of Proposed Class Action Settlement Pursuant to 28 U.S.C. § 1715 of the Class Action Fairness Act of 2025 ("CAFA"), ECF No. 88, which was issued in connection with the filing of the Stipulation, as provided for in ¶21 of the Stipulation.

87.    On January 14, 2026, the Court issued an Order of Consent and Reference of a Civil Action to a Magistrate Judge, and this case was reassigned to Magistrate Judge Daniel E. Butcher for all settlement-related proceedings. ECF No. 92.

88.    A status conference was held on January 23, 2026 before Magistrate Judge Butcher, instructing Lead Plaintiffs to re-file the unopposed motion for preliminary approval of the Settlement and exhibits to reflect that Magistrate Judge Butcher is the presiding judge over the settlement proceedings and that the final Settlement Hearing and other relevant dates would occur in 2026. On January 26, 2026, Lead Plaintiffs filed an unopposed resubmitted motion for preliminary motion. ECF No. 97.

89.    On February 2, 2026, the Court issued an order granting Lead Plaintiffs' motion for preliminary approval and scheduled the final settlement hearing for May 5, 2026. ECF No. 98.

## VI.    THE SIGNIFICANT RISKS OF CONTINUED LITIGATION

90.    The Settlement provides a near-term and certain benefit to the Settlement Class in the form of an upfront $33.75 million cash payment. The merits of the $33.75 million Settlement must be considered in the context of the risks presented by continued litigation of the Action. Having considered the risks of continued litigation, in light of all proceedings and discovery performed in the Action to date, it is the informed judgment of Lead Plaintiffs and Lead Counsel that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

91.    The Settlement is the result of extensive arm's-length negotiations by fully informed Lead Plaintiffs and Lead Counsel, resolves this hard-fought litigation, and represents a very favorable result for the Settlement Class when considered on its own and when evaluated in light of the risks and challenges of continued litigation. Lead Plaintiffs and Lead Counsel understood that while Lead Plaintiffs' claims were strong and Lead Plaintiffs believe they had adduced substantial evidence to support the Settlement Class's claims at class certification, summary judgment, and trial, there

were a number of factors that made the outcome of continued litigation uncertain, weighing in favor of a settlement.

92.    Overall, the factual record developed through document discovery, the pending discovery dispute, the anticipated briefing of class certification and summary judgment, and the Settling Parties' settlement negotiations, allowed Lead Plaintiffs and Lead Counsel to undertake a comprehensive evaluation of the strengths and weaknesses of the claims. Based on that evaluation, Lead Counsel (a firm with extensive experience in the prosecution and trial of complex securities litigation, *see* Ex. 7 - D) together with Lead Plaintiffs (sophisticated institutional investors with billions of dollars in assets under management for the benefit of more than tens of thousands of active and retired members and beneficiaries, *see* Exs. 1 & 2) determined that the Settlement was in the best interests of the Settlement Class.

93.    Moreover, Lead Counsel respectfully submits that it assumed significant risk in prosecuting this Action on an entirely contingent basis. From the time that Lead Counsel agreed to take on the case, settlement was by no means guaranteed and certainly not at the level ultimately achieved. Lead Counsel faced the significant risks faced in any securities class action—particularly so here given the complex nature of the dispute—as well as unique risks in seeking to prove Defendants' liability and damages.

### A.    Lead Plaintiffs Faced Substantial Risks in Proving Liability

94.    While Lead Plaintiffs and Lead Counsel believe that the claims asserted in the Action are strong, they recognize that the Action presented substantial risks to proving liability. Indeed, at the motion to dismiss stage, the Court dismissed certain categories of statements wholesale. Specifically, the Court dismissed from the Action: (i) Defendants' statements about "past financial performances," *i.e.*, the "Past Performance Statements" (MTD Order at 11-13); and (ii) Defendants' statements about the adequacy of its internal disclosure controls, *i.e.*, the "Internal Control Statements" (MTD Order at 17-18). What remained in the Action following the MTD Order were

only two categories of statements: (1) Defendants' "Future Performance Statements" and (2) the "Sound Acquisition Statements." MTD Order at 13-17.

95. Additionally, the Court dismissed the Section 10(b) claims against all but one of the Individual Defendants (Young), finding that the Complaint did not sufficiently allege a strong inference of scienter for the remaining Individual Defendants, including Kiani. Based on the Court's conclusion that there were sufficient allegations of scienter for Defendant Young, it concluded that there was scienter alleged for Defendant Masimo. MTD Order at 18-24.

### 1. Risks in Proving Material Misrepresentations and Omissions

96. As a threshold matter, despite the MTD Order, Lead Plaintiffs faced substantial ongoing challenges with respect to proving that Defendants made materially false and misleading statements, an essential element of Lead Plaintiffs' Section 10(b) claims. As noted above, Lead Plaintiffs alleged, and the Court sustained, two categories of false and misleading statements. Each category of allegedly false statements and omissions faced serious counterarguments by Defendants that the statements were not actionable, as described below. Any failure to maintain the actionability of these misstatements and omissions would have had significant consequences with respect to the damages available to the Settlement Class.

97. As to the Future Performance Statements, Defendants would have likely argued—should the litigation have continued—that the statements are covered and protected by the PSLRA's Safe Harbor for forward-looking statements, and that meaningful cautionary language accompanied the statements through Defendants' risk disclosures in their SEC filings. While Lead Plaintiffs believe in the strength of their claims and in the actionability of the Future Performance Statements, many of the statements were projections or guidance concerning revenue and other financial metrics. Lead Plaintiffs would have countered that even if the Future Performance Statements were deemed forward-looking, the PSLRA Safe Harbor was inapplicable

because (i) the associated cautionary language was meaningless, and (ii) Defendants had actual knowledge of the falsity of their misstatements.  .

98.    Moreover, Defendants also would have likely argued at the summary judgment stage that the Future Performance Statements were inactionable statements of corporate optimism or statements of inactionable puffery. Should the Court have credited such arguments, the Future Performance Statements may have been dismissed in-part, or in-full, from the Action as a matter of law.

99.    Even if the Future Performance Statements were not later deemed to be inactionable forward-looking statements or immaterial puffery, Defendants would have likely argued that Lead Plaintiffs could not demonstrate that they were false when made.

100.    As to the Sound Acquisition Statements, *i.e.*, the statements concerning Masimo's acquisition and integration of Sound United, there were significant and substantial risks given that only one such statement survived the Court's MTD Order. Specifically, although various Defendants made misrepresentations concerning the Sound United integration, the Court determined that Lead Plaintiffs had failed to plead scienter adequately as to Defendant Kiani and accordingly dismissed the Section 10(b) claims against him (but sustained Defendant Kiani's Section 20(a) control-liability claims). MTD Order at 23-24. Thus, only one such Sound Acquisition Statement— made specifically by Defendant Young—remained.  If it did not survive a material falsity challenge, Lead Plaintiffs' Section 10(b) claim arising from this statement would have been completely eliminated, significantly weakening the case.

101.    Similar to the Future Performance Statements, Defendants would have likely argued at the summary judgment stage that the Sound Acquisition Statement was inactionable puffery. If the Court ultimately agreed with Defendants, the single Sound Acquisition Statement that survived would have been dismissed from the Action.

102.    Lead Plaintiffs would also face considerable challenges with respect to the confidential witness allegations pled in the Complaint. In particular, Defendants would

likely argue that the testimony from the confidential witnesses concerning the use of "plugs" to manipulate Masimo's financial close numbers is undermined by the fact that (i) the Company's independent auditor signed off on Masimo's financial statements; and (ii) there has been no government action taken by the SEC to date in response to whistleblower claims related to the accounting "plugs" allegations.

103.   In sum, if both categories of statements were dismissed at the summary judgment stage, or if both categories of statements were found to not be materially false or misleading by a jury, then Lead Plaintiffs would fail to recover anything for the Settlement Class.

### 2.    Risks in Proving Scienter

104.   In addition to Defendants' anticipated falsity arguments, Defendants also likely would have argued that Lead Plaintiffs could not meet their scienter burdens at summary judgment and trial.

105.   As discussed above, the MTD Order ruled that Lead Plaintiffs failed to plead scienter for three of the four Individual Defendants (Kiani, Muhsin, and Kammerman), thus leaving Section 10(b) claims in place only for Defendants Young and Masimo. MTD Order at 18-23. The Court also affirmed that Masimo's scienter was derived from CFO Young's scienter. *See* MTD Order at 23 n.8. Accordingly, proving Young's scienter would have been of paramount importance.

106.   To the extent Lead Plaintiffs were able to prove falsity, they would also need to obtain document and testimonial evidence sufficient to establish scienter with respect to the Company's purported use of accounting "plugs." Defendants would likely produce documents and elicit testimony to demonstrate that they relied upon financial statements prepared by other corporate employees and blessed by the Company's auditors. Moreover, at summary judgment (or at trial) this Court (or a jury) may have credited Masimo's potential competing inference that—according to Defendants—Masimo acted swiftly to report lower than expected earnings and adjust its full year guidance, negating an inference of scienter or intent to defraud.

107. Additionally, should the Court or jury have credited Defendants' argument that certain of the statements reflected mere optimism by the Masimo executives, Defendants also would have a strong likelihood of demonstrating that there was no overall intent to deceive the market, and rather, Defendants were merely overly optimistic when making their statements.

108. Indeed, while Lead Plaintiffs believe the discovery produced by Defendants and the non-party former employee demonstrate significant indicia of scienter in this Action—such a factual question is ripe for jury determination, and there is no guarantee that a jury would find for Lead Plaintiffs on the question as to whether Defendants made their materially false and misleading statements with scienter or an intent to defraud the market.

### 3.   Risks in Proving Loss Causation and Damages

109. While the Court did not rule on loss causation or damages in its MTD Order, Defendants likely would have made several arguments at the class certification, summary judgment, and trial stage concerning loss causation and damages that posed significant risks in continued litigation.

110. As a threshold matter, Lead Plaintiffs' loss causation theory was premised on proving two corrective disclosures: (1) the July 17, 2023 public preannouncement of its Q2 2023 earnings (revealing a substantial cut to its full-year guidance); and (2) the August 8, 2023 release of its final quarterly results for Q2 2023. Lead Plaintiffs' damages expert has estimated that maximum damages attributable to the allegedly corrective disclosures were approximately $755.5 million, depending on the trading model and assumptions used.  However, Defendants would have likely argued that the two corrective disclosures did not correct—whether in full or in part—the falsity of Defendants' prior misstatements (*i.e.*, the Future Performance Statements and the Sound Acquisition Statement), and thus, there was no "causal connection"[9] between the alleged fraud and the alleged loss. Based upon such arguments, should the Court

---

[9] *In re Genuis Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024).

(or jury) have dismissed one corrective disclosure at any continued stage of the Action, damages would have been **severely and greatly reduced**.

111. Moreover, Defendants would have likely argued that Lead Plaintiffs' expert would need to, and would be unable to, disaggregate the corrective disclosures' impact on Masimo's stock price from other confounding non-fraud related factors. Defendants would have presented complex expert-driven evidence purportedly showing that damages in the Action were much smaller, or none at all, after disaggregation. While Lead Plaintiffs do not concede that disaggregation was or is necessary, should Defendants have succeeded in their disaggregation argument, the impact of non-fraud related information on the stock price declines on July 17, 2023 and August 8, 2023 would need to be identified and quantified through complicated expert-driven analysis.

112. For instance, determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case specific and factual question. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.*, price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Additionally, the disaggregation approach would need to utilize a methodology that was reliable enough to survive any anticipated *Daubert* challenge.

113. Lead Plaintiffs' expert estimated that damages could be reduced by more than 60%—to about $272.9 million—if the disaggregation of confounding information was required.

### 4.      Lead Plaintiffs Faced Risks Concerning Certain Witnesses

114.   Separately, and underlying the risks in proving liability discussed above, Lead Plaintiffs also faced risks with respect to Defendants' likely challenges to the testimony of former Masimo employees whose accounts were reflected in the Complaint, including one Masimo former employee and third-party who produced 5,568 pages of documents to Lead Plaintiffs, and may have been used in connection with summary judgment and at trial.

115.   One former employee produced documents in response to Lead Plaintiffs' subpoena. These documents provided information that painted a compelling story of fraud by Masimo and the Individual Defendants. However, at both summary judgment and trial, Defendants likely would have challenged, on a factual basis, the meaning and interpretation of many of these documents, and would have argued that the documents do not establish any element of Lead Plaintiffs' securities fraud claims, including falsity and scienter. Additionally, Defendants would have likely sought to challenge the admissibility of many of the documents through evidentiary arguments, such as relevancy and hearsay. Given that the former employee's documents helped overcome the Motion to Dismiss as to both Defendants' Future Performance Statements and Defendants' Sound Acquisition Statement, any arguments by Defendants that the Court or a jury could credit in discounting or ignoring these documents would certainly impact the likelihood of success on the merits, whether at summary judgment or trial.

116.   Lead Plaintiffs also likely would have called certain current and former Masimo employees as trial witnesses. Separate and apart from an analysis of the documents produced, the weight credited to a witness' testimony is difficult to predict. Should a jury have credited the testimony of current and former employees called by Lead Plaintiffs, then Lead Plaintiffs' case would have been strengthened, but should a jury have found the opposite, Lead Plaintiffs' case and likelihood of success on the merits would have been impacted negatively.

5.    **Risk Associated with Class Certification, Summary Judgment, Trial, and on Appeal**

117.    Given the arguments outlined above, Lead Plaintiffs anticipated substantial challenges at class certification, summary judgment, and trial, with Lead Plaintiffs' class certification motion scheduled to be filed in just over one month from the date the Settlement was reached. Lead Plaintiffs expected that Defendants would lodge a robust opposition to the class certification motion, and would raise materiality and price impact arguments to "rebut the presumption" of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

118.    Even if Lead Plaintiffs surmounted such obstacles and prevailed at class certification, summary judgment, and trial, Defendants would undoubtedly have appealed the judgment each step of the way, including the amount of any damages awarded—leading to many additional months, if not years, of further litigation—and exposing Lead Plaintiffs and the Settlement Class to the risk of having even a favorable judgment reversed or reduced below the Settlement Amount.

B.    **Risks Involved in Prosecuting Securities Class Actions**

119.    In addition to the specific litigation risks summarized above, it is worth noting that securities class actions in general involve significant inherent risk. Of the 234 securities cases resolved in 2025, 155 of them (66%) were dismissed. *See* NERA Full-Year Report, Ex. 4 at 14.

120.    Many securities class actions have been dismissed at summary judgment. *See, e.g., In re REMEC Inc. Sec. Litig.,* 702 F. Supp. 2d 1202, 1211, 1260 (S.D. Cal. 2010) (finding that because defendants were entitled to summary judgment on the element of scienter, the "case shall be dismissed in its entirety with prejudice and judgment entered in [d]efendants' favor"); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd*, *Dalberth v. Xerox Corp.*, 766 F.3d 172 (2d Cir. 2014). Indeed, on August 15, 2025, the court in *Homyk v.*

*ChemoCentryx, Inc.* No. 21-CV-03343-JST, 2025 WL 4110430 (N.D. Cal. Aug. 15, 2025) granted defendants' motion for summary judgment and dismissed all claims just months prior to trial, finding that certain statements initially sustained by the court at the motion to dismiss stage were no longer actionable following the completion of fact and expert discovery.

121.   Even cases that have survived summary judgment have been dismissed before trial, for instance as a result of successful *Daubert* motions by defendants. For example, in *In re Pfizer Inc. Sec. Litig.*, the court granted the defendants' motion *in limine* to exclude the testimony of the plaintiffs' proffered damages expert, and then granted their renewed motion for summary judgment based on the plaintiffs' failure to proffer admissible loss causation and damages evidence. *See In re Pfizer Inc. Sec. Litig.*, No. 04–CV–9866, 2014 WL 3291230 (S.D.N.Y. July 8, 2014), *vacated,* 819 F.3d 642 (2d Cir. 2016); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment for defendants *sua sponte* after finding that plaintiffs' event study was unreliable and that there was accordingly no evidence that the market reacted negatively to alleged corrective disclosures).

122.   Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, overcoming *Daubert* motions, and prevailing at trial, there are still real risks on appeal that could result in no recovery or substantially less of a recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc.*, tried by Labaton, a jury rendered a verdict in plaintiffs' favor on liability in 2010. However, in 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of defendants on all claims. *See* No. 07–61542–CIV, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds by, Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012). In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient

evidence to support a finding of loss causation. *See BankAtlantic Bancorp,* 688 F.3d 713.

123.   Yet another example of the risk inherent in securities class actions is *Jaffe v. Household Int'l,* where a jury returned a verdict for plaintiffs in May 2009, and the district court (four years later) entered a post-verdict judgment of $2.45 billion. In 2015, however, the Seventh Circuit reversed and ordered a new trial on loss causation and damages. *See Jaffe v. Household Int'l,* 787 F.3d 408 (7th Cir. 2015); *see also, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal and judgment entered for defendant).

## VII.   COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

124.   As required by the Court's Preliminary Approval Order, A.B. Data, working at Lead Counsel's direction, began disseminating notice of the Settlement on February 17, 2026. Ex. 5, ¶¶3-10. Specifically, A.B. Data has: (i) mailed by First-Class Mail a copy of the Postcard Notice to potential Settlement Class Members using information gathered to date; (ii) mailed a copy of the Postcard Notice to brokers and nominees that may have purchased Masimo publicly traded common stock on behalf of Settlement Class Members ("Nominees"); (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over *PR Newswire*; and (iv) created a website, www.MasimoSecuritiesSettlement.com, to provide information about the Action and the Settlement. *Id*. at ¶¶3-14.

125.   Collectively, the Settlement notices contain important information about the Action and the Settlement, including, among other things, the definition of the Settlement Class, a description of the proposed Settlement, information regarding the claims asserted in the Action, Settlement Class Members' options in connection with the Settlement, and the deadlines for objecting, seeking exclusion, and submitting claims. *See generally id*., Ex. 5 - A to F. The long-form Notice, available on the website

or from A.B. Data upon request, has detailed information about the Action and Settlement, including the Plan of Allocation. The notices also inform recipients of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for payment of Litigation Expenses incurred by Lead Counsel in an amount not to exceed $400,000. *Id.*

126.   In accordance with the Preliminary Approval Order, as of March 27, 2026, notice of the Settlement has been disseminated to 83,065 potential Settlement Members or their Nominees, through the mailing of 45,460 Postcard Notices and dissemination of 37,605 emails with links to the Settlement Website. *Id.* at ¶10. In addition, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and transmitted it over *PR Newswire* on March 3, 2026. *Id.* at ¶11.

127.   In connection with the notice dissemination, A.B. Data developed a website for the Settlement in order to provide information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to an online claim portal and downloadable copies of the notices, Claim Form, Stipulation, Preliminary Approval Order, and other relevant documents. *Id.* at ¶¶6, 12-14. Copies of the notices and Claim Form are also available on Lead Counsel's website, www.labaton.com. Additionally, A.B. Data maintains a toll-free telephone number and email for inquiries regarding the Settlement. *Id.* at ¶15, Ex. A.

128.   The deadline for Settlement Class Members to file an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion is April 14, 2026. To date, not a single objection to any aspect of the Settlement has been received. In addition, A.B. Data has received no requests for exclusion. *Id.* at ¶16.

129.   Lead Counsel will file reply papers on or before April 28, 2026 that will address any objections and report on requests for exclusion.

## VIII. THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE

130.   In accordance with the Preliminary Approval Order, and as explained in the notices, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Expenses; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim Form and all required supporting documentation to the Claims Administrator by mail or online at www.MasimoSecuritiesSettlement.com. As explained in the notices, the Net Settlement Fund will be distributed to Authorized Claimants in accordance with the plan for allocating the Net Settlement Fund approved by the Court. The plan of allocation proposed by Lead Plaintiffs (*i.e.*, the "Plan of Allocation" or "Plan") is set forth on pages 11-15 of the Notice. *See* Ex. 5 - B.

131.   The objective of the Plan is to distribute the Net Settlement Fund equitably among those Settlement Members who suffered economic losses as a result of the alleged violations of the federal securities laws with respect to purchases or acquisitions of the publicly traded common stock of Masimo during the period from May 4, 2022 through August 8, 2023, both dates inclusive.

132.   Lead Counsel developed the Plan in consultation with Lead Plaintiffs' damages expert. The Plan, however, is not a formal damages analysis. The calculations made pursuant to the Plan are not intended to estimate, or be indicative of, the amounts that Settlement Class Members might have been able to recover as damages at trial. Nor are the calculations, including the Recognized Loss formulas, intended to estimate the amounts that will be paid to Authorized Claimants. The computations under the Plan are only a method to weigh the claims of Authorized Claimants against one another for purposes of making *pro rata* allocations of the Net Settlement Fund, and

the Recognized Claim amounts are the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

133.   A.B. Data, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts for each purchase, as calculated under the Plan and based on the amount of allegedly artificial inflation in the prices of Masimo's common stock) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Lead Plaintiffs' losses will be calculated in the same manner.

134.   Once A.B. Data has processed all submitted Claim Forms and provided Claimants with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, processed responses, and made claim determinations, distributions will be made to Authorized Claimants in the form of checks and wire transfers.

135.   As set forth in the Plan, if there is any balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), after at least six (6) months after the initial distribution, and after payment of any unpaid fees and expenses incurred in administering the Settlement, and Taxes, the Claims Administrator will, if feasible, redistribute such balance among Authorized Claimants who have cashed their initial distribution checks in an equitable and economic fashion. Redistributions will be repeated until the balance in the Net Settlement Fund is no longer feasible or economical to distribute. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical to reallocate, after payment of outstanding Notice and Administration Expenses and Taxes, will be contributed to the Consumer Federation of America, a non-profit, non-

sectarian organization, or such other organization approved by the Court.[10] *See* Ex. 5 - B at ¶68.

136.  The structure of the Plan is similar to that of numerous other plans of allocation that have been used in other class actions under the Exchange Act.

137.  To date, no objections to the Plan have been filed.

138.  In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiffs' damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan is fair, reasonable, and adequate and should be approved.

## IX.  THE FEE AND EXPENSE APPLICATION

139.  In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of itself and Liaison Counsel, is applying to the Court for an award of attorneys' fees and payment of expenses incurred during the course of the Action.[11] Specifically, Lead Counsel is applying for attorneys' fees in the amount of 25% of the Settlement Fund, or $8,437,500, plus interest earned at the same rate as earned by the Settlement Fund, and for Litigation Expenses in the amount of $265,418.12, plus accrued interest.[12] Lead Counsel also seeks reimbursement in the

---

[10] Consumer Federation of America ("CFA") is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests, including those of investors, through policy research, advocacy, and education before the judiciary, Congress, the Executive Branch, federal and state regulatory agencies, and state legislatures. *See generally* www.consumerfed.org. CFA has been approved as a *cy pres* beneficiary in numerous securities cases, including *In re Conduent Inc. Sec. Litig.*, No. 19-cv-08237 (D.N.J.); *In re StoneCo Ltd. Sec. Litig.*, No. 21-cv-9620 (S.D.N.Y.); *In re Livent Corp. Sec. Litig.*, Case No. 190501229 (Pa. Com. Pl. 2021); *In re Broadcom Corp. Sec. Litig.*, No. 01-CV-00275-MLR (C.D. Cal.); and *Allison v. Oak Street Health, Inc., et al.*, No. 22-CV-00149 (N.D. Ill.).

[11] Any determination with respect to Lead Counsel's application for an award of attorneys' fees and Litigation Expenses will not affect the Settlement, if approved.

[12] The time and expense detail for Lead Counsel is set forth in the Declaration of Lauren A. Ormsbee on behalf of Labaton Keller Sucharow LLP ("Labaton Fee and Expense Decl."), attached hereto as Exhibit 7, and the Declaration of Lucas E. Gilmore on behalf of Hagens Berman Sobol Shapiro LLP ("Hagens Berman Fee and Expense Decl."), attached hereto as Exhibit 8. The declarations set forth the names of the attorneys and professional support staff members who worked on the Action, their

---

total amount of $3,702.74 for Lead Plaintiffs' costs (including lost wages) incurred in connection with their representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4). *See* Ex. 1, ¶¶4-5, 8-10; Ex. 2, ¶¶4-5, 8-10. Lead Counsel's Fee and Expense Application is consistent with the amounts set forth in the notices and, to date, not one objection regarding the maximum fee and expense amounts set forth in the notices have been received.

140. Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Ninth Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.

**A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval**

**1.    The Result Achieved**

141. The Settlement provides a recovery of $33.75 million in cash for the benefit of the Settlement Class. For the reasons set forth above and given the challenges and obstacles in this case, Lead Counsel believes that the Settlement represents an excellent result for the Settlement Class. Indeed, given the serious challenges that Plaintiffs faced—most significantly, proving that the remaining misstatements were materially false and misleading and proving damages—there was significant risk that there would be no recovery at all. In contrast, the Settlement avoids the potential impact of these challenges and other risks and achieves a fair and certain result.

142. The $33.75 million recovery is more than twice the $12.5 million median recovery in mid-2025, when the Settlement was reached, and significantly more than the $17 million median recovery for all of 2025. *See* Ex. 3 at 2; Ex. 4 at 24.

hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the expenses incurred, and the background and experience of the firms.

143.   Moreover, as discussed above, the Settlement represents a meaningful portion of the Settlement Class's reasonably recoverable damages, as estimated under potential scenarios analyzed by Lead Plaintiffs' damages expert. If the class's claims survived summary judgment, trial, post-trial motions, and appeals completely intact, then maximum damages were estimated to be approximately $755.5 million. However, a recovery of approximately $272.9 million was possible, once Defendants' likely disaggregation arguments were considered. Accordingly, the Settlement recovers a range of approximately 4.5% to 12.4% of potential damages, which is a very favorable result in these types of cases. According to NERA's full-year 2025 report, for cases with total NERA-defined investor losses of between $200 million and $399 million, the median percentage of recovery from 2016 to 2025 was 2.7% of estimated losses. *See* Ex. 4 at 27.  For cases with NERA losses of $600 million to $999 million, the median percentage of recovery during this time period was 1.7%. *Id*.

144.   Here, as a result of the Settlement, numerous Settlement Class Members will benefit and receive compensation for their losses and avoid the substantial risks of a lesser, or no, recovery in the absence of settlement.

### 2.      The Risks of Litigation and the Contingent Nature of the Fee

145.   The risks faced by Plaintiffs' Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any liability and, if the Action had continued, would have aggressively litigated their defenses through dispositive motions, a complex trial, and the appeals that would inevitably follow. As detailed in Section VI. above, notwithstanding that certain claims survived Defendants' Motion to Dismiss, Lead Counsel and Lead Plaintiffs faced significant risks with respect to obtaining class certification, surviving summary judgment challenges and actually proving Defendants' liability and damages at each of the future stages of the litigation.

146. These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent case law interpreting the federal securities laws and was undertaken on a contingent-fee basis. From the outset, Lead Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Counsel have dedicated more than 8,200 hours to prosecuting the Action for the benefit of the Settlement Class yet have received no compensation for their efforts.

147. Plaintiffs' Counsel also bore the risk that no recovery would be achieved. Lead Counsel is aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. As mentioned above, Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

148. Successfully opposing a motion to dismiss or even for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities

class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, No. 02-cv-1486, slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton), and *In re Tesla, Inc. Sec. Litig.*, No. 18-cv-4865, slip op. (N.D. Cal. Feb. 3, 2023), or substantially lost as to the main case, such as *In re Clarent Corp. Sec. Litig.*, No. 01-cv-3361, slip op. (N.D. Cal. Feb. 16, 2005).[13]

149.   Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g., In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-cv-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (unanimous verdict for plaintiffs rejected by trial court and later reinstated by the Ninth Circuit Court of Appeals).

150.   The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and

---

[13] Unreported slip opinions cited herein, in the Settlement Memorandum, and in the Fee and Expense Memorandum are submitted herewith in a compendium attached as Exhibit 9.

---

able counsel enforce the federal securities laws through private actions. *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citations omitted). Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

151. Plaintiffs' Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Lead Counsel believes is a significant (and certain) recovery for the Settlement Class. In these circumstances, and in consideration of their hard work and the excellent result achieved, Lead Counsel believes the 25% fee request is fair and reasonable and should be approved.

**3.     The Skill Required and Quality of Counsel's Representation**

152. The skill and diligence of Lead Counsel also support the requested fee. As demonstrated by the firm biography included as Exhibit D to the Labaton Fee and Expense Declaration, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country.

153. The substantial result achieved for the Settlement Class here also reflects the superior quality of this representation.

154. The quality of the work performed in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel that vigorously and ably defended the Action on behalf of Defendants.

### 4.    The Time and Labor Devoted to the Action

155.    As more fully described above, Lead Counsel: (i) engaged in a thorough investigation; (ii) drafted a detailed amended complaint; (iii) opposed Defendants' Motion to Dismiss and Request for Consideration; and (iv) engaged in fact discovery, which included the review of approximately 61,500 pages of documents produced by Defendants and third parties. The parties exchanged extensive mediation briefing and participated in a full-day mediation. *See supra* Sections III-V.

156.    These efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible. Throughout the litigation, Lead Counsel implemented effective project management and sought to maintain an appropriate level of staffing on all tasks.

157.    The time devoted to this Action by Plaintiffs' Counsel is set forth in the Labaton Fee and Expense Declaration, Exhibit 7 hereto, and the Hagens Berman Fee and Expense Declaration, Exhibit 8 hereto. Included with the declarations are schedules that summarize the time expended by the attorneys and professional support staff at the firms, as well as expenses ("Fee and Expense Schedules"). *See also* Exhibit 10 (Summary Table of Lodestars and Expenses). The Fee and Expense Schedules report each person's resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates, and their time broken down into different categories of work.

158.    Over the course of the Litigation, the hourly rates of Plaintiffs' Counsel here ranged from $1,050 to $1,450 per hour for partners, $825 to $1,025 per hour for of counsels, $400 to $700 for associates, $350 to $550 for staff attorneys and other attorneys, and $175 to $455 for paralegals. *See* Exs. 7 - A, 8 - A. These hourly rates are reasonable for this type of complex litigation. Exhibit 11, attached hereto, is a table of hourly rates for defense firms compiled by Lead Counsel from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2025. The analysis

shows that across all types of attorneys, Plaintiffs' Counsel's hourly rates here are consistent with, or lower than, the firms surveyed.

159. In total, Plaintiffs' Counsel have expended 8,275.9 hours on the investigation, prosecution, and resolution of the claims against Defendants representing a total lodestar of $4,693,636.00.[14] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 25% of the Settlement Fund (or $8,437,500, plus interest), if awarded, would yield a reasonable multiplier of approximately 1.8 on Plaintiffs' Counsel's lodestar, which is within the range of fee multipliers awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Memorandum, Section I.E.

### 5. Lead Plaintiffs' Endorsement of the Fee Application

160. Lead Plaintiffs have closely monitored and actively participated in the prosecution and settlement of the Action and have evaluated and fully support Lead Counsel's fee request. As set forth in their declarations (Exs. 1 and 2), Lead Plaintiffs have concluded that the requested fee has been earned based on the efforts of Plaintiffs' Counsel and the excellent recovery obtained for the Settlement Class in a difficult and challenging case. Accordingly, Lead Plaintiffs' endorsement of the fee request further demonstrates its reasonableness, and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

### B. Lead Counsel's Request for Litigation Expenses Warrants Approval

#### 1. Lead Counsel Seeks Payment of Reasonable and Necessary Litigation Expenses from the Settlement Fund

161. Lead Counsel seeks payment from the Settlement Fund of $265,418.12 for expenses that were reasonably and necessarily incurred in connection with the Action. The Postcard Notice and long-form notice inform the Settlement Class that

---

[14] Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing. No additional legal fees will be sought for this work.

---

Lead Counsel would be applying for payment of Litigation Expenses in an amount not to exceed $400,000, which may include a request for reimbursement of the reasonable costs and expenses (including lost wages) incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in accordance with 15 U.S.C. § 78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the amount requested by Lead Plaintiffs, is below the maximum set forth in the notices.

162. Plaintiffs' Counsel's expenses are detailed in the Labaton Fee and Expense Declaration and the Hagens Berman Fee and Expense Declaration. *See* Exs. 7 - C; 8 - C. As explained, the expenses incurred are reflected on the books and records maintained by the firms. These books and records were prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

163. From the inception of the Action, Lead Counsel was aware that Plaintiffs' Counsel might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved. Lead Counsel also understood that, even if the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Thus, we were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

164. Plaintiffs' Counsel's expenses include fees and costs for, among other things: (i) experts and consultants in connection with various stages of the litigation; (ii) mediation; (iii) litigation support related to electronic discovery; (iv) court fees and related expenses; (v) work-related travel; and (vi) online factual and legal research. Courts have consistently found that these types of expenses are payable from a fund recovered by counsel for the benefit of a class.

165. The largest component of Plaintiffs' Counsel's expenses (*i.e.*, $81,593.75, or approximately 31% of total expenses) was incurred for experts. Lead Counsel

retained economic experts and an accounting expert to provide analysis of the complex issues underlying the key elements of the Lead Plaintiffs' claims (loss causation, damages, falsity, and materiality) and Defendants' purported defenses (negative causation and falsity). One damages expert also prepared the proposed Plan of Allocation. These experts were essential to the prosecution of the Action. *See* Ex. 7 at ¶6(b)(i)-(ii).

166.   Lead Counsel also worked closely with potential witnesses who were cited in the Complaint. Lead Counsel retained individual counsel for these witnesses, incurring $45,385.02 (17% of total expenses) in expenses. *Id*. at ¶6(b)(iii). Lead Counsel also consulted with one of the witnesses given their familiarity with and expertise concerning the internal controls and accounting matters at issue in the Action, incurring $7,600 in expenses. *Id*. at ¶6(b)(iv).

167.   Another component of the expenses ($13,601.45, or approximately 5% of total expenses) was for document hosting and management related to electronic discovery. Lead Counsel retained third-party vendors to process and host documents produced in the Action. *Id*. at ¶6(d). Lead Counsel used these vendors and the Relativity Database to, among other things: (i) maintain potentially relevant documents collected from Lead Plaintiffs for review and production in response to Defendants' discovery demands, (ii) maintain the approximately 61,500 pages of documents produced in discovery; (iii) process documents so that they would be in a searchable format, including the conversion and upload of any hard copy documents; and (iv) apply data analysis tools to focus the review on the most significant documents to efficiently target information counsel needed to support their allegations.

168.   Lead Plaintiffs' share of the fees of the Mediator in connection with the mediation process totaled $45,852.50 or 17% of the total. *Id.* at ¶6(c).

169.   The Litigation Expenses also include approximately $20,413.81 (or 8% of the total) for work-related transportation expenses, meals, and lodging related to, among other things, working late hours and travel in connection with meetings with

potential witnesses, the mediation, and attending the final Settlement Hearing. (Any first-class airfare has been reduced to be comparable to economy rates.) *Id.* at ¶6(e).

170. The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in complex commercial litigation and routinely paid in non-contingent cases. These expenses include, among others, online legal and factual research, court and service fees, duplicating costs, and overnight delivery expenses. All of the Litigation Expenses incurred by Plaintiffs' Counsel were reasonable and necessary for the successful litigation of the Action.

### C. PSLRA Reimbursement to Lead Plaintiffs Is Fair and Reasonable

171. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Accordingly, Lead Plaintiff Boston Retirement seeks reimbursement of $2,307.50 and Lead Plaintiff Central Pennsylvania seeks reimbursement of $1,395.24 for the cost of the time they incurred in connection with their efforts on behalf of the Settlement Class. *See* Ex. 1, ¶¶8-10; Ex. 2, ¶¶8-10. Lead Plaintiffs were in regular contact with counsel, reviewed court filings and submitted declarations in support of motions, engaged in discovery, and consulted with counsel during the course of the mediation process and approved of the Settlement. *See* Ex. 1, ¶¶4-5; Ex. 2, ¶¶4-5. The General Counsel of Boston Retirement also attended the May 2025 mediation in New York. Ex. 1, ¶5. Lead Plaintiffs' efforts required them to devote time and resources to this Action that would otherwise have been devoted to their beneficiaries.

172. As discussed in the Fee and Expense Memorandum and in Lead Plaintiffs' supporting declarations, Lead Plaintiffs have been fully committed to pursuing the Settlement Class's claims. Lead Plaintiffs provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. The efforts expended by Lead Plaintiffs during the course of this Action, as set forth in their declarations, are

precisely the types of activities courts have found to support reimbursement to representatives, and fully support the request for reimbursement here.

## X.    CONCLUSION

173.   For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the requests for payment of Litigation Expenses in the amount of $265,418.12, plus interest, and reimbursement of Lead Plaintiffs' costs in the amount of $3,702.74 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 31st day of March, 2026.

_Lauren A. Ormsbee_

LAUREN A. ORMSBEE

# CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants only.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 31, 2026

/s/ *Lauren A. Ormsbee*
Lauren A. Ormsbee

**Mailing Information for a Case 3:23-cv-01546-L-DEB Vazquez v. Masimo Corporation et al.**

Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- Adam Marc Apton

aapton@zlk.com

- Marshall A. Camp

mcamp@hueston.com, docketing@hueston.com, mschneider@hueston.com

- Robert James Ellison

robert.ellison@lw.com, robert-ellison-6864@ecf.pacerpro.com

- James M. Fee

jfee@labaton.com, 7935099420@filings.docketbird.com, ElectronicCaseFiling@labaton.com

- Christine M. Fox

cfox@labaton.com, ndonlon@labaton.com, vvibar@labaton.com, ElectronicCaseFiling@labaton.com, kjudd@labaton.com, 6312349420@filings.docketbird.com

- Robert Matthew Garsson

robgarsson@quinnemanuel.com

- Lucas E. Gilmore

lucasg@hbsslaw.com, sf_filings@hbsslaw.com

- Matthew J. Grier

mgrier@labaton.com, ElectronicCaseFiling@labaton.com, 2099396420@filings.docketbird.com

- John Charles Hueston

jhueston@hueston.com, docketing@hueston.com, lhiles@hueston.com

- Harry Arthur Olivar, Jr.

harryolivar@quinnemanuel.com

- Lauren Amy Ormsbee

LOrmsbee@labaton.com, 4457202420@filings.docketbird.com

- Jennifer Pafiti

jpafiti@pomlaw.com, efile@pomlaw.com

- Jeffrey F. Robertson

jeffrey.robertson@srz.com, courtfilings@srz.com, evan.melluzzo@srz.com, ecf-1822127e5d6b@ecf.pacerpro.com

- Valerie Suzanne Roddy

valerieroddy@quinnemanuel.com, ecf-8cc00a9b9174@ecf.pacerpro.com, calendar@quinnemanuel.com

- David Saldamando

dsaldamando@labaton.com

- Lisa Marie Strejlau

lstrejlau@labaton.com

- Michael E. Swartz

michaelswartz@quinnemanuel.com, michael-swartz-3349@ecf.pacerpro.com

- Jonathan D. Uslaner

JonathanU@blbglaw.com, managingclerk@blbglaw.com

- Carol C. Villegas

cvillegas@labaton.com, 5739893420@filings.docketbird.com, electroniccasefiling@labaton.com

- Thomas A. Zaccaro

tzaccaro@hueston.com, mgreen@hueston.com

**Manual Notice List**

The following is the list of attorneys who are not on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

(No manual recipients)